1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  08-80459-CIV-MARRA/JOHNSON

MARIA TERESA OSORIO,

    Plaintiff,

vs.

UNITED STATES OF AMERICA and
CITY OF BOCA RATON, a Florida
municipal corporation,

    Defendants.              /

DEPOSITION OF
ROSAIRE BADGER

1900 Northwest Corporate Boulevard
Suite 215 West
Boca Raton, Florida
Monday, January 26, 2009
2:45 p.m. - 4:01 p.m.

   Taken before Lee M. Walker, Court Reporter and
Notary Public in and for the State of Florida at Large,
pursuant to Notice of Taking Deposition filed in the
above cause.

U.S. Legal Support
(561) 835-0220


EXHIBIT
A

**2**

```
1   The appearances at said time and place were as
2   follows:
3           ELLIS, GED & BODDEN, P.A.
        BY: JOHN F. BILLERA, ESQUIRE
4           7171 North Federal Highway
            Boca Raton, Florida 33487
5           (561) 995-1966
        Appearing on behalf of Plaintiff
6   WEISS, SEROTA, HELFMAN, PASTORIZA, COLE & BONISKE, P.L.
        BY: ARYE P. CORBETT, ESQUIRE
7           200 East Broward Boulevard, Suite 1900
            Fort Lauderdale, Florida 33301
8           (954) 763-4242
        Appearing on behalf of Defendant, CITY OF BOCA
9
        U.S. DEPARTMENT OF JUSTICE
10      BY: DAVID I. MELLINGER, ESQUIRE
        500 East Broward Boulevard, Suite 700
11          Fort Lauderdale, Florida 33394
            (954) 356-7355
12      Appearing on behalf of Defendant, UNITED STATES
13
            ALSO PRESENT:
14
            David Pedersen, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1       The deposition of ROSAIRE BADGER, a witness of
2   lawful age, taken for the purpose of discovery and for
3   use as evidence in the above-styled cause, pending in
4   the United States District Court, Southern District of
5   Florida, pursuant to notice, before Lee M. Walker, a
6   Notary Public in and for the State of Florida at Large,
7   at the time and place aforesaid.
8       ------------------
9           I N D E X
10          ROSAIRE BADGER
11
12  EXAMINATION                    PAGE
13  Direct by Mr. Billera ............... 5
14  Cross by Mr. Corbett ............... 47
15  Cross by Mr. Mellinger ............. 57
16  Redirect by Mr. Billera ............. 59
17
            EXHIBITS
18  IDENTIFIED                     PAGE
        Plaintiff's 1 ...................... 63
19      Plaintiff's 2 ...................... 67
20
21
22
23
24
25
```

**4**

```
1       THE VIDEOGRAPHER:  Today is Monday,
2   January 26th, 2009.  The time is 2:45 p.m. and
3   we're at U.S. Legal Support in Boca Raton, Florida.
4   And this is the deposition of Rosaire Badger from
5   the United States -- who is the United States postal
6   service investigator.  And that's in the case of
7   Maria Teresa Osorio, plaintiff, versus United States
8   of America and the City of Boca Raton, a Florida
9   municipal corporation, defendants.  The case number
10  is 08-80459-CIV-Marra/Johnson.
11      And the court reporter is Lee M. Walker from
12  U.S. Legal Support.  The videographer is David M.
13  Pedersen from DMP Video Productions, Inc. And will
14  counsel please announce their names for the record.
15      MR. BILLERA:  This is John Billera, attorney
16  for Maria Osorio.
17      MR. MELLINGER:  And David Mellinger, Assistant
18  U.S. Attorney, representing the United States of
19  America.
20      MR. CORBETT:  Arye Corbett from the law firm of
21  Weiss, Serota, Helfman, representing the City of
22  Boca Raton.
23  Thereupon,
24          ROSAIRE BADGER,
25  was called as a witness by the Plaintiff, and after
```

**5**

```
1   being first duly sworn, was examined and testified
2   under oath as follows:
3           DIRECT EXAMINATION
4   BY MR. BILLERA:
5       Q  Good afternoon, Mr. Badger.
6       A  Good afternoon.
7       Q  How you doing?  My name is John Billera.  I
8   represent Maria Osorio in this case.
9       Are you familiar with the case of Maria Osorio
10  who fell somewhere around a U.S. postal property?
11      A  I'm familiar with the case, yes.
12      Q  Good.  You've been listed as a witness with
13  knowledge in this case.  What knowledge do you have in
14  this case?
15      MR. MELLINGER:  If I could clarify that.  We
16  didn't list him as a witness in this case, and I
17  understand that that was a matter of some
18  correspondence that might have been an
19  understanding, but our initial disclosures do not
20  contain his name as a witness in this case.
21      MR. BILLERA:  Okay, then.  You may have been
22  listed by Boca, but you've been listed as a witness
23  who may be a witness in this case.
24  BY MR. BILLERA:
25      Q  What knowledge do you have of this case?
```

2 (Pages 2 to 5)

6

1   A   Well, any knowledge that I would have of this
2   case, would be work product because once I am informed
3   of the case, then anything that I do is in preparation
4   of litigation.
5   Q   Are you an attorney?
6   A   No, I'm not.
7   Q   Do you work under an attorney?
8   A   Yes.
9   Q   What attorney?
10   A   Mr. Mellinger.
11   Q   Outside counsel?
12   A   Yes.
13   Q   Okay.
14   A   And we also have a postal attorney.
15   Q   When did an attorney first get involved in this
16   case?
17   A   I believe it was February of '07.
18   Q.  When was your involvement first in this case?
19   A   February of '07.
20   Q   And I understand that you're claiming work
21   product over any knowledge you have in this case, but I
22   believe we're allowed to inquire in what investigation
23   you may have performed.
24       What investigation have you performed in this
25   case?

7

1   A   In regards to what?
2   Q   Anything regarding the case, how Maria Osorio's
3   accident occurred.
4   A   I really don't know how her accident occurred.
5   Q   Are you aware of any statements given by
6   Ms. Osorio.
7   A   Only information that would have been provided
8   to the postal service through your office.
9   Q   Do you have any statements from the City of Boca
10   Raton?
11   A   No, I do not, not that I know of.
12   Q   Did you take any photographs of the area where
13   the accident occurred?
14   A   Yes.
15   Q   How many photographs did you take?
16   A   I don't recall the number.
17   Q   Would it be more than 10?
18   A   Yes.
19   Q   When were those taken?
20   A   They were taken on a couple of occasions.
21   Q   When were they first taken?
22   A   That would have been -- the first set would have
23   been taken shortly after we were notified of the
24   action.
25   Q   And when was that?

8

1   A   I'm not sure, maybe June.
2   Q   June of what month -- of what year?
3   A   Of '07.
4   Q   So, when you said you first got involved in
5   February of '07 --
6   A   Correct.
7   Q   -- you were first notified of the legal action
8   in June of '07?
9   A   No.  In February of '07, we were notified that
10   Ms. Osorio was represented and that there would be
11   legal proceedings.
12   Q   So, then what was June '07?
13   A   That was -- would have been when I went to the
14   area to take photographs.
15   Q   Oh, okay.  And when's the next time you took
16   photographs?
17   A   I'm not sure, probably -- I believe it was after
18   the second submission from your office to the postal
19   service, so probably within a month of that.
20   Q   The second time you took photographs, the area
21   had changed from the first time; is that correct?
22   A   No.
23   Q   There hadn't been repairs done to the area?
24   A   That is correct, no repairs.
25   Q   Were there repairs done the first time you took

9

1   the photos?
2   A   What do you mean?
3   Q   Was there a pothole in the area when you first
4   took the photos --
5   A   No.
6   Q   -- in June of '07?
7   A   No.
8   Q   Had there been a patch to the area in June of
9   '07?
10   A   I wouldn't know that.
11   Q   You don't recall calling somebody from the City
12   of Boca Raton and saying someone patched the area, can
13   you tell us who did that?
14   A   I recall calling the City of Boca Raton to
15   inquire if there had been any repairs done in the
16   alleyway behind the post office, but that was -- that
17   was way after June, I believe.
18   Q   And when you went in June, could you identify
19   the area where Ms. Osorio was injured?
20   A   I didn't know where the area where she was
21   injured in June.
22   Q   Sitting here today, do you know where she was
23   injured?
24   A   No, I don't.
25   Q   Sitting here today, do you know where the

3 (Pages 6 to 9)

**10**

1  pothole was located that was involved in her injury?
2  A  I can say that from the photographs that were
3  submitted by your office I was able to locate an area
4  that I believe may have been the pothole in those
5  photographs.
6  Q  When were those photographs submitted by our
7  office?
8  A  I'm not sure, but it was -- I believe it was
9  after June.
10  Q  Before the first time you went over to take a
11  look?
12  A  After the first time. The first time, I had not
13  seen any photographs from your office.
14  Q  Okay. And then when you went back, had the area
15  changed between the first and the second time at all?
16  A  No.
17  Q  And when you went back, were you able to
18  identify where you believe the pothole was that was
19  involved in the accident?
20  A  From the photographs that were submitted by your
21  office, yes.
22  Q  And there was still either a pothole or some
23  repaired area that looked like it was the same as where
24  the pothole was?
25  A  Correct.

**11**

1  Q  But it was not still a pothole, correct?
2  A  Correct.
3  Q  And it was not still a pothole in June --
4  A  Correct.
5  Q  -- 2007? Okay.
6       And how are you able to identify the area where
7  the pothole was in June '07, and I guess that would be
8  February '08?
9  A  Okay. February '08?
10  Q  I'm sorry, when's the second time you went back?
11  A  It would have been after your second submission,
12  so that might have been around -- I'm not positive on
13  the date.
14  Q  I'm sorry?
15  A  It was later that year.
16  Q  So, some time later '07?
17  A  Correct.
18  Q  How were you able to identify the area in
19  June '07 that was the same area you saw later in '07?
20  A  Okay. First of all --
21       MR. MELLINGER: Objection as to form.
22  BY MR. BILLERA:
23  Q  You can answer.
24  A  First of all in June of '07, I had not seen any
25  pictures from your office.

**12**

1  Q  Right.
2  A  So, I photographed the whole area.
3  Q  Right.
4  A  I did not know any potholes, other than an
5  indentation in the Boca municipal lot on the east side
6  of the post office near the drain. Okay? It wasn't
7  until the second submission from your office that
8  included photographs, and I believe -- I don't even
9  think those were sent directly to me. I think those
10  were sent to our law department, and they forwarded
11  them down to me.
12       From those photographs, I was able to look at
13  those photographs and get an idea of where that
14  particular area was. I went back to Boca to look for
15  that, and I was able to ascertain that there was an
16  area that appeared to be patched. And it was in the
17  same shape and the general location that was in the
18  photographs.
19  Q  Okay. And just to be clear, there were no other
20  areas that were in question, it was really only one
21  area that match matched it, correct, or were there
22  other areas that matched it?
23  A  Well, I mean, from the photographs that were
24  submitted, I felt that that was the area that was
25  reflective in the photographs that were submitted.

**13**

1  Q  And you had taken photos of that same area in
2  June '07, you just weren't sure that was the area, and
3  later you went back and photographed the same area
4  again?
5  A  I believe there's some general photographs of
6  that area, yes.
7  Q  From June '07?
8  A  Correct.
9  Q  And then later you took specific photos of that
10  area?
11  A  I believe so, yes.
12  Q  Do you know how many photos you took in the
13  second set when you kind of knew where the area was?
14  A  No, I don't.
15  Q  Was that more than 10?
16  A  Well, first of all, I didn't know where the area
17  was. Okay? I still don't know where the area is. I'm
18  just going by the evidence in the photograph, trying to
19  match it up to an area in a parking lot --
20  Q  And --
21  A  -- to the alleyway.
22  Q  And those photos were taken by you in
23  anticipation of litigation?
24  A  Correct.
25  Q  Did you review those photographs before this

4 (Pages 10 to 13)

|  | 14 |
|---|---|
| 1 | deposition today? |
| 2 | A  No. |
| 3 | Q  What did you review in anticipation of or |
| 4 | preparation for this deposition today? |
| 5 | A  Just the initial date of the notification from |
| 6 | your office which was February of '07. |
| 7 | Q  Anything else? |
| 8 | A  No. |
| 9 | Q  Have you created an incident or accident report |
| 10 | in this case? |
| 11 | A  I have created documentation in this case, yes. |
| 12 | Q  What documentation have you created? |
| 13 | A  A report to our attorneys. |
| 14 | Q  Anything else? |
| 15 | A  Nope. |
| 16 | Q  When was that report created? |
| 17 | A  That would have been probably around the time of |
| 18 | my first visit to Boca and probably around June. |
| 19 | Q  Did you identify any witnesses at that time? |
| 20 | A  No. |
| 21 | Q  Have you identified any witnesses to date to the |
| 22 | accident? |
| 23 | A  No. |
| 24 | Q  Do you know if there's any surveillance |
| 25 | conducted by the post office or anybody of the area |

|  | 15 |
|---|---|
| 1 | where the accident occurred? |
| 2 | A  No. |
| 3 | Q  How many pages was the report that you prepared |
| 4 | to the attorneys? |
| 5 | A  I'm not sure.  It would be probably less than |
| 6 | five. |
| 7 | Q  Is it on a specific form? |
| 8 | A  No. |
| 9 | Q  So, is it like raw notes or a memo or an e-mail? |
| 10 | A  There's an investigative report.  There is -- |
| 11 | correction, there is a form that I fill out. |
| 12 | Q  What is that form called? |
| 13 | A  It is called -- I believe it's called an |
| 14 | accident report. |
| 15 | Q  Is that a post office governmental form? |
| 16 | A  Yes.  It's a PS form 1700. |
| 17 | Q  And what general categories are on that form? |
| 18 | A  It's information pertaining to the incident. |
| 19 | Q  So, there would be a category as to location of |
| 20 | incident, time of incident? |
| 21 | A  It would be a general location.  It wouldn't be |
| 22 | a specific location; in other words, it would give a |
| 23 | city, ZIP code. |
| 24 | Q  Okay.  Time of incident? |
| 25 | A  (Nods head.) |

|  | 16 |
|---|---|
| 1 | Q  There would be a section for any known |
| 2 | witnesses? |
| 3 | A  Well, the -- you have to understand, the report |
| 4 | would be based upon what was submitted by your office. |
| 5 | Q  Does that incident report contain any subjective |
| 6 | impressions by yourself of the accident? |
| 7 | A  The form, no; my investigative report, yes. |
| 8 | Q  Okay.  Is that on a separate section? |
| 9 | A  That's on a separate sheet. |
| 10 | Q  Your subjective impressions? |
| 11 | A  If you want to call it that, yes. |
| 12 | Q  Your opinion of what happened? |
| 13 | A  Correct. |
| 14 | Q  So, that's on a separate sheet from what -- is |
| 15 | there a sheet for the facts that you gather on your |
| 16 | report? |
| 17 | A  No.  There's the 1700, which we had discussed |
| 18 | and then my investigative report. |
| 19 | Q  Oh, okay.  What's the difference between the |
| 20 | two?  What's the 1700? |
| 21 | A  One is a form and one is a -- |
| 22 | Q  Like a narrative? |
| 23 | A  Yes. |
| 24 | Q  So, what's filled out on the 1700?  How is that |
| 25 | different than just your narrative? |

|  | 17 |
|---|---|
| 1 | A  Basically the form gives the approximate time |
| 2 | and place as it is reported, and that's about it, |
| 3 | location.  It's not a very specific form, if that's |
| 4 | what you're asking. |
| 5 | Q  What is your title with the U.S. post office? |
| 6 | A  It's accident investigator, claims coordinator. |
| 7 | Q  How long have you been with the U.S. post |
| 8 | office? |
| 9 | A  Approximately 23 years. |
| 10 | Q  And how long have you been an accident |
| 11 | investigator, slash -- |
| 12 | A  Since 1988. |
| 13 | Q  Coordinator? |
| 14 | And have you always been stationed in this area? |
| 15 | A  Yes. |
| 16 | Q  Who is your supervisor? |
| 17 | A  I report to Orlando. |
| 18 | Q  Is there a certain person or department? |
| 19 | A  Yes.  Dennis McDonald. |
| 20 | Q  What's his title? |
| 21 | A  Tort claims coordinator. |
| 22 | Q  And do you have staff working under you? |
| 23 | A  No. |
| 24 | Q  What is the territory you're assigned to? |
| 25 | A  I cover from Deerfield Beach on the south end to |

5 (Pages 14 to 17)

18

1  Fort Pierce on the north end to Lake Okeechobee on the
2  west end, which includes Clewiston.
3      Q   And as part of your duties as an accident
4  investigator is to investigate accidents of alleged
5  slip and falls, trip and falls on post office property?
6      A   No.  My job as an investigator is to investigate
7  cases where there is going to be possible or known
8  litigation.
9      Q   So, what happens to an accident where someone's
10  hurt on post office property, but there's no known
11  litigation at that point?  Is there a different
12  department that investigates that?
13      A   No.  The individual office would, you know,
14  write up something on that and submit it.
15      Q   What would they write up?  Is there a form that
16  they have to submit?
17      A   Yeah.  It's a PS1700, accident form.
18      Q   And are you familiar with who the person at the
19  post office which is alleged to have been involved in
20  this accident, who the person here would be that would
21  have submitted a PS1700 in this case?
22      A   No.
23      Q   Do you know what their title would be?
24      A   Well, it would either be a supervisor or a
25  manager.

19

1      Q   And is there some sort of safety manual or
2  safety policies and procedures that says, whenever
3  there's an accident on post office property you got to
4  write it up?
5      A   I believe there is, yes.
6      Q   What's that called?
7      A   It's a good question.  I really -- I don't get
8  involved in the safety end of it, so...strictly be
9  speculation on my part.
10      Q   But are you familiar with what the policy is
11  regarding any accident occurring on post office
12  property?
13      A   They're supposed to report it, yes.
14      Q   But you don't know where that duty to report it
15  comes from, like from any particular manual or
16  anything?
17      A   I don't know the name of the manual, no.
18      Q   And do you know if there's any kind of
19  inspection policy or inspection procedures on post
20  office property regarding unsafe conditions?
21      A   I wouldn't have any direct knowledge of that.
22      Q   Do you know who would?
23      A   That would be safety.
24      Q   Is there a safety manager or coordinator for
25  each post office?

20

1      A   No.  There's a safety coordinator at the
2  district level.
3      Q   Is that someone that you worked with?
4      A   No.
5      Q   Do you do any kind of quality control reports or
6  corrective action reports or anything like that?
7      A   No, I do not.
8      Q   And you don't fill out any forms that state root
9  causes for any particular accidents that are submitted
10  to the post office?
11      A   Explain what you mean.
12      Q   A root cause analysis pursuant to a quality
13  management system?
14      A   No, I'm not -- I'm not in that function.
15      Q   Do you know anyone that is?
16      A   It would be probably the safety department,
17  because they deal with the OSHA.
18      Q   But the safety department is at a district
19  level?
20      A   Correct.
21      Q   And that district would be what, all South
22  Florida or something?
23      A   It would be considered Central Florida District,
24  they're based out of mid-Florida, Florida.
25      Q   For Boca?

21

1      A   Yeah.  I believe they cover down to the Broward
2  line.
3      Q   Okay.  Do you know who the head of that is, the
4  safety coordinator?
5      A   I'm not sure who's up there now.
6      Q   And do you have a policy and procedure manual on
7  how to fill out accident reports, what to look for,
8  that kind of stuff?
9      A   Yes.
10      Q   What's that called?
11      A   It's called a 702.
12      Q   And that's a manual of what they wanted in your
13  accident reports?
14      A   No.  It's -- yeah, basically, yes.
15      Q   And what kind of items are supposed to be
16  included in the accident reports?
17      A   Well, it would be time, date, place, the who,
18  what, where, why, and how.
19      Q   As part of your investigation, did you try to
20  find out who owned the property where the -- Ms. Osorio
21  was injured?
22      A   I don't know where she was injured for sure.
23      Q   It was somewhere in that alleyway; is that
24  correct?
25      A   I really don't know.  I mean, I've been given an

U.S. Legal Support
(561) 835-0220

22

1  alleged place, but as far as I know, it was never
2  reported to us. So, I really don't know where it
3  happened.
4      Q   Did you ever talk to anyone from the bank?
5      A   Yes.
6      Q   And did they deny that she came in injured and
7  that they called an ambulance for her?
8      A   No.
9      Q   Did they tell you that?
10     A   Yes.
11     Q   So, do you have any reason to believe that she
12 was not injured on the date in question?
13     A   No, but as far as location goes.
14     Q   But you have no reason to believe that this
15 accident did not occur, correct?
16     A   I have no definitive proof that it occurred.
17     Q   Who did you talk to at the bank?
18     A   I believe it was the manager.
19     Q   Do you remember who that was?
20     A   No.
21     Q   What did the manager tell you?
22     A   He just said that a lady had come in, and I
23 don't recall he even knew the exact date, and reported
24 that she had fallen and he offered assistance.
25     Q   And she was apparently injured?

23

1      A   She said she was, I guess.
2      Q   And that's what he offered her assistance for
3  being injured?
4      A   That's what he said.
5      Q   Not assistance for money or to give her a drive
6  somewhere because she was injured, that's what you
7  understood offered assistance related to?
8      A   Correct.
9      Q   Okay. Do you have any reason to doubt that the
10 accident occurred in the area where you identified the
11 former pothole to be?
12         MR. MELLINGER: Objection, calls for
13     speculation.
14 BY MR. BILLERA:
15     Q   You can answer.
16     A   I have no evidence as to where she fell.
17     Q   But you have no reason to disbelieve that she
18 fell where you found there to be --
19     A   Nor do I have a reason to believe.
20     Q   But the question is: You don't have any reason
21 to disbelieve that she fell where the pothole is that
22 was repaired; is that correct?
23     A   If you put it that way, correct.
24     Q   And but your belief is that is not post office
25 property, correct?

24

1      A   Correct.
2      Q   Do you know whose property that is?
3      A   No idea.
4      Q   You don't know if that's owned by Boca Raton or
5  a private person, correct?
6      A   Correct.
7      Q   Did you ever do any investigation to find out
8  who owned the alleyway?
9      A   Yes.
10     Q   And who owned it?
11     A   I believe it is the City of Boca.
12     Q   What gives you that belief?
13     A   The plat.
14     Q   So, you reviewed a plat that said the City of
15 Boca owned it?
16     A   I was sent a copy of the plat by the City of
17 Boca.
18     Q   Was that plat dated 1914?
19     A   It was dated a long time ago, yes.
20     Q   And other than reading the plat, did anything
21 else indicate to you that it was owned by the City of
22 Boca?
23     A   No.
24     Q   Were you -- do you recall receiving photographs
25 taken by personnel on behalf of the City of Boca of the

25

1  area where the accident occurred?
2      A   I'm not sure what you're asking.
3      Q   Did you ever get this photograph, it's in black
4  and white, from Mike Roberts?
5      A   He never sent this to me.
6      Q   Do you remember ever getting any photographs
7  from Mike Roberts?
8      A   No.
9      Q   This photograph or this one, and I know you said
10 he didn't send you, so I imagine he didn't send you any
11 of them, but I'm just showing you in case they refresh
12 your recollection.
13     A   No.
14     Q   Have you ever seen these photographs before?
15     A   I may have.
16     Q   Do those look different than the photos that you
17 took?
18     A   Do they look different than the photos I took,
19 yes.
20     Q   As to the condition?
21     A   I really can't see the condition that well here,
22 but -- and I don't know when these photos were taken.
23     Q   They were taken, you could assume, November 29,
24 2007, according to Mr. Roberts' testimony.
25     A   Okay. That could very well be.

U.S. Legal Support
(561) 835-0220

26

1   Q  Do you see any differences there from the
2   photographs you took as to the condition -- the way the
3   accident occurred or can you not tell?
4   A  No, I can't tell, not from these.
5   Q  Does this look like the area, and I'm going to
6   show you what was marked as Roberts Exhibit 1 and 9,
7   does this look like the area that had been patched in
8   later or can you tell from it?
9   A  I can't tell from this one.
10  Q  Can you identify what's alleyway and what's
11  parking lot there?
12  A  Not in this photo.
13  Q  But you can identify it in the photos that you
14  took?
15  A  Well, it might be the quality of this
16  photograph, but there's not enough in the background to
17  give a good location.
18  Q  What would you need in the background to be able
19  to tell?
20  A  Reference with a building would be helpful.
21  Yup, that would be helpful.
22  Q  Let me show you what's been marked as Roberts 8.
23  Does the area depicted in there look similar to
24  the area that you later saw that was patched?
25  A  The area looks similar; however, when I was

27

1   there, there was no water.  There was no standing
2   water, so I can't tell.
3   Q  If you assume that this area in this picture is
4   the same, there would be testimony to that effect in
5   Exhibit 10 --
6   A  Uh-huh.
7   Q  -- and this is approximately 38 inches wide,
8   does that look like the area that was patched?
9   A  Let me see.
10  MR. MELLINGER:  And I'm going to object, calls
11  for speculation, and calls for an opinion and mental
12  impressions of this witness that really relate to
13  work product.
14  MR. BILLERA:  If he's not going to testify at
15  all regarding anything about this accident, that's
16  fine.  But if he's going to get up and testify, you
17  know, as to his investigation at trial, we get to
18  ask about it.  If he's not going to testify as to
19  his investigation at trial, then I won't ask about
20  it, but I'll move to strike it later, which is it?
21  Is he going to testify regarding his investigation
22  at trial?
23  MR. MELLINGER:  I don't know what phase of his
24  investigation, if any, he will be testifying about.
25  MR. BILLERA:  Well, none that you object to

28

1   here and you don't get to question him and later you
2   try to introduce it.  So, I mean, I don't know if
3   you're instructing him not to answer, but the
4   question is:  Does that look like the area you later
5   saw patched?  Is it the same in shape and size, or
6   was there some different area that you saw patched?
7   THE WITNESS:  It would be in the general
8   location.  But like I said, these pictures do not
9   depict what I saw when I was down there.
10  BY MR. BILLERA:
11  Q  Right, you saw no standing water?
12  A  Correct.
13  Q  You didn't see a pothole?
14  A  Correct.
15  Q  You saw a repair to the road, whatever that was,
16  correct?
17  A  I did see some repairs in the area, correct.
18  Q  Did you see any other large patches in the area
19  like other potholes?
20  A  There was patches all over the alley.
21  Q  How about in the parking lot?
22  A  I didn't notice any in the parking lot.
23  Q  In looking at this, can you tell in Exhibit 8 if
24  that looks like a similar area to where you saw the
25  patch?  Is that on post office property, or is that in

29

1   the alleyway?
2   A  That, I couldn't tell you from this photo.
3   Q  Could you tell from your examination of the area
4   where the patch you saw was located?
5   A  No, I could not.  I was not able to ascertain
6   the patch.
7   Q  Looking at the patch, you couldn't tell -- when
8   you were there and looking at the patch, you couldn't
9   tell if that was on post office property or in the
10  alleyway, correct?
11  A  That's correct.
12  Q  And are you -- do you have any training in
13  reading surveys or plats or maps?
14  A  To a certain extent.
15  Q  What training do you have?
16  A  Other than being able to read measurements and
17  look at a plat, I mean, I don't know -- specific
18  training, no.
19  Q  So, you've read plats and surveys?
20  A  Yes.
21  Q  But you've had no training in reading them?
22  A  Correct.
23  Q  Do you know how far beyond the property line,
24  meaning to the south of the property line or -- I'm
25  sorry.

8 (Pages 26 to 29)

**U.S. Legal Support**
**(561) 835-0220**



30

1    Do you know how far the property line extends to
2  the south of the building at the post office?
3    A  No.
4    Q  Did you talk to any other persons other than the
5  bank manager and the people from the City of Boca,
6  Mr. Roberts, regarding your investigation of this
7  accident? I'm not including your counsel or people in
8  the post office. Any outside witnesses?
9    A  No.
10   Q  Are you familiar with roof runoff drains on the
11 building of the U.S. post office building?
12   A  Familiar in what respect?
13   Q  Do you know where they're located, what they're
14 for, and how they're irrigated?
15   A  Nope.
16   Q  Do you know where they're located?
17   A  No, I don't.
18   Q  Do you know how the post office gets rid of
19 water running off from the roof?
20   A  No, I do not.
21   Q  Do you know if there is any provision for
22 drainage in the post office's parking lot?
23   A  I couldn't tell you that either.
24   Q  I want to show you what was marked as Roberts 4
25 and ask if that's the plat that you saw.

31

1    A  That appears to be what I saw.
2    Q  You don't recall seeing any different plat?
3    A  Not that he sent me, no.
4    Q  What other plat did you see?
5    A  Offhand, I don't recall.
6    Q  Do you recall calling Mr. Badger [sic] from the
7  City of Boca Raton and asking if the city had repaired
8  the area of the accident?
9        MR. MELLINGER:  Objection as to form.  He's
10 Mr. Badger.
11 BY MR. BILLERA:
12   Q  I'm sorry.  Excuse me, sir.
13       Do you recall calling Mr. Roberts asking if the
14 City of Boca Raton had affected repairs to the area?
15   A  I called the City of Boca, and I believe it was
16 Mr. Roberts that I spoke to.
17   Q  What did he tell you?
18   A  I just asked if there had been any -- if the
19 city had made any repairs in the alleyway between such
20 a street and such and such a street, which is behind
21 the post office.
22   Q  What did he say?
23   A  He said he didn't know, he'd get back to me.  He
24 got back to me and he said he couldn't find any work
25 orders.

32

1    Q  Did you ever, in any of your investigation, find
2  out who made the repairs to the area?
3    A  No.
4    Q  Did you check to see if the post office made the
5  repair?
6    A  Yes.
7    Q  And did you determine they didn't make the
8  repair?
9    A  Correct.
10   Q  Do you know of any other accidents involving
11 potholes at that location of the U.S. Post Office?
12   A  No, I do not.
13   Q  Do you know of any other trip and fall accidents
14 on the exterior of the U.S. Post Office in that area
15 for the past five years?
16       MR. MELLINGER:  I'm going to object.  The court
17 issued a protective order with regard to questions
18 that would be posed to a 30B6 deposition witness,
19 and that protective order is still in force.
20       MR. BILLERA:  Sure.
21       MR. MELLINGER:  And that line of questioning
22 was among the areas that were attached to the
23 deposition that you intended to get in with a 30B6
24 witness.  So, I would object to any lines of
25 questioning that would be going to a 30B6 witness at

33

1  this time.
2        MR. BILLERA:  You can object all you want.  I
3  think the case law is clear.
4        MR. MELLINGER:  The court issued an order
5  saying you couldn't take that deposition.  That's
6  what I'm saying.
7        MR. BILLERA:  I'm not taking the 30B6
8  deposition.  The case law is clear that even if you
9  have a 30B6, you can ask questions beyond the scope
10 of the 30B6 and you can inquire into the individual
11 knowledge of the person, and that's not subject to
12 the 30B6.
13       MR. MELLINGER:  There's a protective order in
14 place, that's all I'm saying.
15       MR. BILLERA:  There's no protective order in
16 place regarding this witness.  Is he your 30B6
17 deponent?
18       MR. MELLINGER:  There's a protective order in
19 place with respect to the 30B6 witness, and this is
20 an area of questioning that would be covered by your
21 30B6 witness, according to your written submission.
22       MR. BILLERA:  Right.  But I can still ask this
23 witness his individual knowledge, not corporate
24 knowledge, not governmental knowledge, and not a
25 question that would be binding on the company or the

9 (Pages 30 to 33)

34

1  corporation or the governmental entity; however, if
2  he has knowledge of -- particular as to other
3  accidents, I think I'm allowed to inquire into them.
4  Whether that's binding on you is doubtful
5  considering this is not a 30B6 and you've made it
6  clear he's not the 30B6 deponent. I believe I can
7  ask him if he knows of other accidents, which he
8  probably doesn't.
9      MR. MELLINGER: He probably doesn't.
10     MR. BILLERA: Do you want to ask him first and
11  then maybe we dont' have to file the motion?
12     MR. MELLINGER: If you can answer the
13  question --
14     THE WITNESS: I don't know of any.
15  BY MR. BILLERA:
16     Q  Okay. What do you do when you create your
17  report? Do you give it to the U.S. attorney and is
18  there someone at the post office that also keeps that,
19  like risk?
20     A  No. I deal directly with the postal law
21  department and they, in turn, deal with Mr. -- the
22  Department of Justice and as the case agent, I work
23  with both sets of attorneys. So, I report directly to
24  the law department as far as my reports.
25     Q  But do you have something that you have access

35

1  to to check if there's been -- I am not asking if
2  there's been, but a database or other program to check
3  if there's been other accidents in that area?
4      A  I believe there is a database, yes.
5      Q  What is that database called?
6      A  I think it's called the tort claims database.
7      Q  And that's searchable by area and by kind of
8  accident and by kind of injuries?
9      A  I believe so, yes.
10     Q  And who's the person that, if we were to ask the
11  company or, I'm sorry, the agency, you know, have you
12  had any other trip and falls in that area, who's the
13  person or the department, or the title of the person
14  that would answer that, do you know?
15     A  It would be anybody that has access to that
16  program.
17     Q  So, that would be probably someone in risk?
18     A  No, it would be somebody in the tort area.
19     Q  Tort area.
20     A  The law department could look that up for you.
21     Q  And have you ever spoken to any kind of expert
22  regarding, you know, the location of the accident and
23  on whose property it was?
24     A  No.
25     Q  Did you ever review a survey of the property, as

36

1  opposed to the plat?
2      A  I believe I did look at one, yes.
3      Q  When did you look at the survey?
4      A  I don't know. It would have been some time
5  around the end of last year.
6      Q  When you looked at that survey, were you able to
7  tell where the plaintiff's accident occurred?
8      A  No.
9      Q  If you were to look at your photographs that you
10  took in February -- I'm sorry, in June '07 and later,
11  and compare those to either a satellite map or a
12  survey, do you think you could pinpoint where the patch
13  was that you found?
14     A  I don't know. I'd have to look.
15     Q  But you took those in relation to the buildings
16  and everything else, so you could find it later,
17  correct? You have to answer out loud.
18     A  Yes.
19     Q  And those photos were provided to the law
20  department?
21     A  Correct.
22     Q  Do you keep a copy of the photos?
23     A  No.
24     Q  Does anyone else get a copy of the photos?
25     A  Whoever the law department designates.

37

1      Q  Okay. But you, yourself, don't copy other
2  agencies or any persons?
3      A  No, I do not.
4      Q  Have you conducted any surveillance of
5  Ms. Osorio?
6      A  I have not.
7      Q  Do you know of any?
8      A  No, I do not.
9      Q  The photographs that you took, were they on a
10  digital camera?
11     A  I'm not sure, because that was when we were kind
12  of transitioning. So, it would either have been
13  35-millimeter or digital.
14     Q  If it's digital, how are the photos thereafter
15  stored? Is it stored on hard disk somewhere?
16     A  I believe the CD is generated and then sent to
17  the law department.
18     Q  And if it's a 35-millimeter film, the negatives
19  would be sent to the law department?
20     A  Correct.
21     Q  Okay. You said you filled out one incident or
22  accident report plus your own subjective narrative in
23  around June '07. Did you ever make any supplements to
24  that?
25     A  I don't recall offhand. I don't believe I did,

10  (Pages 34 to 37)

38

```
 1   other than the photographs.
 2      Q   Did you make any diagrams at the same time you
 3   made the photographs?
 4      A   No.
 5      Q   You don't have any diagrams as part of your
 6   incident report?
 7      A   Correct.
 8      Q   Did anyone accompany you on your investigation
 9   into that area at the time?
10      A   No.
11      Q   Did you have any contact with anyone from Boca,
12   other than Mr. Roberts?
13      A   I believe there was another person that answered
14   the phone, but he didn't give his name or anything.  He
15   didn't give me any information if that's what you want
16   to know.
17      Q   Did you come to learn as between the post
18   office, who apparently leases the property, and the
19   Sedlaks, who apparently owned the property, who was
20   supposed to take care of any problems on the property?
21      A   I was not able to ascertain that.
22      Q   And are you aware of any system that the post
23   office has if there's a complaint called in that
24   there's a problem on the property somewhere, that
25   there's a pothole or there's a broken step or anything
```

40

```
 1   you know what the procedure is for the post office to
 2   get that fixed?
 3      A   No, I don't.
 4      Q   Is there anywhere at the post office that has
 5   knowledge superior to yours as to where this accident
 6   occurred that you know of?
 7      A   Not that I know of.
 8      Q   Do you know who would -- do you know William
 9   Glenn from the post office?
10      A   I believe he's a paralegal in the law
11   department.
12      Q   A tort claims examiner, adjudicator?
13      A   Yeah, a paralegal in the law department.
14      Q   He's not an attorney?
15      A   Correct.
16      Q   Did you ever go with him to investigate the
17   accident to go on site?
18      A   No, sir.  He's in St. Louis.
19      Q   So, as far as you know, he never went to
20   investigate the accident site?
21      A   I have no knowledge of that.
22      Q   Do you know where the information comes from
23   that the property in which the plaintiff claims to have
24   fallen is owned by the City of Boca Raton?
25          MR. MELLINGER:  Just a minute.
```

39

```
 1   like that?
 2      A   I'm not aware of any particular procedure, but
 3   I've -- you know.
 4      Q   Do you know who would get --
 5      A   I'm sure --
 6      Q   I'm sorry, who would get those complaints?
 7      A   It depends on what it is, I mean, if it's a
 8   safety hazard, then there are, you know, safety hazard
 9   forms that they fill out that goes to the safety
10   department from what I understand.
11      Q   Who would fill it out; the complainer or the
12   post office itself?
13      A   It would be the post office.
14      Q   Safety hazard form, do you know the number of
15   that one?
16      A   No, I don't.  I really don't get involved in the
17   safety end of it.
18      Q   Okay.  But just for informational purposes, the
19   safety hazard form is filled out by someone on the
20   property, and then they send it off to the district
21   safety department?
22      A   Correct.
23      Q   If there is a big dangerous pothole,
24   hypothetically, in the middle of the post office
25   parking lot as opposed to somewhere near the alley, do
```

41

```
 1          THE WITNESS:  Okay.  Go ahead.  I'm sorry.
 2   BY MR. BILLERA:
 3      Q   Do you know where the information came from that
 4   the property on which the plaintiff claims to have been
 5   injured was not owned by the post office, but was owned
 6   by the City of Boca Raton?
 7      A   Not offhand.
 8      Q   But that doesn't come from you?
 9      A   No, that wouldn't come from me.
10      Q   Did you have any involvement in investigating
11   this claim that we haven't talked about so far?
12      A   I wouldn't have any idea how to answer that.
13      Q   Did you talk to any other witnesses?
14      A   Other than what we talked about, no.
15      Q   Did you visit any other scenes or sites or visit
16   this site any more than the times we talked about?
17      A   I believe it was two times.
18      Q   And one of those times you weren't -- you didn't
19   have the photographs from us, so you went and looked at
20   the other end of the parking lot as well?
21      A   (Nods head.)
22      Q   Did you see anything that looked like the area
23   where she claims to have been injured on the other side
24   of the parking lot?
25      A   Well, when I received the information on the
```

11  (Pages 38 to 41)

**42**

1  claim, it said a pothole.  When I first went to Boca to
2  do my investigation, like I said earlier today, there
3  was an indentation by the drain in the Boca municipal
4  lot on the east side of the postal facility --
5  **Q  Okay.**
6  A  -- which I took a photograph of because that's
7  the only thing I could see that would have presented a
8  trip and fall hazard.
9  **Q  But you knew that was seven months after the**
10 **accident, right?  You had a date of incident of**
11 **December 5, '06.**
12 A  I don't think it was seven months.  It was like
13 in -- yeah, it would have been seven months, wouldn't
14 it?  Yeah.
15 **Q  And then you also went on the other side, looked**
16 **around, and you saw that there had been a patch?**
17 A  Yeah, I walked around the whole building, right.
18 **Q  Other than the indent and the patch, did you see**
19 **any other areas that you thought would be involved?**
20 A  I didn't see a patch on the first -- I wasn't
21 looking for a patch on the first one.  I was looking
22 for a pothole.
23 **Q  Oh, okay.**
24 A  And the only thing that I found that resembled
25 that was the indentation on the east lot.

**43**

1  **Q  So, you did not photograph a patch in your first**
2  **time going around the building?**
3  A  I photographed -- I believe I photographed the
4  parking lot, but I had no knowledge of any patch or
5  pothole at that time for that area, because there was
6  none there, that I saw.
7  **Q  And then, later, you were given photographs**
8  **showing what she alleged to be the incident area,**
9  **correct?**
10 A  Correct.
11 **Q  Did you ever go back and compare the photos you**
12 **took in June to see if you depicted that area?**
13 A  No.
14 **Q  So, sitting here, you don't know?**
15 A  Those had already been sent up to the law
16 department.
17 **Q  So, you don't know if they depict the area or**
18 **not?**
19 A  Correct.
20 **Q  You weren't particularly looking in that area?**
21 A  Correct.
22 **Q  But you took everything and you might have taken**
23 **it?**
24 A  Yes.
25 **Q  The second time you went, did you focus on that**

**44**

1  **area?**
2  A  On the area that was depicted in the
3  photographs, correct.
4  **Q  And sitting here today, do you recall if, in**
5  **June, there was a patch in that area?**
6  A  I don't recall.  I can only tell you there
7  wasn't a pothole.
8  **Q  At the time you went?**
9  A  Correct.
10 **Q  Did you ever learn the identities of any people**
11 **working at the post office who had any knowledge of**
12 **this accident or of the condition that she alleges hurt**
13 **her?**
14 A  To the best of my knowledge, no one knew of the
15 incident or of the pothole.
16 **Q  Did you interview any of the post office**
17 **drivers?**
18 A  No.
19 **Q  I see why they would have to drive through that**
20 **every once in awhile.**
21 A  Uh-huh.
22 **Q  Do you recall who you interviewed in-house at**
23 **that post office to see if they knew anything about it?**
24 A  I believe I talked to the station manager at the
25 time.  She's no longer there.  I believe she retired.

**45**

1  **Q  Do you remember her name?**
2  A  No, I don't, not offhand.  And then I spoke to a
3  supervisor down there.
4  **Q  Is that a man or a woman?**
5  A  It was a woman.
6  **Q  Do you know her name?**
7  A  I believe it was Lorraine.  I don't recall her
8  last name.
9  **Q  Is she still there?**
10 A  I'm not sure.
11 **Q  Did you speak to anyone else within the post**
12 **office that had knowledge of the accident or that**
13 **didn't have knowledge of the accident?**
14 A  Not that I recall.  That would have been it.
15 **Q  Are there any other stores around where that**
16 **accident is?  I know there's a bank across the street,**
17 **there's the post office.  Did you canvass anywhere else**
18 **to see if anyone saw anything?**
19 A  No, because of the length of time.
20 **Q  And sitting here today, you don't have any**
21 **evidence or any knowledge, you haven't gathered any**
22 **facts that would indicate Ms. Osorio did not fall in**
23 **the pothole as she described on the date, correct?**
24 A  I'm not sure how you're asking that.
25 **Q  Sure.  Ms. Osorio stated that she walked across**

12  (Pages 42 to 45)

46

1  this parking lot, stepped in this pothole, and got
2  severely injured --
3      A  Okay.
4      Q  -- on December 5th, 2006.
5      Do you have -- have you gained any knowledge or
6  seen any facts or evidence that would say that's not
7  true?
8      A  No, nor have I seen any that would say it was
9  true.
10     Q  Other than the bank manager confirmed that a
11  lady came in hurt, correct?
12     A  Correct.
13     Q  And other than you saw a patch in the area where
14  she said the pothole occurred, correct?
15     A  Well, I saw a patch in the area that was in the
16  photographs that were provided.  I've never talked to
17  Ms. Osorio.  So, she's never -- nobody's ever pointed
18  out to me, you know, where this occurred or anything.
19     Q  Okay.  And I'm not trying to argue with you with
20  what that shows --
21     A  Sure.
22     Q  -- I'm just asking if you think that shows
23  something different or not, but just to be clear, you
24  have not seen anything that disproves her allegation
25  that she fell in a pothole on the date in question the

47

1  way she said she fell, correct?
2      A  No.
3      Q  In fact, you did get a copy of our package
4  saying how we said the accident occurred at some point,
5  correct?
6      A  Yes.
7      MR. BILLERA:  Okay.  That's all I have.
8      MR. CORBETT:  I just want to take a second to
9  look at the exhibits.
10     MR. BILLERA:  Sure.
11     MR. CORBETT:  Mr. Badger, you need the rest
12  room or anything?
13     THE WITNESS:  No, I'm fine.
14     THE VIDEOGRAPHER:  Standby to switch tapes.
15  Standby to stop.
16     (Whereupon, a short recess was taken.)
17     THE VIDEOGRAPHER:  Tape is rolling.
18          CROSS-EXAMINATION
19  BY MR. CORBETT:
20     Q  Mr. Badger, in front of you there is a document
21  that was previously marked as Roberts No. 4.
22     A  Correct.
23     Q  You were also shown that during the -- during
24  Mr. Billera's questioning, correct?
25     A  Correct.

48

1      Q  And is that a document that you -- you appear to
2  recognize?
3      A  Yes.
4      Q  To the best of your knowledge, what does that
5  depict?
6      A  It says that it is a -- appears to be a land
7  plat of the JR Campbell's subdivision in Boca Raton.
8      Q  Do you remember the first time you were provided
9  that document?
10     A  I believe it was faxed to me by the City of
11  Boca.
12     Q  And is today the second time that you have
13  looked at that document?
14     A  Yes.
15     Q  So, from the time that you first received it and
16  today, you haven't taken a look at it at all?
17     A  Not really, because when I received it, it went
18  in my package up to the law department.
19     Q  And, correct me if I'm wrong, but I believe that
20  you had stated that based on your review of that plat,
21  you believed that the alleyway was city property; is
22  that fair?
23     A  Correct.
24     Q  In your review of the document the first time
25  that you received it, what led you to believe that?

49

1      A  That was just my assumption at that time.
2      Q  And Mr. Billera went over kind of training,
3  experience, and formal training on plat reading, it's
4  more of just a general working knowledge; is that fair?
5      A  Yes.
6      Q  And based on that knowledge and training, you
7  made the assessment that you believed it was a city
8  alleyway?
9      A  Well, what is the question you're asking; that
10  the pothole is in the alleyway or --
11     Q  No.  Just starting at just the alleyway that you
12  made the statement that, in your opinion, your belief
13  in reviewing the plat, that it stood for the
14  proposition that it was a city alleyway.  And I'm
15  trying to find out why that is.
16     A  It was a -- it was maintained by the city.
17     Q  What investigation did you do to make that
18  determination that it was maintained by the city?
19     A  Well, when I was down there, the city municipal
20  lot is on the east side of the building, and the --
21     Q  And just so we're clear, the east side of the
22  post office building?
23     A  Yes, I'm sorry.
24     And the pavement seemed to be of the same
25  texture and nature.  And I know that from past

13 (Pages 46 to 49)

50

```
 1   experience, that normally alleyways, you know, between
 2   buildings are normally rights of way for, you know, the
 3   city to get through regardless of what -- like a
 4   utility easement and various things.  So, from the
 5   looks of it, I knew that we didn't maintain it, so I
 6   was assuming that the City of Boca maintained it.
 7       Q  Besides the fact that the city owns a municipal
 8   lot to the east of the post office building is there
 9   anything independent that you learned that led you to
10   believe that it was maintained by the city?
11       MR. BILLERA:  Form.
12       THE WITNESS:  Just in my conversations with
13   Mr. Roberts from Boca.
14   BY MR. CORBETT:
15       Q  Is it fair to say that your opinion about
16   maintaining the lot is simply an opinion without any
17   further investigation?
18       A  Which lot are we talking about?
19       Q  The alleyway.
20       A  Okay.  I'm not sure what you're asking.
21       MR. MELLINGER:  Objection as to form.
22   BY MR. CORBETT:
23       Q  You mentioned that based on your previous
24   knowledge of alleyways --
25       A  Correct.
```

51

```
 1       Q  -- that it had been your prior experience that
 2   you -- that alleyways are maintained by the city; is
 3   that correct?
 4       A  That's correct.
 5       Q  Is there anything that you did, independent of
 6   that working knowledge, to confirm or deny that this is
 7   a city-maintained alleyway?
 8       A  When I spoke to Mr. Roberts, you know, I asked
 9   him if they had any repair orders in that alleyway.
10       Q  And what did he tell you?
11       A  He said that he would look it up.  And then he
12   called at a later time and said he couldn't find any
13   work orders.
14       Q  In addition to speaking to Mr. Roberts, what
15   else did you do?
16       A  That's it.
17       Q  Did you, not your first trip to this location,
18   but at a subsequent one, you saw an area that looked to
19   have been patched or there's a different color concrete
20   or work done?
21       A  It appeared to be patched.  It really wasn't a
22   different color.  It was very similar to the mixture in
23   the alleyway.
24       Q  But, for whatever reason, it appeared to you,
25   based on your training and experience and knowledge,
```

52

```
 1   that it had been patched?
 2       A  It appeared to be a patch, correct.
 3       Q  And, to the best of your memory, where was that
 4   area?
 5       A  It was right there at the alleyway.
 6       Q  Obviously, the alleyway runs east and west.
 7   Would you --
 8       A  Correct.
 9       Q  -- would you say it was closer to the east side
10   of the post office building or the west side of the
11   post office building?
12       A  It would be on the west side of the post office
13   building, and it would be on the north side of the
14   alley.
15       Q  And based on that area, did you ever do any
16   investigation to determine whose property that patch
17   was on?
18       A  I was unable to determine that.
19       Q  What investigation did you do to try to
20   determine that?
21       A  That's a good question, because there really
22   isn't anything to look at.  I know I talked to the
23   owner of the building, and he was unable to give me any
24   information.
25       Q  And who did -- at that time, who did you know
```

53

```
 1   the owner to be?
 2       A  He mentioned the name.  I think it was Selik.
 3       Q  Mr. Sediak, does that sound pretty close?
 4       A  Yeah.
 5       Q  To the best of your memory, how many times did
 6   you speak with Mr. Sediak?
 7       A  I believe I spoke with him twice.
 8       Q  To the best of your memory, when was the first
 9   time?
10       A  It was after I learned about the patch.
11       Q  So, that would have been at a second or
12   subsequent trip out there?
13       A  Correct.
14       Q  And how much longer after the first time was the
15   second time?
16       A  I don't recall the specific time, because it
17   was -- it had to do with a submission of additional
18   materials from the claimant's attorney.
19       Q  Okay.  Did you meet with him face to face or
20   over the phone?
21       A  Over the phone.
22       Q  Do you remember the substance of your
23   conversation with him the first time?
24       A  I believe I called to ask him who his insurance
25   company was.
```

14 (Pages 50 to 53)

**54**

1    Q   Anything else besides that?

2    A   And to determine, you know, who was -- who owned

3    the building.

4    Q   What was he able to -- was he able to shed any

5    light on the issue?

6    A   Actually, it's a little confusing, because

7    apparently he owned the building, sold the building,

8    and now he owns the building again or something to that

9    effect.

10   Q   And did you specifically ask him about this

11   patched area that you saw?

12   A   I asked if he did any patching there.

13   Q   And I'm assuming he said no?

14   A   That's correct.

15   Q   Did you ask him if that was, in fact, part of

16   his property?

17   A   No, I did not.

18   Q   Okay. So, as it pertains to the patch, you

19   simply asked him whether he affirmatively took steps to

20   patch the area?

21   A   To patch any area.

22   Q   Had he patched any area?

23   A   No.

24   Q   And the second time you spoke with him, do you

25   remember what that was about?

**55**

1    A   I don't recall. It was a follow-up call.

2    Q   In the times that you spoke with Mr. Sedlak, in

3    addition to speaking about the patch and about his

4    insurance company, did you speak about any other

5    topics?

6    A   Just passed the time of day.

7    Q   I'm sorry?

8    A   Just the passed the time of day, you know, how

9    are you --

10   Q   Sure.

11   A   -- that type of thing.

12   Q   No other substantive topics that you believe

13   would be relevant to this deposition?

14   A   No.

15   Q   In addition to speaking to Mr. Sedlak, what

16   other investigation did you try to do to determine if

17   that was U.S. Post Office land or, sorry, strike that;

18   not U.S. Post Office, but -- strike the entire

19   question, how about that?

20        In addition to speaking to Mr. Sedlak, what else

21   did you do to try to determine who owned the area that

22   had been patched?

23   A   That would have been it.

24   Q   You had mentioned that you looked at a survey.

25   A   Right.

**56**

1    Q   When you say that you looked at a survey, is

2    that a document separate and apart from Mr. Roberts

3    No. 4 that's in front of you?

4    A   Yeah. It would have been the -- I believe

5    Mr. Sedwick [sic] sent a copy down that I forwarded to

6    the law department, which is just a bigger piece like

7    this (indicating).

8    Q   And when you say like this, it was similar in

9    that there were kind of equal rectangles next to each

10   other?

11   A   Yes, this plat.

12   Q   Did that separate document shed any light or

13   show you anything different than the one that's in

14   front of you?

15   A   None.

16   Q   And you said that you forwarded that over to the

17   law department?

18   A   Correct.

19   Q   In addition to speaking to Mr. Sedlak and

20   looking at the two documents that you've identified,

21   what other investigation did you do to determine the

22   owner of the patch?

23   A   That's it.

24   Q   In your investigative arm, do you deal with

25   determining who is the owner of property? Is that

**57**

1    something that's within your duties and

2    responsibilities?

3    A   I attempt to, yes.

4    Q   What do you -- it's kind of a broad question,

5    but what's usually your first step to determine who

6    owns a piece of property?

7    A   Go the property appraiser's Web site.

8    Q   That's usually a pretty good start?

9    A   Usually.

10   Q   What about how far a property extends or -- into

11   the land?

12   A   I don't get into that for the simple reason it's

13   been my experience that the numbers that the property

14   appraiser has and the actual figures don't always

15   match.

16   Q   Who would you go to in the post office or is

17   there an arm to make those determinations or has that

18   expertise?

19   A   No. It would have to be surveyed.

20        MR. CORBETT:  I don't have anything else.

21        MR. MELLINGER:  Just a couple brief follow-up.

22              CROSS-EXAMINATION

23   BY MR. MELLINGER:

24   Q   Mr. Badger, you indicated that during the course

25   of your investigation you learned that the plaintiff

15 (Pages 54 to 57)

58

1  had gone to the bank across the alleyway to report that
2  she had fallen; is that correct?
3      A  I went to the bank. I spoke to the manager, and
4  he indicated that a lady had come in to report falling.
5  Now, whether or not it's the claimant, you know, he
6  didn't have a name for me.
7      Q  To the best of your knowledge, at or around the
8  time of the alleged accident, did the plaintiff ever
9  come to the post office building to submit an accident
10  report?
11      A  Not to my knowledge.
12      Q  And so, you never learned of the accident until
13  counsel provided correspondence to you indicating that
14  an accident had occurred and litigation was planned; is
15  that correct?
16      A  That is correct.
17      Q  And that's the February 2007 time period that
18  you --
19      A  That is correct.
20      Q  -- you testified to earlier?
21          And, as you sit here today, has the plaintiff or
22  plaintiff's counsel or anyone ever pointed out to you
23  the exact place where that accident happened?
24      A  No, they have not.
25      Q  And are you aware of the exact spot where that

59

1  accident happened?
2      A  No, I am not.
3      Q  Did you ever tell Mr. Roberts with the City of
4  Boca Raton that the accident happened on the property
5  that the post office was leasing?
6      A  No, I did not.
7          MR. MELLINGER:  No further questions.
8          MR. BILLERA:  Just a couple follow-up.
9              REDIRECT EXAMINATION
10  BY MR. BILLERA:
11      Q  Who was Sedlak's insurance company, do you
12  remember?
13      A  No, I don't.
14      Q  Did you get a documentation from him from his
15  insurance?
16      A  No. He gave me the information over the phone
17  and I forwarded it to our law department.
18      Q  When you went to look at the property and were
19  told there was a hole and you went and saw the patch,
20  did you see any other areas in the same or similar area
21  that looked like they were also patches?
22      A  There was -- there were patches all along this
23  area from east to west --
24      Q  You're indicating --
25      A  -- along the side of the alley there.

60

1      Q  You're indicating the seam of the alley with the
2  parking lot?
3      A  I guess you would call it that, yes.
4      Q  Did you photograph each one of those?
5      A  No.
6      Q  Why not?
7      A  Because this appears to be the area that was in
8  the photographs that you submitted indicating that that
9  is where the fall occurred.
10          MR. BILLERA:  I'm going to mark this as Badger
11  1. It's the same as our 1 and 9 from Roberts, but I
12  have an extra copy.
13  BY MR. BILLERA:
14      Q  So, you got a copy of this photograph, correct?
15      A  What I got was a -- I believe it was a color
16  copy, similar to this on paper. I don't believe it was
17  a regular photograph.
18      Q  Okay. So, you got a color copy similar to what
19  we're attaching, correct?
20      A  Correct.
21      Q  All right. And then when you went to the area,
22  you found a patch that seemed to match that area,
23  correct?
24      A  Correct.
25      Q  So, sitting here today, you understand that

61

1  plaintiff alleges she stepped in that hole, correct?
2      A  Well, whether it's this hole or a little bit
3  over this way, I can't tell you. All I can tell you
4  is, is that photographs were sent of an area that
5  showed a pothole. When I went to the post office,
6  there was not a pothole; however, there was an area
7  that appeared to have been patched that was in the same
8  general area as the photographs that were submitted
9  from your office.
10      Q  And so you understand that's where she claims
11  she was hurt, correct?
12      A  I guess if you put it that way.
13      Q  And the patch that you saw, was it approximately
14  24 inches wide?
15      A  It could be. I did not measure it.
16      Q  Is there a reason you didn't measure it?
17      A  Because I went by the shape.
18      Q  Was it approximately 38 to 39 inches long?
19      A  It could have been. Like I said, I didn't
20  measure it.
21      Q  So, the shape was similar to what you saw in the
22  photographs submitted by the plaintiff?
23      A  The patch was similar to the pothole photograph
24  that was submitted, correct.
25      Q  And that area was identified on the survey which

16 (Pages 58 to 61)

62

1  has been attached as Roberts 6 that Mr. Roberts, per
2  his investigation, he identified where he thought the
3  pothole was, which is marked as a blue circle.
4       Do you disagree that that's the area where the
5  patch was located that you saw?
6       MR. CORBETT:  I'm going to object to
7  Mr. Roberts' characterization as seeing a pothole
8  there.  I believe the testimony was that the patched
9  area was where he circled.
10 BY MR. BILLERA:
11      Q  Is that where you saw the patched area?
12      A  It's hard to tell from this, because you've got
13 lines here.  And I would have to see the pavement, if
14 you understand what I'm saying, because if you look at
15 the photograph --
16      Q  Right.
17      A  -- this here would be over here (indicating)
18 along the seam of the alleyway.
19      Q  Okay.
20      A  All right?  So, this would not -- in my
21 estimation, would not truly depict where that is.
22      Q  This would be a little bit north, north meaning
23 up?
24      A  It would be right along this alleyway side,
25 right here (indicating), on the north side of the

63

1  alleyway.
2       Q  So, if we were to assume that this broken dotted
3  line is the edge of the alleyway and that this area is
4  the parking lot itself, where would you place the patch
5  that you saw?
6       A  Well, I wouldn't be able to do that on this and
7  the reason being is this doesn't show the paved area.
8  If you look in the photographs, okay --
9       Q  Sure.
10      A  -- you'll see that there's a paved line.  That
11 doesn't depict it.
12      Q  Your photographs that you took depict it?
13      A  I think there's one in there that does, a little
14 bit better.  Yeah, like this one here (indicating).  If
15 you follow this in here --
16      Q  Is that the same one?
17      A  Yeah, it seems to be, yeah.
18      (Whereupon, the document referred to was marked
19  for identification as Plaintiff's Exhibit No. 1.)
20 BY MR. BILLERA:
21      Q  Referring to Badger 1.
22      A  If you follow this here (indicating), this looks
23 like the edge of the paved alleyway.
24      Q  Okay.
25      A  You see this line here.

64

1       Q  Right.
2       A  So, that's what -- if -- it would be difficult
3  to transfer this onto here because there are no
4  measurements here (indicating).
5       Q  Right.
6       A  But this appears to be the edge of the paved
7  alleyway.
8       Q  When you say this, you're indicating this bottom
9  portion?
10      A  No.  Right where this line is right here.
11      Q  Where the line is?
12      A  Right.
13      Q  Can you hold that up for the camera to show
14 where you're indicating?  Which line appears to be the
15 edge of the paved alleyway?
16      A  There appears to be a paved line right here
17 (indicating).
18      Q  And, to you, that would separate the street from
19 the --
20      A  That would separate the alleyway from the
21 parking lot.
22      Q  Okay.  And -- but you're not sure because
23 there's no measurements of exactly where that is?
24      A  Correct, in relationship to this survey.
25      Q  But would you agree that some of this, what

65

1  appears to be the pothole and the testimony will be
2  that is the pothole --
3       A  Well, I can't say that, because this is not a --
4  is this a photograph of the pothole --
5       Q  Yes.
6       A  -- or is this a photograph that was taken later?
7       Q  That's of the pothole.
8       A  Okay.  It's hard to say exactly where the
9  pothole is, because it is filled with water.
10      Q  So, you can't see the pothole?
11      A  So, you can't see the pothole.
12      Q  Right.  We understand that, but this seam
13 though, would you not agree, seems to go through the
14 pothole if you were to draw a straight line through it?
15      A  You got a ruler?
16      Q  Sure, or we can use the edge of a book or
17 something like that.  At least a portion of that
18 pothole seems to --
19      A  Well, a portion of the water.
20      Q  Correct.
21      A  Now, if you look at other photographs that were
22 taken by Mr. Roberts, you're going to see that the
23 water --
24      Q  Let's look at that photograph?
25      MR. CORBETT:  What are we looking at?

17 (Pages 62 to 65)

**Page 66**

```
 1       MR. BILLERA:  I don't know yet.  I haven't
 2  marked it as an exhibit.
 3       MR. CORBETT:  Fair enough.
 4  BY MR. BILLERA:
 5    Q   Taken at the same time.
 6    A   Okay.
 7    Q   So --
 8    A   So, this would be -- this would be your line
 9  right here (indicating).
10    Q   It appears that some of the pothole protrudes
11  into the parking lot, correct?
12    A   It could very well be.  It's very difficult to
13  see with the water.
14    Q   This is the line we were talking about here,
15  correct?
16    A   Yes.
17    Q   And this appears to be the same line?
18    A   Which would be difficult to place on here.
19    Q   I understand.
20    A   Okay.
21    Q   So, you can't place it on this survey?
22    A   That's correct.
23    Q   But here (indicating) you can place it --
24    A   Right.
25    Q   -- as the seam between the parking lot that we
```

**Page 67**

```
 1  described --
 2    A   Correct.
 3    Q   -- and the alleyway, and you would agree with
 4  me, if this is the pothole, that it protrudes somewhat
 5  in the parking lot, correct?
 6    A   If it is, yes.
 7       MR. BILLERA:  I'll mark that as Badger 2.
 8  Thank you.
 9       (Whereupon, the document referred to was marked
10  for identification as Plaintiff's Exhibit No. 2.)
11       MR. BILLERA:  I have no more questions.
12       MR. MELLINGER:  We'll read.
13       Witness excused.
14  (Thereupon, the deposition was concluded at
15  4:01 p.m.)
16
17
18
19
20
21
22
23
24
25
```

**Page 68**

```
 1              CERTIFICATE
 2  THE STATE OF FLORIDA )
 3  COUNTY OF PALM BEACH )
 4     I, Lee M. Walker, a Court Reporter and Notary Public
 5  in and for the State of Florida at Large, do hereby
 6  certify that I reported the deposition of ROSAIRE
 7  BADGER, a witness called by the Plaintiff in the
 8  above-styled cause; that said witness was duly sworn by
 9  me; that the foregoing pages, 1 through 68, inclusive,
10  constitute a true and correct record of the transcript
11  of the deposition by said witness.
12     I further certify that I am not an attorney or
13  counsel of any of the parties, nor a relative or
14  employee of any attorney or counsel connected with the
15  action, not financially interested in the action.
16     The foregoing certification of this transcript does
17  not apply to any reproduction of the same by any means
18  unless under the direct control and/or direction of the
19  certifying reporter.
20     WITNESS my hand and official seal in the City of
21  Boca Raton, County of Palm Beach, State of Florida,
22  this 14th day of February, 2009.
23          Lee M. Walker, Court Reporter
            My Commission Expires 11/30/11
24          Commission #DD728386
25
```

**Page 69**

```
 1              ERRATA SHEET
 2  MARIA TERESA OSORIO vs.
    UNITED STATES OF AMERICA
 3  CASE NO.: 08-80459-CIV-MARRA/JOHNSON
    DEPOSITION OF:  ROSAIRE BADGER
 4  DATE TAKEN:  January 26, 2009
 5       DO NOT WRITE ON TRANSCRIPT
         ENTER CHANGES HERE
 6
    PAGE NO.     LINE NO.     CORRECTION OR CHANGE
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
              WITNESS SIGNATURE
22     Sworn to and subscribed before me this        day
    of             , 2009.
23
24          Notary Public in and for the
            State of Florida at Large
25          My commission expires:
```



70

1                    U.S. LEGAL SUPPORT, INC.
2              515 NORTH FLAGLER DRIVE, SUITE 200
                 WEST PALM BEACH, FLORIDA 33401
3                        (561) 835-0220

4                       February 14, 2009

5    Mr. Rosaire Badger
     c/o DAVID I. MELLINGER, ESQUIRE
6    U.S. DEPARTMENT OF JUSTICE
     500 East Broward Boulevard, Suite 700
7    Fort Lauderdale, Florida 33394

8    RE: Maria Teresa Osorio v. United States of America

9    Dear Mr. Badger:

10        At the conclusion of your deposition given in the
     above-styled cause on January 26, 2009, you indicated
11   you wished to read and sign the transcript.

12        This letter is to advise you that your deposition is
     ready, and we ask that you call our office at the
13   number listed above to schedule an appointment to come
     in.

14
          If you are a party in this action or an expert
15   witness, and your attorney has ordered a copy of this
     transcript, you may wish to read their copy and forward
16   to us a photostatic copy of your signed correction
     sheet.  Under no circumstances can a copy be released
17   to a witness.

18        If this has not been taken care of within the next
     30 days, or by the time of trial, whichever comes
19   first, we shall conclude that the reading, signing, and
     notice of filing of the above deposition has been
20   waived.

21        Thank you for your prompt attention.

22                         Sincerely,
                           U.S. LEGAL SUPPORT, INC.
23

24            Lee M. Walker, Court Reporter

25   CC: All counsel of record

                                                    19  (Page 70)

1

**A**

able 10:3, 17
  11:6, 18  12:12
  12:15  26:18
  29:5, 16  36:6
  38:21  54:4, 4
  63:6
about 17:2  27:15
  27:18, 19, 24
  28:21  41:11
  41:14, 16
  44:23  50:15
  50:18  53:10
  54:10, 25  55:3
  55:3, 4, 19
  57:10  66:14
above 1:25  70:13
  70:19
above-styled 3:3
  68:8  70:10
access 34:25
  35:15
accident 7:3, 4
  7:13  10:19
  14:9, 22  15:1
  15:14  16:6
  17:6, 10  18:3
  18:9, 17, 20
  19:3, 11  21:7
  21:13, 16
  22:15  23:10
  25:1  26:3
  27:15  30:7
  31:8  35:8, 22
  36:7  37:22
  40:5, 17, 20
  42:10  44:12
  45:12, 13, 16
  47:4  58:8, 9
  58:12, 14, 23
  59:1, 4
accidents 18:4
  20:9  32:10, 13
  34:3, 7  35:3
accompany 38:8
according 25:24
  33:21
across 45:16, 25
  58:1
action 7:24  8:7
  20:6  68:15, 15
  70:14
actual 57:14
Actually 54:6
addition 51:14
  55:3, 15, 20
  56:19
additional 53:17
adjudicator
  40:12
advise 70:12
affected 31:14
affirmatively
  54:19

aforesaid 3:7
after 4:25  7:23
  8:17  9:17
  10:9, 12  11:11
  42:9  53:10, 14
afternoon 5:5, 6
again 13:4  54:8
age 3:2
agencies 37:2
agency 35:11
agent 34:22
ago 24:19
agree 64:25
  65:13  67:3
ahead 41:1
allegation 46:24
alleged 18:4, 19
  22:1  43:8
  58:8
alleges 44:12
  61:1
alley 28:20
  39:25  52:14
  59:25  60:1
alleyway 9:16
  13:21  21:23
  24:8  26:10
  29:1, 10  31:19
  48:21  49:8, 10
  49:11, 14
  50:19  51:7, 9
  51:23  52:5, 6
  58:1  62:18, 24
  63:1, 3, 23
  64:7, 15, 20
  67:3
alleyways 50:1
  50:24  51:2
allowed 6:22
  34:3
along 59:22, 25
  62:18, 24
already 43:15
always 17:14
  57:14
ambulance 22:7
America 1:8  4:8
  4:19  69:2
  70:8
among 32:22
analysis 20:12
and/or 68:18
announce 4:14
another 38:13
answer 11:23
  23:15  28:3
  34:12  35:14
  36:17  41:12
answered 38:13
anticipation
  13:23  14:3
anybody 14:25
  35:15
anyone 20:15
  22:4  36:24

38:8, 11  45:11
  45:18  58:22
anything 6:3  7:2
  14:7, 14  19:16
  20:6  24:20
  27:15  38:14
  38:25  41:22
  44:23  45:18
  46:18, 24
  47:12  50:9
  51:5  52:22
  54:1  56:13
  57:20
anywhere 40:4
  45:17
apart 56:2
apparently 22:25
  38:18, 19  54:7
appear 48:1
appearances 2:1
appeared 12:16
  51:21, 24  52:2
  61:7
Appearing 2:5, 8
  2:12
appears 31:1
  48:6  60:7
  64:6, 14, 16
  65:1  66:10, 17
apply 68:17
appointment
  70:13
appraiser 57:17
appraiser's 57:7
approximate 17:1
approximately
  17:9  27:7
  61:13, 18
area 7:12  8:14
  8:20, 23  9:3, 8
  9:12, 19, 20
  10:3, 14, 23
  11:6, 18, 19
  12:2, 14, 16, 21
  12:24  13:1, 2
  13:3, 6, 10, 13
  13:16, 17, 19
  14:25  17:14
  23:10  25:1
  26:5, 7, 23, 24
  26:25  27:3, 8
  28:4, 6, 17, 18
  28:24  29:3
  31:8, 14  32:2
  32:14  32:20
  35:3, 7, 12, 18
  35:19  38:9
  41:22  43:5, 8
  43:12, 17, 20
  44:1, 2, 5
  46:13, 15
  51:18  52:4, 15
  54:11, 20, 21
  54:22  55:21
  59:20, 23  60:7

60:21, 22  61:4
  61:6, 8, 25
  62:4, 9, 11
  63:3, 7
areas 12:20, 22
  32:22  42:19
  59:20
argue 46:19
arm 56:24  57:17
around 5:10
  11:12  14:17
  14:18  36:5
  37:23  42:16
  42:17  43:2
  45:15  58:7
Arye 2:6  4:20
ascertain 12:15
  29:5  38:21
asked 31:18  51:8
  54:12, 19
asking 17:4  25:2
  31:7, 13  35:1
  45:24  46:22
  49:9  50:20
assessment 49:7
assigned 17:24
assistance 22:24
  23:2, 5, 7
Assistant 4:17
assume 25:23
  27:3  63:2
assuming 50:6
  54:13
assumption 49:1
attached 32:22
  62:1
attaching 60:19
attempt 57:3
attention 70:21
attorney 4:15, 18
  6:5, 7, 9, 14, 15
  34:17  40:14
  53:18  68:12
  68:14  70:15
attorneys 14:13
  15:4  34:23
aware 7:5  38:22
  39:2  58:25
awhile 44:20

**B**

back 10:14, 17
  11:10  12:14
  13:3  31:23, 24
  43:11
background 26:16
  26:18
Badger 1:14  3:1
  3:10  4:4, 24
  5:5  31:6, 10
  47:11, 20
  57:24  60:10
  63:21  67:7
  68:7  69:3
  70:5, 9

bank 22:4, 17
  30:5  45:16
  46:10  58:1, 3
based 16:4  20:24
  48:20  49:6
  50:23  51:25
  52:15
basically 17:1
  21:14
Beach 17:25  68:3
  68:21  70:2
before 1:23  3:5
  10:10  13:25
  25:14  69:21
behalf 2:5, 8, 12
  24:25
behind 9:16
  31:20
being 5:1  23:3
  29:16  63:7
belief 23:24
  24:12  49:12
believe 6:17, 22
  8:17  9:17
  10:4, 8, 18
  12:8  13:5, 11
  15:13  19:5
  21:1  22:11, 14
  22:18  23:19
  24:11  31:15
  34:6  35:4, 9
  36:2  37:16, 25
  38:13  40:10
  41:17  43:3
  44:24, 25  45:7
  48:10, 19, 25
  50:10  53:7, 24
  55:12  56:4
  60:15, 16  62:8
believed 48:21
  49:7
besides 50:7
  54:1
best 44:14  48:4
  52:3  53:5, 8
  58:7
better 63:14
between 10:15
  16:19  31:19
  38:17  50:1
  66:25
beyond 29:23
  33:9
big 39:23
bigger 56:6
Billera 2:3  3:13
  3:16  4:15, 15
  5:4, 7, 21, 24
  11:22  23:14
  27:14, 25
  28:10  31:11
  32:20  33:2, 7
  33:15, 22
  34:10, 15  41:2
  47:7, 10  49:2

50:11 59:8,10
60:10,13
62:10 63:20
66:1,4 67:7
67:11
Billera's 47:24
binding 33:25
34:4
bit 61:2 62:22
63:14
black 25:3
blue 62:3
Boca 1:8,19 2:4
2:8 4:3,8,22
5:22 7:9 9:12
9:14 12:5,14
14:18 20:25
24:4,11,15,17
24:22,25 30:5
31:7,14,15
38:11 40:24
41:6 42:1,3
48:7,11 50:6
50:13 59:4
68:21
BODDEN 2:2
BONISKE 2:6
book 65:16
both 34:23
bottom 64:8
Boulevard 1:18
2:7,10 70:6
brief 57:21
broad 57:4
broken 38:25
63:2
Broward 2:7,10
21:1 70:6
building 26:20
30:2,11,11
42:17 43:2
49:20,22 50:8
52:10,11,13
52:23 54:3,7
54:7,8 50:9
buildings 36:15
50:2

— C —
call 16:11 55:1
60:3 70:12
called 4:25
15:12,13,13
19:6 21:10,11
22:7 31:15
35:5,6 38:23
51:12 53:24
68:7
calling 9:11,14
31:6,13
calls 23:12
27:10,11
came 22:6 41:3
46:11
camera 37:10

64:13
Campbell's 48:7
canvass 45:17
care 38:20 70:18
case 1:2 4:6,9
5:8,9,11,13
5:14,16,20,23
5:25 6:2,3,16
6:18,21,25
7:2 14:10,11
18:21 25:11
33:3,8 34:22
69:3
cases 18:7
categories 15:17
category 15:19
cause 1:25 3:3
20:12 68:8
70:10
causes 20:9
co 70:25
CD 37:16
Central 20:23
certain 17:18
29:14
CERTIFICATE 68:1
certification
68:16
certify 68:6,12
certifying 68:19
CHANGE 69:6
changed 8:21
10:15
CHANGES 69:5
characteriza...
62:7
check 32:4 35:1
35:2
circle 62:3
circled 62:9
circumstances
70:16
city 1:8 2:8 4:8
4:21 7:9 9:11
9:14 15:23
24:11,14,16
24:21,25 30:5
31:7,7,14,15
31:19 40:24
41:6 48:10,21
49:7,14,16,18
49:19 50:3,6
50:7,10 51:2
59:3 68:20
city-maintained
51:7
claim 41:11 42:1
claimant 58:5
claimant's 53:18
claiming 6:20
claims 17:6,21
35:6 40:12,23
41:4,23 61:10
clarify 5:15
clear 12:19 33:3

33:8 34:6
46:23 49:21
Clewiston 18:2
close 53:3
closer 52:9
code 15:23
COLE 2:6
color 51:19,22
60:15,18
come 22:22 38:17
41:8,9 58:4,9
70:13
comes 19:15
40:22 70:18
commission 68:23
68:24 69:25
company 33:25
35:11 53:25
55:4 59:11
compare 36:11
43:11
complainer 39:11
complaint 38:23
complaints 39:6
conclude 70:19
concluded 67:14
conclusion 70:10
concrete 51:19
condition 25:20
25:21 26:2
44:12
conditions 19:20
conducted 14:25
37:4
confirm 51:6
confirmed 46:10
confusing 54:16
connected 68:14
considered 20:23
considering 34:5
constitute 68:10
contact 38:11
contain 5:20
16:5
control 20:5
68:18
conversation
53:23
conversations
50:12
coordinator 17:6
17:13,21
19:24 20:1
70:24
copy 24:16 36:22
36:24 37:1
47:3 56:5
60:12,14,16
60:18 70:15
70:15,16,16
Corbett 2:6 3:14
4:20,20 47:8
47:11,19
50:14,22
57:20 62:6

65:25 66:3
corporate 1:18
33:23
corporation 1:9
4:9 34:1
correct 8:6,21
8:24 10:25
11:1,2,4,17
12:21 13:8,24
16:13 20:20
21:24 22:15
23:8,22,23,25
24:1,5,6
28:12,14,16
28:17 29:10
29:11,22 32:9
36:17,21
37:20 38:7
39:22 40:15
43:9,10,19,21
44:3,9 45:23
46:11,12,14
47:1,5,22,24
47:25 48:19
48:23 50:25
51:3,4 52:2,8
53:13 54:14
56:18 58:2,15
58:16,19
60:14,19,20
60:23,24 61:1
61:11,24
64:24 65:20
66:11,15,22
67:2,5 68:10
correction 15:11
69:6 70:16
corrective 20:6
correspondence
5:18 58:13
counsel 4:14
6:11 30:7
58:13,22
68:13,14
70:25
County 68:3,21
couple 7:20
57:21 59:8
course 57:24
court 1:1,23 3:4
4:11 32:16
33:4 68:4,23
70:24
cover 17:25 21:1
covered 33:20
create 34:16
created 14:9,11
14:12,16
Cross 3:14,15
CROSS-EXAMIN...
47:18 57:22
c/o 70:5

— D —
D 3:9

dangerous 39:23
database 35:2,4
35:5,6
date 11:13 14:5
14:22 21:17
22:12,23
42:10 45:23
46:25 69:4
dated 24:18,19
David 2:10,14
4:12,17 70:5
day 55:6,8 68:22
69:21
days 70:18
DD728386 68:24
deal 20:17 34:20
34:21 56:24
Dear 70:9
December 42:11
46:4
Deerfield 17:25
Defendant 2:8,12
defendants 1:10
4:9
definitive 22:16
Dennis 17:19
deny 22:6 51:6
department 2:9
12:10 17:18
18:12 20:16
20:18 34:21
34:22,24
35:13,20
36:20,25
37:17,19
39:10,21
40:11,13
43:16 48:18
56:6,17 59:17
70:6
depends 39:7
depict 28:9
43:17 48:5
62:21 63:11
63:12
depicted 26:23
43:12 44:2
deponent 33:17
34:6
deposition 1:13
1:24 3:1 4:4
14:1,4 32:18
32:23 33:5,8
55:13 67:14
68:6,11 69:3
70:10,12,19
described 45:23
67:1
designates 36:25
determination
49:18
determinations
57:17
determine 32:7
52:16,18,20

Transcription unavailable.

4

head 15:25 21:3
41:21
Helfman 2:6 4:21
helpful 26:20,21
her 7:4 10:1
22:7 23:2,5
44:13 45:1,6
45:7 46:24
Highway 2:3
him 5:16 28:1,3
34:7,10 40:16
51:9 53:7,19
53:23,24
54:10,15,19
54:24 59:14
hold 64:13
hole 59:19 61:1
61:2
hurt 18:10 44:12
46:11 61:11
hypothetically
39:24

_____

    I

idea 12:13 24:3
41:12
identification
63:19 67:10
identified 3:18
14:21 23:10
56:20 61:25
62:2
identify 9:18
10:18 11:6,18
14:19 26:10
26:13
identities 44:10
imagine 25:10
impressions 16:6
16:10 27:12
Inc 4:13 70:1,22
inches 27:7
61:14,18
incident 14:9
15:18,20,20
15:24 16:5
37:21 38:6
42:10 43:8
44:15
included 12:8
21:16
includes 18:2
including 30:7
inclusive 68:9
indent 42:18
indentation 12:5
42:3,25
independent 50:9
51:5
indicate 24:21
45:22
indicated 57:24
58:4 70:10
indicating 56:7
58:13 59:24

60:1,8 62:17
62:25 63:14
63:22 64:4,8
64:14,17 66:9
66:23
individual 18:13
33:10,23
information 7:7
15:18 38:15
40:22 41:3,25
52:24 59:16
informational
39:18
informed 6:2
initial 5:19
14:5
injured 9:19,21
9:23 21:21,22
22:6,12,25
23:3,6 41:5
41:23 46:2
injuries 35:8
injury 10:1
inquire 6:22
9:15 33:10
34:3
inspection 19:19
19:19
instructing 28:3
insurance 53:24
55:4 59:11,15
intended 32:23
interested 68:15
interview 44:16
interviewed
44:22
introduce 28:2
investigate 18:4
18:6 40:16,20
investigates
18:12
investigating
6:22,24 21:19
24:7 27:17,19
27:21,24 30:6
32:1 38:8
42:2 49:17
50:17 52:16
52:19 55:16
56:21 57:25
62:2
investigative
15:10 16:7,18
56:24
investigator 4:6
17:6,11 18:4
18:6
involved 6:15
8:4 10:1,19
18:19 19:8
39:16 42:19
involvement 6:18
41:10

involving 32:10
in-house 44:22
irrigated 30:14
issue 54:5
issued 32:17
33:4
items 21:15

_____

    J

January 1:20 4:2
69:4 70:10
job 18:6
John 2:3 4:15
5:7
JR 48:7
June 8:1,2,8,12
9:6,8,17,18
9:21 10:9
11:3,7,19,24
13:2,7 14:18
36:10 37:23
43:12 44:5
just 12:19 13:2
13:18 14:5
16:25 22:22
25:11 31:18
39:18 40:25
46:22,23 47:8
49:1,4,11,11
49:21 50:12
55:6,8 56:6
57:21 59:8
Justice 2:9
34:22 70:6

_____

    K

keep 36:22
keeps 34:18
kind 13:13 19:18
20:5 21:8,15
35:7,8,21
37:11 49:2
56:9 57:4
knew 13:13 22:23
42:9 44:14,23
50:5
know 7:4,11 9:10
9:20,22,25
12:4 13:12,16
13:17 14:24
18:13,23
19:14,17,18
19:22 20:15
21:3,22,25
22:1,2 24:2,4
25:9,22 27:17
27:23 28:2
29:17,23 30:1
30:13,16,18
30:21 31:23
32:10,13
34:14 35:11
35:14,22 36:4
36:14 37:7
38:16 39:3,4

39:8,14 40:1
40:6,7,8,8,19
40:22 41:3
43:14,17 45:6
45:16 46:18
49:25 50:1,2
51:8 52:22,25
54:2 55:8
58:5 66:1
knowledge 5:13
5:13,25 6:1
6:21 19:21
33:11,23,24
33:24 34:2
40:5,21 43:4
44:11,14
45:12,13,21
46:5 48:4
49:4,6 50:24
51:6,25 58:7
58:11
known 16:1 18:7
18:10
knows 34:7

_____

    L

lady 22:22 46:11
58:4
Lake 18:1
land 48:6 55:17
57:11
large 1:24 3:6
28:18 68:5
69:24
last 36:5 45:8
later 11:15,16
11:19 13:3,9
26:8,24 27:20
28:1,4 36:10
36:16 43:7
51:12 65:6
Lauderdale 2:7
2:11 70:7
law 4:20 12:10
33:3,8 34:20
34:24 35:20
36:19,25
37:17,19
40:10,13
43:15 48:18
56:6,17 59:17
lawful 3:2
learn 38:17
44:10
learned 50:9
53:10 57:25
58:12
leases 38:18
leasing 59:5
least 65:17
led 48:25 50:9
Lee 1:23 3:5
4:11 68:4,23
70:24
legal 4:3,12 8:7

8:11 70:1,22
length 45:19
less 15:5
Let 26:22 27:9
letter 70:12
Let's 65:24
level 20:2,19
light 54:5 56:12
like 10:23 15:9
16:22 19:15
20:6 26:5,7
27:8 28:4,8
28:19,24
34:19 39:1
41:22 42:2,12
50:3 56:6,8
59:21 61:19
63:14,23
65:17
line 21:2 29:23
29:24 30:1
32:21 63:3,10
63:25 64:10
64:11,14,16
65:14 66:8,14
66:17 69:6
lines 32:24
62:13
list 5:16
listed 5:12,22
5:22 70:13
litigation 6:4
13:23 18:8,11
58:14
little 54:6 61:2
62:22 63:13
locate 10:3
located 10:1
29:4 30:13,16
62:5
location 12:17
15:19,21,22
17:3 22:13
26:17 28:8
32:11 35:22
51:17
long 17:7,10
24:19 61:18
longer 44:25
53:14
look 10:11 12:12
12:14 21:7
25:16,18 26:5
26:7,23 27:8
28:4 29:17
35:20 36:2,3
36:9,14 47:9
48:16 51:11
52:22 59:18
62:14 63:8
65:21,24
looked 10:23
36:6 41:19,22
42:15 48:13
51:18 55:24

**U.S. Legal Support**
**(561) 835-0220**

56:1 59:21
looking 28:23
29:7,8 42:21
42:21 43:20
56:20 65:25
looks 26:25
28:24 50:5
63:22
Lorraine 45:7
lot 12:5 13:19
26:11 28:21
28:22 30:22
39:25 41:20
41:24 42:4,25
43:4 46:1
49:20 50:8,16
50:18 60:2
63:4 64:21
66:11,25 67:5
loud 36:17
Louis 40:18

——————————
        M
M 1:23 3:5 4:11
4:12 68:4,23
70:24
made 31:19 32:2
32:4 34:5
38:3 49:7,12
maintain 50:5
maintained 49:16
49:18 50:6,10
51:2
maintaining
50:16
make 32:7 37:23
38:2 49:17
57:17
man 45:4
management 20:13
manager 18:25
19:24 22:18
22:21 30:5
44:24 46:10
58:3
manual 19:1,15
19:17 21:6,12
many 7:15 13:12
15:3 53:5
map 36:11
maps 29:13
Maria 1:5 4:7,16
5:8,9 7:2
69:2 70:8
mark 60:10 67:7
marked 26:6,22
30:24 47:21
62:3 63:18
66:2 67:9
match 12:21
13:19 57:15
60:22
matched 12:21,22
materials 53:18
matter 5:17

may 5:21,23 6:23
10:4 25:15
70:15
maybe 8:1 34:11
McDonald 17:19
mean 9:2 12:23
20:11 21:25
28:2 29:17
39:7
meaning 29:24
62:22
means 68:17
measure 61:15,16
61:20
measurements
29:16 64:4,23
meet 53:19
Mellinger 2:10
3:15 4:17,17
5:15 6:10
11:21 23:12
27:10,23 31:9
32:16,21 33:4
33:13,18 34:9
34:12 40:25
50:21 57:21
57:23 59:7
67:12 70:5
memo 15:9
memory 52:3 53:5
53:8
mental 27:11
mentioned 50:23
53:2 55:24
middle 39:24
mid-Florida
20:24
might 5:18 11:12
26:15 43:22
Mike 25:4,7
minute 40:25
mixture 51:22
Monday 1:20 4:1
money 23:5
month 8:2,19
months 42:9,12
42:13
more 7:17 13:15
41:16 49:4
67:11
motion 34:11
move 27:20
much 53:14
municipal 1:9
4:9 12:5 42:3
49:19 50:7

——————————
        N
N 3:9
name 5:7,20
19:17 38:14
45:1,6,8 53:2
58:6
names 4:14
narrative 16:22

16:25 37:22
nature 49:25
near 12:6 39:25
need 26:18 47:11
negatives 37:18
never 22:1 25:5
40:19 46:16
46:17 58:12
next 8:15 56:9
70:18
nobody's 46:17
Nods 35:25 41:21
none 27:25 43:6
56:15
Nope 14:15 30:15
normally 50:1,2
north 2:3 18:1
52:13 62:22
62:22,25 70:1
Northwest 1:18
Notary 1:24 3:6
68:4 69:24
notes 15:9
notice 1:24 3:5
28:22 70:19
notification
14:5
notified 7:23
8:7,9
November 25:23
number 4:9 7:16
39:14 70:13
numbers 57:13

——————————
        O
oath 5:2
object 27:10,25
32:16,24 33:2
62:6
Objection 11:21
23:12 31:9
50:21
Obviously 52:6
occasions 7:20
occur 22:15
occurred 7:3,4
7:13 15:11
22:16 23:10
25:1 26:3
36:7 40:6
46:14,18 47:4
58:14 60:9
occurring 19:11
off 30:19 39:20
offered 22:24
23:2,7
offhand 31:5
37:25 41:7
45:2
office 7:8 8:18
9:16 10:3,7
10:13,21
11:25 12:6,7
14:6,25 15:15
16:4 17:5,8

18:5,10,13,19
19:3,11,20,25
20:10 23:24
28:25 29:9
30:2,8,11,18
31:21 32:4,11
32:14 34:18
38:18,23
39:12,13,24
40:1,4,9 41:5
44:11,16,23
45:12,17
49:22 50:8
52:10,11,12
55:17,18
57:16 58:9
59:5 61:5,9
70:12
office's 30:22
official 68:20
Oh 8:15 16:19
42:23
okay 5:21 6:13
8:15 10:14
11:5,9,20
12:6,19 13:17
15:24 16:8,19
21:3 23:9
25:25 34:16
37:1,21 39:18
41:1 42:5,23
46:3,19 47:7
50:20 53:19
54:18 60:18
62:19 63:8,24
64:22 65:8
66:6,20
Okeechobee 18:1
once 6:2 44:20
one 12:20 16:21
16:21 25:9
26:9 36:2
37:21 39:15
41:18 42:21
44:14 51:18
56:13 60:4
63:13,14,16
only 7:7 12:20
42:7,24 44:6
onto 64:3
opinion 16:12
27:11 49:12
50:15,16
opposed 36:1
39:25
order 32:17,19
33:4,13,15,18
ordered 70:15
orders 31:25
51:9,13
Orlando 17:17
OSHA 20:17
Osorio 1:5 4:7
4:16 5:8,9
7:6 8:10 9:19

21:20 37:5
45:22,25
46:17 69:2
70:8
Osorio's 7:2
other 12:4,19,22
15:22 24:20
28:18,19
29:16 30:4,4
31:4 32:10,13
34:2,7 35:2,3
35:12 37:1
38:1,12 41:13
41:14,15,20
41:23 42:15
42:18,19
45:15 46:10
46:13 55:4,12
55:16 56:10
56:21 59:20
65:21
out 15:11 16:24
20:8,24 21:7
21:20 24:7
32:2 36:17
37:21 39:9,11
39:19 46:18
49:15 53:12
58:22
outside 6:11
30:8
over 6:21 10:10
28:20 49:2
53:20,21
56:16 59:16
61:3 62:17
own 37:22
owned 21:20 24:4
24:8,10,15,21
38:19 40:24
41:5,5 54:2,7
55:21
owner 52:23 53:1
56:22,25
owns 50:7 54:8
57:6

——————————
        P
P 2:6
package 47:3
48:18
PAGE 3:12,18
69:6
pages 15:3 68:9
Palm 68:3,21
70:2
paper 60:16
paralegal 40:10
40:13
parking 13:19
26:11 28:21
28:22 30:22
39:25 41:20
41:24 43:4
46:1 60:2

6

63:4 64:21
66:11,25 67:5
part 18:3 19:9
21:19 38:5
54:15
particular 12:14
19:15 20:9
34:2 39:2
particularly
43:20
parties 68:13
party 70:14
passed 55:6,8
past 32:15 49:25
PASTORIZA 2:6
patch 9:8 28:25
29:4,6,7,8
36:12 42:16
42:18,20,21
43:1,4 44:5
46:13,15 52:2
52:16 53:10
54:18,20,21
55:3 56:22
59:19 60:22
61:13,23 62:5
63:4
patched 9:12
12:16 26:7,24
27:8 28:5,6
51:19,21 52:1
54:11,22
55:22 61:7
62:8,11
patches 28:18,20
59:21,22
patching 54:12
paved 63:7,10,23
64:6,15,16
pavement 49:24
62:13
Pedersen 2:14
4:13
pending 3:3
people 30:5,7
44:10
per 62:1
performed 6:23
6:24
period 58:17
person 17:18
18:18,20 24:5
33:11 35:10
35:13,13
38:13
personnel 24:25
persons 30:4
37:2
pertaining 15:18
pertains 54:18
phase 27:23
phone 38:14
53:20,21
59:16
photo 26:12 29:2

photograph 13:18
25:3,9 26:16
42:6 43:1
60:4,14,17
61:23 62:15
65:4,6,24
photographed
12:2 13:3
43:3,3
photographs 7:12
7:15 8:14,16
8:20 10:2,5,6
10:13,20 12:8
12:12,13,18
12:23,25 13:5
13:25 24:24
25:6,14 26:2
36:9 37:9
38:1,3 41:19
43:7 44:3
46:16 60:8
61:4,8,22
63:8,12 65:21
photos 9:1,4
13:1,9,12,22
25:16,18,22
26:13 36:19
36:22,24
37:14 43:11
photostatic
70:16
picture 27:3
pictures 11:25
28:8
piece 56:6 57:6
Pierce 18:1
pinpoint 36:12
place 2:1 3:7
17:2 21:17
22:1 33:14,16
33:19 58:23
63:4 66:18,21
66:23
plaintiff 1:6
2:5 4:7,25
40:23 41:4
57:25 58:8,21
61:1,22 68:7
plaintiff's 3:18
3:19 36:7
58:22 63:19
67:10
planned 58:14
plat 24:13,14,16
24:18,20
29:17 30:25
31:2,4 36:1
48:7,20 49:3
49:13 56:11
plats 29:13,19
please 4:14
plus 37:22
point 18:11 47:4
pointed 46:17
58:22

policies 19:2
policy 19:10,19
21:6
portion 64:9
65:17,19
posed 32:18
positive 11:12
possible 18:7
post 9:16 12:6
14:25 15:15
17:5,7 18:5
18:10,19 19:3
19:11,19,25
20:10 23:24
28:25 29:9
30:2,8,11,18
30:22 31:21
32:4,11,14
34:18 38:17
38:22 39:12
39:13,24 40:1
40:4,9 41:5
44:11,16,23
45:11,17
49:22 50:8
52:10,11,12
55:17,18
57:16 58:9
59:5 61:5
postal 4:5 5:10
6:14 7:8 8:18
34:20 42:4
pothole 9:3 10:1
10:4,18,22,24
11:1,3,7
23:11,21
28:13 38:25
39:23 42:1,22
43:5 44:7,15
45:23 46:1,14
46:25 49:10
61:5,6,23
62:3,7 65:1,2
65:4,7,9,10
65:11,14,18
66:10 67:4
potholes 12:4
28:19 32:11
preparation 6:3
14:4
prepared 15:3
PRESENT 2:13
presented 42:7
pretty 53:3 57:8
previous 50:23
previously 47:21
prior 51:1
private 24:5
probably 8:17,19
14:17,18 15:5
20:16 34:8,9
35:17
problem 38:24
problems 38:20
procedure 21:6

39:2 40:1
procedures 19:2
19:19
proceedings 8:11
95:12,14 24:4
product 6:2,21
27:13
Productions 4:13
program 35:2,16
prompt 70:21
proof 22:16
property 5:10
18:5,10 19:3
19:12,20
21:20 23:25
24:2 28:25
29:9,23,24
30:1 35:23,25
38:18,19,20
38:24 39:20
40:23 41:4
48:21 52:16
54:16 56:25
57:6,7,10,13
59:4,18
proposition
49:14
protective 32:17
32:19 33:13
33:15,18
protrudes 66:10
67:4
provided 7:7
36:19 46:16
48:8 58:13
provision 30:21
PS 15:16
PS1700 18:17,21
Public 1:24 3:6
68:4 69:24
purpose 3:2
purposes 39:18
pursuant 1:24
3:5 20:12
put 23:23 61:12
P.A 2:2
P.L 2:6
p.m 1:20,20 4:2
67:15

------
Q
------
quality 20:5,12
26:15
question 12:20
19:7 22:12
23:20 28:1,4
33:25 34:13
46:25 49:9
52:21 55:19
57:4
questioning
32:21,25
33:20 47:24
questions 32:17
33:9 59:7
67:11

------
R
------
Raton 1:8,19 2:4
4:3,8,22 7:10
9:12,14 24:4
31:7,14 40:24
41:6 48:7
59:4 68:21
raw 15:9
RE 70:8
read 29:16,19
67:12 70:11
70:15
reading 24:20
29:13,21 49:3
70:19
ready 70:12
really 7:4 12:20
19:7 21:25
22:2 25:21
27:12 39:16
48:17 51:21
52:21
reason 22:11,14
23:9,17,19,20
51:24 57:12
61:16 63:7
recall 7:16 9:11
9:14 22:23
24:24 31:2,5
31:6,13 37:25
44:4,6,22
45:7,14 53:16
55:1
received 41:25
48:15,17,25
receiving 24:24
recess 47:16
recognize 48:2
recollection
25:12
record 4:14
68:10 70:25
rectangles 56:9
Redirect 3:16
59:9
Reference 26:20
referred 63:18
67:9
Referring 63:21
reflective 12:25
refresh 25:11
regard 32:17
regarding 7:2
19:11,20
27:15,21 30:6
33:16 35:22
regardless 50:3
regards 7:1
regular 60:17
relate 27:12
related 23:7
relation 36:15
relationship
64:24

relative 68:13
released 70:16
relevant 55:13
remember 22:19
  25:6 45:1
  48:8 53:22
  54:25 59:12
repair 28:15
  32:5,8 51:9
repaired 10:23
  23:22 31:7
repairs 8:23,24
  8:25 9:15
  28:17 31:14
  31:19 32:2
report 14:9,13
  14:16 15:3,10
  15:14 16:3,5
  16:7,16,18
  17:17 19:13
  19:14 34:17
  34:23 37:22
  38:6 58:1,4
  58:10
reported 17:2
  22:2,23 68:6
reporter 1:23
  4:11 68:4,19
  68:23 70:24
reports 20:5,6
  21:7,13,16
  34:24
represent 5:8
represented 8:10
representing
  4:18,21
reproduction
  68:17
resembled 42:24
respect 30:12
  33:19
responsibili...
  57:2
rest 47:11
retired 44:25
review 13:25
  14:3 35:25
  48:20,24
reviewed 24:14
reviewing 49:13
rid 30:18
right 12:1,3
  28:11 33:22
  42:10,17 52:5
  55:25 60:21
  62:16,20,24
  62:25 64:1,5
  64:10,10,12
  64:16 65:12
  66:9,24
rights 50:2
risk 34:19 35:17
road 28:15
Roberts 25:4,7
  25:24 26:6,22

30:6,24 31:13
31:16 38:12
47:21 50:13
51:8,14 56:2
59:3 60:11
62:1,1,7
65:22
rolling 47:17
roof 30:10,19
room 47:12
root 20:8,12
Rosaire 1:14 3:1
  3:10 4:4,24
  68:6 69:3
  70:5
ruler 65:15
running 30:19
runoff 30:10
runs 52:6

                S
safety 19:1,2,8
  19:23,24 20:1
  20:16,18 21:4
  39:8,8,9,14
  39:17,19,21
same 10:23 11:19
  12:17 13:1,3
  27:4 28:5
  38:2 49:24
  59:20 60:11
  61:7 63:16
  66:5,17 68:17
satellite 36:11
saw 11:19 26:24
  28:5,6,9,11
  28:15,24 29:4
  30:25 31:1
  42:16 43:6
  45:18 46:13
  46:15 51:18
  54:11 59:19
  61:13,21 62:5
  62:11 63:5
saying 9:12 33:5
  33:6,14 47:4
  62:14
says 19:2 48:6
scenes 41:15
schedule 70:13
scope 33:9
seal 68:20
seam 60:1 62:18
  65:12 66:25
searchable 35:7
second 8:18,20
  10:15 11:10
  11:11 12:7
  13:13 43:25
  47:8 48:12
  53:11,15
  54:24
section 16:1,8
Sedlak 53:3,6
  55:2,15,20

56:19
Sedlaks 38:19
Sedlak's 59:11
Sedwick 56:5
see 25:21 26:1
  27:9 28:13,17
  28:18 31:4
  32:4 41:22
  42:7,18,20
  43:12 44:19
  44:23 45:18
  59:20 62:13
  63:10,25
  65:10,11,22
  66:13
seeing 31:2 62:7
seemed 49:24
  60:22
seems 63:17
  65:13,18
seen 10:13 11:24
  25:14 46:6,8
  46:24
Selik 53:2
send 25:10,10
  39:20
sent 12:9,10
  24:16 25:5
  31:3 37:16,19
  43:15 56:5
  61:1
separate 16:8,9
  16:14 56:2,12
  64:18,20
Serota 2:6 4:21
service 4:6 7:8
  8:19
set 7:22 13:13
sets 34:23
seven 42:9,12,13
severely 46:2
shape 12:17 28:5
  61:17,21
shed 54:4 56:12
sheet 16:9,14,15
  69:1 70:16
short 47:16
shortly 7:23
show 26:6,22
  30:24 56:13
  63:7 64:13
showed 61:5
showing 25:11
  43:8
shown 47:23
shows 46:20,22
sic 31:6 56:5
side 12:5 41:23
  42:4,15 49:20
  49:21 52:9,10
  52:12,13
  59:25 62:24
  62:25
sign 70:11
SIGNATURE 69:20

signed 70:16
signing 70:19
similar 26:23,25
  28:24 51:22
  56:8 59:20
  60:16,18
  61:21,23
simple 57:12
simply 50:16
  54:19
Since 17:12
Sincerely 70:22
sir 31:12 40:18
sit 58:21
site 40:17,20
  41:16 57:7
sites 41:15
sitting 9:22,25
  43:14 44:4
  45:20 60:25
size 28:5
slash 17:11
slip 18:5
sold 54:7
some 5:17 10:22
  11:16 13:5
  19:1 28:6,17
  36:4 47:4
  64:25 66:10
somebody 9:11
  35:18
someone 9:12
  20:3 34:18
  35:17 39:19
someone's 18:9
something 18:14
  20:22 34:25
  46:23 54:8
  57:1 65:17
somewhat 67:4
somewhere 5:10
  21:23 23:6
  37:15 38:24
  39:25
sorry 11:10,14
  29:25 31:12
  35:11 36:16
  39:6 41:1
  49:23 55:7,17
sort 19:1
sound 53:3
south 17:25
  20:21 29:24
  30:2
Southern 1:1 3:4
speak 45:11 53:6
  55:4
speaking 51:14
  55:3,15,20
  56:19
specific 13:9
  15:7,22 17:3
  29:17 53:16
specifically
  54:10

speculation 19:9
  23:13 27:11
spoke 31:16 45:2
  51:8 53:7
  54:24 55:2
  58:3
spoken 35:21
spot 58:25
St 40:18
staff 17:22
Standby 47:14,15
standing 27:1
  28:11
start 57:8
starting 49:11
stars 1:24 3:6
  20:8 68:2,5
  68:21 69:24
stated 45:25
  48:20
statement 49:12
statements 7:5,9
States 1:1,8
  2:12 3:4 4:5
  4:5,7,18 69:2
  70:8
station 44:24
stationed 17:14
step 38:25 57:5
stepped 46:1
  61:1
steps 54:19
still 10:22 11:1
  11:3 13:17
  32:19 33:22
  45:9
stood 49:13
stop 47:15
stored 37:15,15
stores 45:15
straight 65:14
street 31:20,20
  45:16 64:18
strictly 19:8
strike 27:20
  55:17,18
stuff 21:8
subdivision 48:7
subject 33:11
subjective 16:5
  16:10 37:22
submission 8:18
  11:11 12:7
  33:21 53:17
submit 18:14,16
  58:9
submitted 10:3,6
  10:20 12:24
  12:25 16:4
  18:21 20:9
  60:8 61:8,22
  61:24
subscribed 69:21
subsequent 51:18
  53:12

substance 53:22
substantive
  55:12
Suite 1:19  2:7
  2:10  70:1,6
superior 40:5
supervisor 17:16
  18:24  45:3
supplements
  37:23
Support 4:3,12
  70:1,22
supposed 19:13
  21:15  38:20
sure 8:1,17  10:8
  13:2  15:5
  21:5,22  25:2
  32:20  37:11
  39:5  45:10,24
  45:25  46:21
  47:10  50:20
  55:10  63:9
  64:22  65:16
surveillance
  14:24  37:4
survey 35:25
  36:3,6,12
  55:24  56:1
  61:25  64:24
  66:21
surveyed 57:19
surveys 29:13,19
switch 47:14
sworn 5:1  68:8
  69:21
system 20:13
  38:22

          T

take 7:12,15
  8:14  10:10
  33:5  38:20
  47:8
taken 1:23  3:2
  7:19,20,21,23
  13:1,22  24:25
  25:22,23
  43:22  47:16
  48:16  65:6,22
  66:5  69:4
  70:18
taking 1:24  33:7
talk 22:4,17
  30:4  41:13
talked 41:11,14
  41:16  44:24
  46:16  52:22
talking 50:18
  66:14
Tape 47:17
tapes 47:14
tell 9:13  22:9
  22:21  26:3,4
  26:8,9,19
  27:2  28:23

29:2,3,7,9
30:23  31:17
36:7  44:6
51:10  59:3
61:3,3  62:12
Teresa 1:5  4:7
  69:2  70:8
territory 17:24
testified 5:1
  58:20
testify 27:14,16
  27:18,21
testifying 27:24
testimony 25:24
  27:4  62:8
  65:1
texture 49:25
Thank 67:8  70:21
their 4:14  18:23
  70:15
thing 42:7,24
  55:11
things 50:4
think 12:9,9
  33:3  34:3
  35:6  36:12
  42:12  46:22
  53:2  63:13
though 65:13
thought 42:19
  62:2
through 7:8
  44:19  50:3
  65:13,14  68:9
time 2:1  3:7  4:2
  8:15,20,21,25
  10:10,12,12
  10:15  11:10
  11:16  14:17
  14:19  15:20
  15:24  17:1
  21:17  24:19
  33:1  36:4
  38:2,9  43:2,5
  43:25  44:8,25
  45:19  48:8,12
  48:15,24  49:1
  51:12  52:25
  53:9,14,15,16
  53:23  54:24
  55:6,8  58:8
  58:17  66:5
  70:18
times 41:16,17
  41:18  53:5
  55:2
title 17:5,20
  18:23  35:13
today 4:1  9:22
  9:25  14:1,4
  42:2  44:4
  45:20  48:12
  48:16  58:21
  60:25
told 59:19

topics 55:5,12
tort 17:21  35:6
  35:18,19
  40:12
training 29:12
  29:15,18,21
  49:2,3,6
  51:25
transcript 68:10
  68:16  69:5
  70:11,15
transfer 64:3
transitioning
  37:12
trial 27:17,19
  27:22  70:18
trip 18:5  32:13
  35:12  42:8
  51:17  53:12
true 46:7,9
  68:10
truly 62:21
try 21:19  28:2
  52:19  55:16
  55:21
trying 13:18
  46:19  49:15
turn 34:21
twice 53:7
two 16:20  41:17
  56:20
type 55:11

          U

Uh-huh 27:6
  44:21
unable 52:18,23
under 5:2  6:7
  17:22  68:18
  70:16
understand 5:17
  6:20  16:3
  39:10  60:25
  61:10  62:14
  65:12  66:19
understanding
  5:19
understood 23:7
United 1:1,8
  2:12  3:4  4:5
  4:5,7,18  69:2
  70:8
unless 68:18
unsafe 19:20
until 12:7  58:12
use 3:3  65:16
usually 57:5,8,9
utility 50:4
U.S.2:9  4:3,12
  4:18  5:10
  17:5,7  30:11
  32:11,14
  34:17  55:17
  55:18  70:1,6
  70:22

          V

v 70:8
various 50:4
versus 4:7
very 17:3  25:25
  51:22  66:12
  66:12
Video 4:13
videographer
  2:14  4:1,12
  47:14,17
visit 14:18
  41:15,15
vs 1:7  69:2

          W

waived 70:20
walked 42:17
  45:25
Walker 1:23  3:5
  4:11  68:4,23
  70:24
want 16:11  30:24
  33:2  34:10
  38:15  47:8
wanted 21:12
wasn't 12:6
  42:20  44:7
  51:21
water 27:1,2
  28:11  30:19
  65:9,19,23
  66:13
way 9:17  23:23
  26:2  47:1
  50:2  61:3,12
Web 57:7
Weiss 2:6  4:21
well 6:1  12:23
  13:16  16:3
  18:24  21:17
  25:21,25
  26:15  27:25
  41:20,25
  46:15  49:9,19
  61:2  63:6
  65:3,19  66:12
went 8:13  9:18
  10:10,14,17
  11:10  12:14
  13:3  40:19
  41:19  42:1,15
  43:25  44:8
  48:17  49:2
  58:3  59:18,19
  60:21  61:5,17
  were 2:1  7:19,20
  7:21,23  8:7,9
  8:25  10:2,6
  10:17,20
  11:18  12:9,10
  12:19,20,21
  12:23,25
  13:22  24:24

25:22,23  29:8
32:22  35:10
36:6,9,19
37:9,11  43:7
46:16  47:23
48:8  56:9
55:18,21,22
61:4,8  63:2
65:14,21
66:14
weren't 13:2
  41:18  43:20
west 1:19  18:2
  52:6,10,12
  59:23  70:2
We'll 67:12
we're 4:3  6:22
  49:21  60:19
when's 8:15
  11:10
whichever 70:18
white 25:4
whole 12:2  42:17
wide 27:7  61:14
William 40:8
wish 70:15
wished 70:11
witness 3:1  4:25
  5:12,16,20,22
  5:23  27:12
  28:7  32:18,24
  32:25  33:16
  33:19,21,23
  34:14  41:1
  47:13  50:12
  67:13  68:7,8
  68:11,20
  69:20  70:15
  70:17
witnesses 14:19
  14:21  16:2
  30:8  41:13
woman 45:4,5
words 15:22
work 6:2,7,20
  27:13  31:24
  34:22  51:13
  51:20
worked 20:3
working 17:22
  44:11  49:4
  51:6
wouldn't 9:10
  15:21  19:21
  41:9,12  42:13
  63:6
write 18:14,15
  19:4  69:5
written 33:21
wrong 48:19

          X

X 3:9

          Y

**U.S. Legal Support**
**(561) 835-0220**

**Y**

yeah 18:17 21:1
  21:14 40:13
  42:13,14,17
  53:4 56:4
  63:14,17,17
year 8:2 11:15
  36:5
years 17:9 32:15
Yup 26:21

**Z**

ZIP 15:23

**0**

06 42:11
07 6:17,19 8:3,5
  8:8,9,12 9:6
  9:9 11:7,16
  11:19,19,24
  13:2,7 14:6
  36:10 37:23
08 11:8,9
08-80459-CIV...
  1:2 4:10 69:3

**1**

1 3:18 26:6
  60:11,11
  63:19,21 68:9
10 7:17 13:15
  27:5
11/30/11 68:23
14 70:3
14th 68:22
1700 15:16 16:17
  16:20,24
1900 1:18 2:7
1914 24:18
1988 17:12

**2**

2 3:19 67:7,10
2:45 1:20 4:2
200 2:7 70:1
2006 46:4
2007 11:5 25:24
  58:17
2009 1:20 4:2
  68:22 69:4,22
  70:3,10
215 1:19
23 17:9
24 61:14
26 1:20 69:4
  70:10
26th 4:2
29 25:23

**3**

30 70:18
30B6 32:18,23,25
  33:7,9,10,12
  33:16,19,21
  34:5,6

33301 2:7
33394 2:11 70:7
33401 70:2
33487 2:4
35-millimeter
  37:13,18
356-7355 2:11
38 27:7 61:18
39 61:18

**4**

4 30:24 47:21
  56:3
4:01 1:20 67:15
47 3:14

**5**

5 3:13 42:11
5th 46:4
500 2:10 70:6
515 70:1
561 2:4 70:2
57 3:15
59 3:16

**6**

6 62:1
63 3:18
67 3:19
68 68:9

**7**

700 2:10 70:6
702 21:11
7171 2:3
763-4242 2:0

**8**

8 26:22 28:23
835-0220 70:2

**9**

9 26:6 60:11
954 2:8,11
995-1966 2:4

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  08-80459-CIV-MARRA/JOHNSON


MARIA TERESA OSORIO,

    Plaintiff,

vs.

UNITED STATES OF AMERICA and
CITY OF BOCA RATON, a Florida
municipal corporation,

    Defendants.                 /


DEPOSITION OF
MICHAEL ROBERTS


1900 Northwest Corporate Boulevard
Suite 215 West
Boca Raton, Florida
Monday, January 26, 2009
10:19 a.m. - 1:40 p.m.


    Taken before Lee M. Walker, Court Reporter and
Notary Public in and for the State of Florida at Large,
pursuant to Notice of Taking Deposition filed in the
above cause.

EXHIBIT
tabbies

**2**

1  The appearances at said time and place were as
   follows:
2
3        ELLIS, GED & BODDEN, P.A.
         BY:  JOHN F. BILLERA, ESQUIRE
              7171 North Federal Highway
4             Boca Raton, Florida 33487
              (561) 995-1966
5         Appearing on behalf of Plaintiff
6  WEISS, SEROTA, HELFMAN, PASTORIZA, COLE & BONISKE, P.L.
         BY:  ARYE P. CORBETT, ESQUIRE
7             200 East Broward Boulevard, Suite 1900
              Fort Lauderdale, Florida 33301
8             (954) 763-4242
       Appearing on behalf of Defendant, CITY OF BOCA
9
       U.S. DEPARTMENT OF JUSTICE
10       BY:  DAVID I. MELLINGER, ESQUIRE
              500 East Broward Boulevard, Suite 700
11            Fort Lauderdale, Florida 33394
              (954) 356-7355
12     Appearing on behalf of Defendant, UNITED STATES
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1  The deposition of MICHAEL ROBERTS, a witness of
2  lawful age, taken for the purpose of discovery and for
3  use as evidence in the above-styled cause, pending in
4  the United States District Court, Southern District of
5  Florida, pursuant to notice, before Lee M. Walker, a
6  Notary Public in and for the State of Florida at Large,
7  at the time and place aforesaid.
8  -----------------
9            I N D E X
10         MICHAEL ROBERTS
11
12  EXAMINATION                          PAGE
13   Direct by Mr. Billera ............... 5
14   Cross by Mr. Mellinger ............. 94
15   Redirect by Mr. Billera ........... 97
16
           EXHIBITS
17  IDENTIFIED                           PAGE
     Plaintiff's 1 & 9 ................... 8
18   Plaintiff's 2 ....................... 9
     Plaintiff's 3 ....................... 9
19   Plaintiff's 4 ...................... 15
     Plaintiff's 5 ...................... 28
20   Plaintiff's 6 ...................... 30
     Plaintiff's 7 ...................... 32
21   Plaintiff's 8 ...................... 39
     Plaintiff's 9 ...................... 39
22   Plaintiff's 10 ..................... 39
     Plaintiff's 11 ..................... 82
23   Plaintiff's 12 ..................... 84
     Plaintiff's 13 ................. 79 & 82
24   Plaintiff's 14 .................... 102
25  (Original No. 14 held by Mr. Billera.)

**4**

1       THE VIDEOGRAPHER:  Today is Monday, January
2  26th, 2009.  We are at U.S. Legal Support in Boca
3  Raton, Florida.  The time is 10:19 a.m., and this is
4  the deposition of Mike Roberts, who is the
5  superintendent of streets at the City of Boca Raton
6  in the case of Maria Teresa Osorio versus the City
7  of Boca Raton.  Case number
8  08-80459-CIV-MARRA/JOHNSON.
9       The court reporter is Lee M. Walker from U.S.
10  Legal Support.  The videographer is David M.
11  Pedersen of DMP Video Productions, Inc.
12       And will counsel announce their names for the
13  record.
14       MR. BILLERA:  This is John Billera, attorney
15  for Maria Osorio.
16       MR. MELLINGER:  And David Mellinger, Assistant
17  U.S. Attorney representing the Defendant, United
18  States of America.
19       MR. CORBETT:  Ayre Corbett from the law firm of
20  Weiss, Serota, Helfman, representing the City of
21  Boca Raton.
22  Thereupon,
23            MICHAEL ROBERTS,
24  was called as a witness by the Plaintiff, and after
25  being first duly sworn, was examined and testified

**5**

1  under oath as follows:
2            DIRECT EXAMINATION
3  BY MR. BILLERA:
4    Q  Good morning, Mr. Roberts.  How are you?
5    A  Good morning.
6    Q  I'm John Billera.  I represent Maria Osorio, who
7  was injured on someone's property and we're trying to
8  figure out on whose property she was injured on.
9       Will you please state your full name for the
10  record.
11    A  Mike -- Michael Alan Roberts.
12    Q  And what's your business address?
13    A  201 West Palmetto Park Road, Boca Raton, Florida
14  33431.
15    Q  And what is your job title?
16    A  Superintendent of streets.
17    Q  How long have you been superintendent of
18  streets?
19    A  About 18 years.
20    Q  And you work for the City of Boca Raton,
21  correct?
22    A  Yes.
23    Q  What are your job duties as superintendent of
24  streets?
25    A  To manage 17 staff members and administer

2 (Pages 2 to 5)

**6**

1  contracts with various companies.
2    Q  You understand we're here today about a fall
3  that occurred apparently adjacent to a parking lot
4  where the U.S. post office was owned in Boca Raton and
5  what appeared to be a City of Boca Raton street.  Is
6  that something that would be within your domain, the
7  City of Boca Raton street?
8    A  Yes.
9    Q  And the allegation is that there was a large
10  pothole covered by water, so she couldn't see it and
11  she stepped in it and had a very severe injury.
12      Would it be within your purview to fix
13  potholes?
14    A  Yes.  My staff would fix potholes.
15    Q  And how does that happen?  What staff would fix
16  potholes?
17    A  I have a staff of employees that do asphalt
18  repairs and other types of work.
19    Q  And how many members is that?
20    A  It varies.  Usually around three.
21    Q  What are their titles?
22    A  Maintenance worker and equipment operator.
23    Q  Do you know who that person would have been at
24  the time of this accident?
25    A  I'm not sure when the accident took place.

**7**

1    Q  I'll get it for you, one second.
2      Do you know who those people are today?
3    A  Today?  It varies depending on the day, but
4  usually it's Larry Jackson, Floyd Blutcher, and Willard
5  Jones.
6    Q  How do you spell Blutcher?
7    A  B-L-U-T-C-H-E-R.
8    Q  And what is Larry Jackson's title?
9    A  Larry Jackson is maintenance worker, I believe.
10    Q  How long has he been with you or your
11  department?
12    A  About seven or eight years.
13    Q  How about Floyd Blutcher, what's his title?
14    A  Maintenance worker.
15    Q  How long has he been with your department?
16    A  About five years, I think; five or six.
17    Q  How about Willard Jones, what's his title?
18    A  Willard Jones is an equipment operator one.
19    Q  And how long has he been with you?
20    A  About five years, I think.
21    Q  So, how does it come about that they would fix a
22  pothole?  I mean, is there an inspection routine by the
23  City of Boca Raton?
24    A  There could be, yes, but in this area there
25  wasn't that I'm aware of.

**8**

1    Q  Okay.  No inspection routine in that area?
2    A  (Shakes head.)
3    Q  What is the area you're describing?
4    A  The area behind the post office on -- or at 170
5  Northeast 2nd Street.
6    Q  And the street that runs adjacent to the post
7  office or runs across there, is that a City of Boca ton
8  street?
9    A  I'm not sure what area you're describing.
10    Q  Sure.  Are you familiar with the area?
11    A  Yes.
12    Q  I'm going to show you two photographs which have
13  been produced before.  They're just a little blown up
14  for this deposition, okay?  And in the photographs,
15  this -- there are some postal trucks.  I'll mark that
16  one as Plaintiff's A -- I'm sorry, Plaintiff's 1.
17      (Whereupon, the document referred to was marked
18    for identification as Plaintiff's Exhibit No. 1.)
19  BY MR. BILLERA:
20    Q  I'm going to mark it on the back, so we don't
21  lose some area that might be relevant for you.
22      Do you recognize that area in the photograph?
23    A  Yes, I do.
24    Q  Is any part of that area Boca Raton property?
25    A  No, not that I'm aware of.

**9**

1    Q  And in the front of this there's an access road.
2  If that's a road that runs alongside the post office,
3  whose property is that?
4    A  It was described as an alleyway.  And as far as
5  I know, it still belongs to the person who platted the
6  property.  It was never dedicated.
7    Q  Do you know who that person was?
8    A  It was Campbell JR, I believe, was the name on
9  the plat.
10    Q  As far as you know, does Campbell JR still own
11  that property?
12    A  Yes.
13    Q  And at the same time, I'm showing you some
14  photographs that were produced by your office or your
15  counsel and I'll mark this one as Plaintiff's 2 and 3.
16      (Whereupon, the document referred to was marked
17    for identification as Plaintiff's Exhibit Nos. 2 and
18    3.)
19  BY MR. BILLERA:
20    Q  And on Plaintiff's 2, does that show what you
21  understand to be the place where Ms. Osorio was
22  injured?
23    A  That was the area that the investigator for the
24  post office, Mr. Badger, described as the place where
25  an accident may have occurred.

3 (Pages 6 to 9)

**10**

1   Q   Okay.  And Plaintiff's 3 is just another shot of
2   that same area?
3   A   Yes.
4   Q   Now, in Plaintiff's 2 and 3, it appears that
5   alleyway runs for some distance; is that correct?
6   A   That's correct.
7   Q   For blocks and blocks?
8   A   One block.
9   Q   So, would Campbell JR own the entire alleyway?
10  A   Yes.
11  Q   Do you know what property Campbell JR currently
12  owns?  Does he just own or she just own the alleyway
13  itself, or is there a property that that alleyway is
14  attached to?
15  A   I can't answer that.
16  Q   Is that property currently leased to anybody by
17  Campbell JR, as far as you know?
18  A   I'm not aware of that.
19  Q   How does that work when somebody owns an
20  alleyway behind Boca Raton property?  Do they pay taxes
21  on it?
22  A   I can't answer that.
23  Q   Do they have any duty to maintain it as far as
24  the city is concerned?
25  A   Yes I would believe so.

**11**

1   Q   Do you know what their duty to maintain it is as
2   imposed by the city?
3   A   No, I don't.
4   Q   Do you know who would know that?
5   A   Probably our code enforcement department.
6   Q   How did you come to realize that Campbell JR
7   owns that alleyway?
8   A   I looked up the plat.
9   Q   When did you do that?
10  A   After Mr. Badger had notified me of a possible
11  accident back there.
12  Q   Did you ever put Campbell JR on notice of the
13  accident and Ms. Osorio's claim against the City of
14  Boca Raton?
15  A   No, I didn't.
16  Q   In your answers to interrogatory number three,
17  there's a note.  It appears the property where the
18  alleged fall took place was owned by John Sedlak and
19  Dorothy Sedlak and leased to the U.S. post office.  Is
20  that the property that's adjacent to that alley, but
21  that's on post office property?
22  A   That's correct.  It's on Sedlaks' property.  The
23  post office leased, or at that time, leased it off of
24  Sedlak.
25  Q   What -- and you're the person that's being

**12**

1   produced with the -- as the person with the most
2   knowledge regarding this accident; is that correct?
3   A   No.
4       MR. CORBETT:  My understanding was he was just
5   he was served independently.
6   BY MR. BILLERA:
7   Q   Do you know who would be the person with the
8   most knowledge of this accident for Boca Raton?
9   A   Perhaps the fire department.  They may have been
10  called on the incident.
11  Q   Anyone else --
12      MR. CORBETT:  Mr. Billera, sorry, the document
13  you just passed is the plat.  I don't know if that's
14  what you're looking for.
15      MR. BILLERA:  Sure.
16      THE WITNESS:  Perhaps the police department was
17  also notified of this accident.
18  BY MR. BILLERA:
19  Q   Is there a public easement in that alleyway by
20  virtue of the terms of the City of Boca Raton?
21  A   Not that I'm aware of.
22  Q   So, he could close that alleyway off,
23  Mr. Campbell could if he wanted to?
24  A   I can't answer that.
25  Q   That would be between him and the property

**13**

1   owners, but not between him and the city or you don't
2   know?
3   A   I don't know.
4   Q   What does the City of Boca Raton do regarding
5   streets that are in disrepair that are alleyways owned
6   by another person?
7   A   You would have to ask code enforcement how they
8   handle that.  I don't get involved in
9   privately-maintained property.
10  Q   And any particular part of code enforcement?  It
11  wouldn't be building, right?  It would be who?
12  A   Yeah, it's possible the building department.
13  Q   Do you know if the City of Boca Raton has ever
14  made any kind of repairs to that property?
15      MR. CORBETT:  Object to the form.  Just a
16  little more specific on the property.
17  BY MR. BILLERA:
18  Q   You can answer.
19  A   We have made repairs to the areas around the
20  sewer and water, utilities in that alleyway.
21  Q   Do you have any records of that?
22  A   Yes, I have one record of that that I found.
23  Q   When was that repaired?
24  A   2004.
25  Q   And who made the repair, your department?

4  (Pages 10 to 13)

**14**

1   A   My department as well as utility services.
2   Q   And is utility services a private company or is
3   that part of Boca Raton?
4   A   It's a department within the City of Boca Raton.
5   Q   Okay.  And what was done to the sewer in 2004?
6   A   I can't answer that.
7   Q   Who would be able to answer that?
8   A   George Norton possibly.
9   Q   And does your department have any records
10   regarding what was done?
11   A   Yes.  I stated I provided that record or I have
12   a copy of that record.  You don't have it.  I just got
13   it today.
14   Q   Okay.
15   A   I brought a copy of that for you.
16   Q   Did you bring it with you?
17   A   Yes, I did.
18   Q   Can I see it?  Sir, what other documents have
19   you reviewed in anticipation of or preparation for this
20   deposition today?
21   A   I looked at a survey.
22   Q   Is that included here?
23   A   That is the plat that I looked at.
24   Q   Okay.  The survey's something different?
25   A   Yes.

**15**

1   Q   Do you know if the survey was included before in
2   your documents to us?  I think we have something.
3   A   No, I don't know if they had been included.
4   They should have been.
5   Q   Is that the survey?
6   A   No, that's not it.
7   Q   So, what does that survey look like?
8   A   Well, I have a copy of that.
9   Q   Thank you.  You saw it, you want to see it?
10       While David's looking -- Mr. Mellinger is
11   looking at this survey, I'm going to ask you to
12   identify what's marked as JR Campbell, subdivision 61.
13   What is that, sir?
14   A   That's the platted subdivision.
15   Q   That shows that area to be owned by JR Campbell;
16   is that correct?
17   A   Yes.
18       (Whereupon, the document referred to was marked
19   for identification as Plaintiff's Exhibit No. 4.)
20   BY MR. BILLERA:
21   Q   Can you show us on this where the accident
22   occurred?  Do you have an understanding of where the
23   accident occurred on here or approximately?
24   A   In my estimation, it would be somewhere between
25   lots four and five.

**16**

1   Q   Can you draw a circle?  And we understand that
2   it's not perfectly to scale or exact as to area, but
3   approximately the area.
4   A   Right in there.
5   Q   When you say between lots four and five, which
6   of those lots would be the post office property?  Do
7   you know that?
8   A   I believe lots three through six belong to them,
9   to the -- at that time, John Sedlak.
10   Q   Who leased lots three through six to the post
11   office?
12   A   Correct.
13   Q   So, as far as you know, lots three through six
14   are leased to the post office from the Sedlaks,
15   correct?
16   A   Yes.
17   Q   And so, if the accident occurred in the
18   alleyway, partially on the street and partially on the
19   parking lot, the alleyway in question would be the one
20   directly beneath the circle that you drew, correct?
21   A   Correct.
22   Q   Just for the record, the circle is in blue.
23       What is the date of this plat?
24   A   July 19 --
25   Q   Is that a 14?

**17**

1   A   Fourteen it looks like or a 19, I'm not sure.
2   Q   Before World War I?
3   A   1914 or 1919.
4   Q   Can you tell from the bottom?
5   A   Oh, yes, 1914.
6   Q   So, as far as you know, no one else but JR
7   Campbell has any responsibility for that alley?
8   A   Yes.
9   Q   Do you know where JR Campbell is today?
10   A   No.
11   Q   Do you know if the city imposes any duty on
12   property owners to maintain the adjacent alley behind
13   their property?
14   A   I can't answer that, no, I don't.
15   Q   Who would know that?
16   A   Someone in our code enforcement.
17   Q   Do you know who the head of the code enforcement
18   would be?
19   A   I can't think of his name right now.
20   Q   What is his title?
21   A   Chief code enforcement officer.
22   Q   Do you know when Boca Raton ran sewers under
23   this alley?
24   A   No, I don't.
25   Q   Do you know if there are any sewers in the

5 (Pages 14 to 17)

18

1  location of the area where Ms. Osorio was injured?
2  A  No, I don't.
3  Q  Have you been to that area?
4  A  Yes, I have.
5  Q  Is there any drainage -- I mean, what are we
6  talking about with the sewer in an alley?  Is that like
7  a drainage area for water to drain out of?
8  A  In that area, it's a sanitary sewer.
9  Q  What is a sanitary sewer?
10  A  A sanitary sewer is the pipe that conduits
11  waste, human waste.
12  Q  Are there any storm drains in that area?
13  A  Not that I'm aware of.
14  Q  Who maintains storm drains for the city?
15  A  That would be me and my staff.
16  Q  Are there any storm drains at all in that
17  alleyway?
18  A  No, not that I'm aware of.
19  Q  Are there any storm drains in any alleyways that
20  you know of that are privately owned?
21  A  That are privately owned?
22  Q  Yes.
23  A  I'm not aware of any.
24  Q  How about storm drains that are on private
25  property, are those maintained by the city?

19

1  A  Sometimes.
2  Q  Are there any storm drains on the property
3  leased to the post office?
4  A  I'm not aware of any, no.
5  Q  Do you know what the terms of the lease are
6  between the property owners and the post office?
7  A  No.
8  Q  Is that something -- when there's a lease of
9  property in Boca Raton, is that something that the city
10  has to review and approve?
11  A  I can't answer that.
12  Q  Who would be able to answer that?
13  A  I don't know.
14  Q  And is there a sewage and water department that
15  has to permit the use of any property for, say, a
16  change of use?
17  A  Possibly.
18  Q  But you're not aware of it?
19  A  No, I'm not aware of it.
20  Q  Do you know what permits were issued to the U.S.
21  post office by the City of Boca Raton on that property?
22  A  No.
23  Q  Did you take a look to see what permits were
24  issued?
25  A  No.

20

1  Q  Other than the work done on the sewer line by
2  the City of Boca Raton in that area, do you know if any
3  other repairs, modifications, or changes by the City of
4  Boca Raton to that alleyway?
5  A  Yes.
6  Q  What other changes, repairs, or modifications
7  were there?
8  A  There was a water meter box lid that was
9  replaced and the pavement repair around it.
10  Q  Did you tell us everything that you reviewed?
11  You said you reviewed a plat.  What else did you review
12  in anticipation of this deposition -- in preparation
13  for this deposition?
14  A  That survey.
15  Q  Survey.
16  A  Some maintenance records.
17  Q  Is that all you found was the water meter box,
18  plus the change to the sewer?
19  A  I didn't find the water meter box.  That's from
20  my own memory.
21  Q  Okay.
22  A  I couldn't find any record of that maintenance,
23  but I do remember us doing that work.
24  Q  Did you find any other changes or modifications
25  or repairs to the area of the accident?

21

1  A  No.  I also had some documents on the parking
2  lot east of that, because we weren't sure where this
3  accident actually occurred.  So, there was some
4  documents I reviewed.
5  Q  Have you reviewed the photographs that the
6  plaintiff produced regarding where the accident
7  occurred?
8  A  No.
9  Q  Were you provided photographs from the post
10  office investigator showing the other parking lot as
11  well?
12  A  No.
13  Q  So, the post office investigator indicated
14  that's where the accident occurred in that alleyway,
15  correct?
16  A  He described that area, yes.
17  Q  And he didn't describe any other area, correct?
18  A  That's correct.
19  Q  I'm going to ask if you know, was this
20  photograph produced to you by the post office or by the
21  plaintiff, if you know?
22  A  That looks like something I took.
23  Q  Okay.  'Cause that one is also followed by
24  another picture that seems to have the same time stamp
25  on it.  What do you think?

6  (Pages 18 to 21)

22

1    A  I can't read the time stamp.
2    Q  Well, even the fact of the time stamp.
3    A  It looks like something I took, yes.
4    Q  Okay.  Did you produce photographs of the other
5  areas you took photographs of, do you know?
6    A  That's the only area I took photographs of.
7    Q  And that's the area you understood where the
8  accident occurred, correct?
9    A  Yes.
10    Q  And do you recall taking the photograph showing
11  the water?
12    A  Yes.
13    Q  And did you check if there was a hole in that
14  area at the time?
15    A  Yes.
16    Q  And was there a hole?
17    A  No.
18    Q  Had you seen any signs of recent repairs to that
19  area?
20    A  Yes.
21    Q  Do you know who did those repairs?
22    A  No.
23    Q  Do you know who would have done those repairs?
24    A  No.
25    Q  But your department didn't do those repairs?

23

1    A  I can't answer that.
2    Q  Do you know who paved that road?
3    A  I believe the City of Boca Raton paved it at one
4  time.
5    Q  And were they paid by the long lived Mr. --
6    A  JR Campbell?
7    Q  Yeah, to pave it?
8    A  No, I don't believe so.
9    Q  Why would they pave a private road if they
10  weren't paid to do so?
11    A  I don't know.
12    Q  Is it Boca's practice to pave private roads?
13    A  No.
14    Q  Do you know when the road was paved?
15    A  No.
16    Q  Why is it your belief that the City of Boca
17  Raton paved the road?
18    A  In my discussion about this with other staff
19  members, it was brought to my attention that it was
20  paved.
21    Q  By the city?
22    A  Yes.
23    Q  Do you have any records of that?
24    A  I don't, no.
25    Q  Do you know where any records might be located?

24

1    A  I don't know where the records might be, perhaps
2  Mike Wood, our chief inspector, would know where those
3  records may be.
4    Q  What records are kept of paving jobs, in
5  general?
6    A  I don't know, I can't answer that.
7    Q  Who would know that?
8    A  Tony Puerta, possibly.
9    Q  What's his -- how do you spell his last name?
10    A  P-U-E-R-T-A.
11    Q  What's his title?
12    A  I believe it's city engineer and stormwater
13  specialist.
14    Q  And you mentioned Mike Woods?
15    A  Mike Wood.
16    Q  Wood, I'm sorry.  What's his title?
17    A  Chief inspector.
18    Q  Is he with your department or different
19  department?
20    A  He's with the municipal services department,
21  engineering division.
22    Q  Did you come to understand what the
23  circumstances were for the city paving that road; if it
24  had been requested by anyone or if it had been ordered
25  by the city?

25

1    A  He informed me that it was requested by a member
2  working for the city, a person working for the city.
3    Q  And he being who?
4    A  Mike Wood.
5    Q  I mean, do you understand that it was like some
6  kind of favor done by that member for the property
7  owner or was it an official request or do you know?
8    A  I don't know.
9    Q  And did you understand whether there was any
10  payment by the property owner to Boca?
11    A  I don't know.
12    Q  Do you know how long ago the paving was?
13    A  Not specifically, no.
14    Q  In general?
15    A  In general --
16    Q  More than five?
17    A  -- 10 years ago.
18    Q  Do you know if the city has done any patching of
19  the alleyway since then?
20    A  No, I don't.
21    Q  Was it your department that would have paved it
22  10 years ago?
23    A  No.
24    Q  What department would have paved it?
25    A  That was done by a private contractor.

7 (Pages 22 to 25)

26

1   Q   On behalf of the city?
2   A   Yes.
3   Q   What's the name of the private contractor?
4   A   I don't know that.
5   Q   Do you have records of who the private
6   contractor would be?
7   A   I wouldn't, no. Tony Puerta might.
8   Q   Was that the practice back then, if something
9   needed to be paved on the city's behalf, they would
10  hire a private contractor?
11  A   Sometimes, yes.
12  Q   And sometimes the city would do it?
13  A   Yes, sometimes.
14  Q   So, how do you have knowledge that that was done
15  by a private contractor as opposed to the city?
16  A   In conversation with Mr. Wood.
17  Q   He remembered it was a private contractor?
18  A   Yes.
19  Q   With that contractor -- are you familiar with
20  other places where private contractors have been paving
21  on behalf of the city?
22  A   Yes.
23  Q   Do those contractors thereafter have a
24  continuing duty to maintain the areas that they pave?
25  A   No.

27

1   Q   Do those contractors ever step in and patch
2   something they paved?
3   A   Yes.
4   Q   If asked to by the city?
5   A   Yes.
6   Q   So, what if a private contractor has paved a
7   road or an alleyway and there's a problem with it.
8   What's the next step? Does the contractor call to fix
9   it, or does the city go fix it usually themselves?
10  A   It depends on the situation.
11  Q   Right. I imagine that the first time they paved
12  it and did it wrong, you'd make them fix it, correct?
13  A   Correct.
14  Q   But if two years later, there's a sink hole in
15  it, is that something the city would fix?
16  A   Not on a private alleyway.
17  Q   How about any road paved by a private contractor
18  on behalf of the city that's not privately owned?
19  A   Yes.
20  Q   What -- is there any mechanism in place once a
21  private road has been paved by the City of Boca Raton
22  to maintain that road?
23  A   Not that I'm aware of.
24  Q   Is there any mechanism in place once the City of
25  Boca Raton has paved a private road to inspect it?

28

1   A   No.
2   Q   And what evidence of repair did you find? I'm
3   sorry, I didn't mark it yet, so we'll mark it as
4   Exhibit 4 -- 5,
5       (Whereupon, the document referred to was marked
6       for identification as Plaintiff's Exhibit No. 5.)
7   BY MR. BILLERA:
8   Q   What evidence did you find of a recent repair in
9   that spot?
10  A   It looks like there was some different colored
11  asphalt at the bottom of that puddle.
12  Q   Newer and darker?
13  A   Yes.
14  Q   Do you know what date this was taken, referring
15  to Exhibit 5?
16  A   I believe that was taken in November 29th, I
17  believe, 2000 and -- 2007, I believe.
18  Q   I'm sorry, date of accident was December 5,
19  2006. So, that would be about a year later?
20  A   Yes.
21  Q   I noticed on the survey you gave me or produced
22  here, and is this an extra copy or is this your
23  original?
24  A   That's a copy.
25  Q   Can we attach this to the deposition, do you

29

1   guys have any objection?
2       MR. CORBETT:  (Shakes head.)
3       MR. MELLINGER:  No, that's fine.
4   BY MR. BILLERA:
5   Q   On this survey, there appear to be storm -- I'm
6   sorry, roof runoff drains in the post office building.
7   Are you familiar with those?
8   A   No.
9   Q   Do you know what a roof runoff drain is?
10  A   Yes.
11  Q   What is a roof runoff drain?
12  A   It's the drains to the ground from the roof.
13  Q   Sort of like a gutter and then those would be
14  the down pipes or the downspouts from a gutter?
15  A   Could be.
16  Q   And is there any requirement by the City of Boca
17  Raton, that you know of, that -- where there's roof
18  runoff drains there should be a storm drain or
19  something to take that water away?
20  A   I'm not aware of any requirement.
21  Q   Are you able to identify on this survey the area
22  of where we believe Ms. Osorio's accident allegedly
23  occurred? I hate to block everything out here.
24  A   Well, the area that was described to me was
25  somewhere right in this area, marked as asphalt

8 (Pages 26 to 29)

U.S. Legal Support
(561) 835-0220

**30**

1  parking, right on the edge of that.
2  **Q  Is it okay if we mark that?  I'm going to have**
3  **you just draw a circle, where you understand that her**
4  **accident occurred, and that's also the area that is**
5  **depicted in the photograph that we marked as Exhibit 5,**
6  **right here?**
7  A  Yes.
8  MR. BILLERA:  I'll attach this survey as six.
9  (Whereupon, the document referred to was marked
10  for identification as Plaintiff's Exhibit No. 6.)
11  BY MR. BILLERA:
12  **Q  Do you know when this survey was performed?**
13  A  No.  Oh, drawing date was done in 2000.
14  **Q  2000?**
15  A  March of 2000, yes.
16  **Q  I'm sorry to interrupt.**
17  So, this is -- this was not in response to the
18  accident, this was done prior to the accident, correct?
19  A  Yes.
20  **Q  And do you know what the purpose of this survey**
21  **was for?**
22  A  No.
23  **Q  Is there anything in the survey that would tell**
24  **you what the purpose was for?**
25  A  It says specific purpose survey of alley behind

**31**

1  the downtown post office.
2  **Q  Is there some reason why this survey is**
3  **performed on a regular basis?  Do they survey every**
4  **street every 10 years or anything that you know of that**
5  **would be the reason for this?**
6  A  No, I can't answer the reason for this survey.
7  It says, specific purpose survey.
8  **Q  On this area marked sewer manhole, your**
9  **understanding is that's for the sanitation line?**
10  A  Yes.
11  **Q  So, as far as you know, the City of Boca Raton**
12  **paved this alleyway from -- well, for the entire way**
13  **shown on the survey; is that correct?**
14  A  That was reported to me by Mr. Wood, yes.
15  **Q  And does this survey show anywhere who the**
16  **current owner is?**
17  A  No.
18  **Q  Is that something normally included on a survey?**
19  A  Not on a specific survey that I'm aware of.
20  **Q  What is this photograph of?**
21  A  Photograph depicts the loading dock near the
22  post office and the alleyway adjacent to that.
23  **Q  And is the area shown in Exhibit 5 also shown in**
24  **7?**
25  A  Yes.

**32**

1  MR. BILLERA:  I marked that photograph as
2  Exhibit 7 that we just discussed.
3  (Whereupon, the document referred to was marked
4  for identification as Plaintiff's Exhibit No. 7.)
5  BY MR. BILLERA:
6  **Q  Where is that?**
7  A  Right here (indicating), and off the right here
8  (indicating).
9  **Q  And could you draw a circle in Exhibit 7 as to**
10  **where the area of plaintiff's fall is believed to have**
11  **been or approximately?**
12  A  Okay.  Somewhere in that area.
13  **Q  And that's where -- what you drew the circle**
14  **around I thought as first was a fence, but that's**
15  **actually a reflection of water, correct?**
16  A  Yes.
17  **Q  There's no fence in that area?**
18  A  No.
19  **Q  That's asphalt that's got standing water in it,**
20  **correct?**
21  A  Yes.
22  **Q  Now, the area to the left of the circle you just**
23  **drew, what area is that?**
24  A  That is the loading dock area of the post
25  office.

**33**

1  **Q  And that's the property that is leased to the**
2  **post office, correct?**
3  A  The post office leases the property from the
4  property owner.
5  **Q  And that's John P. Sedlak and Dorothy Sedlak?**
6  A  At the time I did the research, yes, that was
7  correct.
8  **Q  Do you know if they're still the property owner?**
9  A  No, I don't believe so.
10  **Q  If there is an addition on the post office**
11  **leased property that's not according to code, do you**
12  **know if the city would approach the Sedlaks or they**
13  **would approach the city, I mean, the U.S. post office**
14  **regarding that condition?**
15  A  They would approach the property owner.
16  **Q  Okay.  Not the property lessor?**
17  A  I really can't answer for code enforcement.  So,
18  I'd say, I don't know.  Possibly, but I don't know.
19  **Q  They would issue citations, as far as you know,**
20  **to the property owner?**
21  A  Correct.
22  **Q  So, if there is a bad sign up, they would cite**
23  **the property owner?**
24  A  Yes.
25  **Q  Would they also cite the tenant?**

9  (Pages 30 to 33)

**Page 34**

1    A   I can't answer that.  They might.
2    Q   So, you don't know?
3    A   No, I don't.
4    Q   Did you know if any citations were ever issued
5    to the United States Post Office by the City of Boca
6    Raton?
7    A   No.
8    Q   Who would know that?
9    A   Our code enforcement department.
10   Q   Did we talk about all the documents that you
11   reviewed in anticipation for this deposition?
12   A   I believe so.
13   Q   Did you review any kind of accident reports or
14   incident reports?
15   A   No.
16   Q   Other than paving that alleyway, do you know if
17   this and maintaining the sewer one time and fixing a
18   meter box, do you know of any other involvement that
19   the city of Boca Raton has had in that alleyway?
20   A   No.  Oh, yes, I do.  I'm sorry, can I back up
21   there?
22   Q   Sure.  What would that be?
23   A   We built a parking lot on the very east end of
24   that.
25   Q   Is that contained in the plat, the survey

**Page 35**

1    rather?
2    A   Yes, it should be.
3    Q   Where would that be?
4    A   Right here (indicating).
5    Q   So, on the right-hand portion of the survey,
6    just for the record, is there -- it says, asphalt
7    parking, six-inch extruded curb.  That's where the City
8    of Boca Raton built a parking lot?
9    A   Yes.
10   Q   When was that built?
11   A   I don't know the exact date.
12   Q   Approximately; five, 10 years ago?
13   A   Ten years ago.
14   Q   Does the City of Boca Raton maintain that
15   parking lot?
16   A   Yes.
17   Q   And, in fact, the alleyway was paved right
18   around that same time?
19   A   Yes.
20   Q   Was the alleyway paved in relation to the
21   building of that parking lot?
22   A   I don't know.
23   Q   Do you know who owns the -- that parking lot, is
24   that owned by the city --
25   A   Yes.

**Page 36**

1    Q   -- or is it leased by the city?
2    A   It's owned by the City of Boca Raton.
3    Q   And in fact, the alleyway that we're talking
4    about where the plaintiff was injured is the access
5    point for that parking lot?
6    A   It's the exit point, yes.
7    Q   The exit point.
8    A   Uh-huh.
9    Q   And without that alleyway, you couldn't exit
10   that parking lot; is that correct?
11   A   Well, you could -- there's five feet you could
12   exit on here.
13   Q   So, that five feet goes out to the street also?
14   A   Yes.
15   Q   Is that alleyway one way?
16   A   No, not that I'm aware of.
17   Q   Do you know if that -- if the parking lot has
18   been recently maintained in the last 10 years, if it's
19   been resurfaced?
20   A   Yes, I do.
21   Q   When was it last resurfaced?
22   A   It has never been resurfaced.
23   Q   When was it last maintained?
24   A   It was maintained in November, I believe, of
25   this year by may staff.

**Page 37**

1    Q   What maintenance was done on the parking lot by
2    your staff?
3    A   Given a minor asphalt repair next to a storm
4    drain inlet.
5    Q   What --
6    A   And we also did a repair on a sidewalk area
7    adjacent to that, a ground portion of it to make it
8    flush with the adjacent sidewalk.
9    Q   Why did the -- how about prior to that?  When
10   was the last repair prior to that, do you recall?
11   A   No.
12   Q   Do you recall if it was within five years?  Is
13   it something you do every year?
14   A   To my knowledge, that's the only repair we've
15   done to that area.
16   Q   Why did the asphalt have to be repaired next to
17   the storm drain anyway?  What had happened to it?
18   A   It settled slightly.
19   Q   And when you say settled, was there a pothole
20   there?
21   A   No.  It was a depression next to a storm drain,
22   concrete storm drain inlet.
23   Q   Do you know why the depression was caused?  Was
24   it from vehicle traffic or was it from erosion from the
25   water?

U.S. Legal Support
(561) 835-0220

**38**

1  A  It could have been both.

2  Q  And how about the sidewalk, was that also from

3  settling?

4  A  Sidewalk difference was from the sidewalk on the

5  post office side had settled and so we ground those to

6  match that existing sidewalk.

7  Q  So, some of it settled and you ground down the

8  higher sidewalk, so --

9  A  Yes.

10  Q  -- it was level surface?

11  Is that parking lot an access point for the post

12  office?

13  A  It could be, yes.

14  Q  Is it a municipal parking lot?

15  A  Yes, it is.

16  Q  So, they can go to any business around there,

17  it's not just dedicated to one business?

18  A  That's correct.

19  Q  I didn't mean to interrupt you before. Were you

20  saying something?

21  A  We also did some grinding on the sidewalks at

22  the intersection, too --

23  Q  From settling?

24  A  -- around the same time.  Yes.

25  Q  Do you know why there's so much settling in that

**39**

1  area?

2  A  No.

3  Q  Is there any indication here what the bedrock or

4  foundation is underneath the streets or alleyway under

5  the parking lot?

6  A  No.

7  Q  Can you tell from this survey how long the

8  alleyway is?

9  A  No.

10  Q  As far as you know, is the area depicted in

11  Exhibit 5, the same area depicted in the photograph I'm

12  showing you with the post office trucks?

13  And maybe this would be a better --

14  A  Yes.

15  MR. BILLERA:  So, I'm going to -- you have that

16  Dave?

17  I'm going to mark that as our next exhibit, 8.

18  And if we're looking at -- let me see if I have a

19  better shot of this.  If you were to assume this is

20  the same as this, I'll mark this as 9 and 10.

21  (Whereupon, the documents referred to were

22  marked for identification as Plaintiff's Exhibit

23  Nos. 8, 9 and 10.)

24  BY MR. BILLERA:

25  Q  Nine is a different view of the area you

**40**

1  described in Exhibit 8, do you agree with that?

2  A  Yes, it looks like it.

3  Q  And then if you assume 10 is the same, but just

4  an overhead view of that same area, are you able to

5  tell, looking at all of these, whether any portion of

6  this hole, for want of a better term pothole, is on

7  property leased by the post office?

8  A  Not from them photographs.

9  Q  Well, on the survey, can you identify where the

10  post office property begins and where the private

11  alleyway ends?

12  A  As far as I know, it's not post office property.

13  It's private property.  You keep describing as post

14  office property.

15  Q  Post office leased property.

16  A  Okay, okay.

17  Q  Property leased by the post office and we don't

18  disagree with that.

19  A  At this point right here, it looks like where

20  the survey points out this line --

21  Q  Uh-huh.

22  A  -- that looks like where the 3.13 feet from the

23  edge of building...

24  Q  Would be post office leased property?

25  A  Correct.

**41**

1  Q  Owned by the *Sedlaks*, as far as we know; is that

2  right?

3  A  At that time --

4  THE VIDEOGRAPHER:  Excuse me.  We have to

5  standby to stop tape, plus the witness' microphone

6  has dropped on the ground.  We're going to standby,

7  we're going to stop, we're going to switch tapes.

8  And we'll have time to make the change.  Standby to

9  stop.

10  (Whereupon, a short recess was taken.)

11  THE VIDEOGRAPHER:  We're going to standby to

12  roll, and tape is rolling.

13  BY MR. BILLERA:

14  Q  So, could you please mark on the survey the area

15  where the owner of the property -- where their property

16  begins and where the private alley ends, according to

17  the survey?  Thank you, sir.

18  A  Right here, at this point (indicating), it looks

19  like to me.

20  Q  How about the -- do you know who owns that

21  parking lot?

22  A  It's privately owned, yes.

23  Q  By the Sedlaks as well at the time?

24  A  Yes.

25  Q  And was it leased to the post office building at

11  (Pages 38 to 41)

```
                                        42
1    the time?
2        A  As far as I know, yes.
3        Q  And when you drew that line, that line would
4    extend fully down the alleyway, correct --
5        A  Yes.
6        Q  -- it doesn't vary?  Okay.
7           So, could you draw -- could you draw that line
8    straight across the parking lot, just so we have a
9    clear record?  And we know you're going to try to
10   follow that and not go off, but it's hard to do that.
11       A  (Witness complies.)
12       Q  Okay, great.  You indicated a blue line that
13   appears to be, is that east or south rather of the
14   circle that you drew?
15       A  South.
16       Q  Okay.  And the post office building is depicted
17   on this survey and your understanding is that the
18   responsibility for the property extends 3.13 feet away
19   from the building?
20       A  According to the survey, yes.
21       Q  So, that indication of 3.13, that's at the
22   right-hand end of the line you drew, that indication is
23   the amount of property that is owned by the property
24   owner as opposed to the alleyway, correct?
25       A  Yes.
```

```
                                        43
1        Q  And, just for the record, we believe that the
2    pothole depicted in Exhibit 10 is the same as that in
3    9, do you have any disagreement with that?
4        A  No.
5        Q  Did you ever have any discussions with the post
6    office as to, hey, you know, who owns the property
7    where this pothole was?
8        A  I had discussion with Mr. Badger, the
9    investigator for the post office --
10       Q  Uh-huh.
11       A  -- in regards to records that I might have as
12   far as maintenance of that area.
13       Q  Okay.  How about as to who's responsible for a
14   pothole sitting on the property?
15       A  No.
16       Q  And did you learn anything in your discussions
17   with Mr. Badger or produce any information that we
18   haven't discussed already regarding maintenance?
19       A  No.
20       Q  Is there some kind of protocol if there's a city
21   street and there's a big pothole and part of it's on
22   the city property and part of it is on just,
23   hypothetically, I'm not talking about our particular
24   situation, but part of the pothole is on city street
25   and part of the property's [sic] on, say, a private
```

```
                                        44
1    property owner's property and someone's saying, hey, we
2    gotta fix this pothole, is there a protocol for that?
3        A  Yes.
4        Q  What is that?
5        A  We would repair -- the city would repair our
6    section and attempt to notify the property owner to do
7    the repairs in their area.
8        Q  So, if it's a big hole you would just do half of
9    it?
10       A  Yes.
11       Q  And the other one could just stay there and they
12   need to fix it?
13       A  That's correct.
14       Q  Is there any time you would actually do the
15   whole thing and send them a bill and say, there's a
16   cost for this?
17       A  Yes, there might be.
18       Q  Do you recall that specifically, as we sit here
19   today?
20       A  I don't remember any specific ones, but...
21       Q  And if it's mostly on Boca property and just a
22   lip of it is on a private property owner, is the city
23   usually going to fix that one themselves, or is there
24   any rule like if it's 50/50, we're only going to fix
25   50 percent?
```

```
                                        45
1        A  There's no hard and fast rule, no.  And we'll
2    err on the side of repairing typically the greater
3    majority of the hole.
4        Q  But, normally, wherever the city's property cuts
5    off, that's where you're going to stop?
6        A  We try to, yes.
7        Q  Okay.  And how do you determine whether it's on
8    city property versus a private property owner's
9    property?  Is it from the survey that we discussed?
10       A  Sometimes.
11       Q  What other means would you use?
12       A  Kind of rule of thumb things; edge of pavement
13   typically was a good indicator of where their
14   responsibilities to pave the area would be.  Sometimes
15   aerial photographs that depict property lines from
16   either the county Web site or our own.
17       Q  Have you seen any aerial photographs of this
18   area?
19       A  Yes, I have.
20       Q  Did you look them up online or do you have them?
21       A  I don't have them with me.  We have a program
22   called Pictometry that we -- the city utilizes.  It has
23   aerial photographs from 2005 and 2007.
24       Q  And you reviewed those when?
25       A  Let's see, about four or five months ago, maybe.
```

12 (Pages 42 to 45)

46

1   Q   In relation to this accident to try to see where
2   the accident occurred?
3   A   Yes, in discussion with my attorney or our
4   attorney.
5   Q   And I don't want you to -- I don't want to
6   accidentally ask you to reveal something of your
7   discussion with your attorney, other than specific
8   facts that you may have learned independently from your
9   attorney, okay?
10  A   Uh-huh.
11  Q   Because that would be covered by your
12  attorney-client privilege, but were you able to
13  determine independently looking at the photographs
14  where the accident occurred?
15  A   No.
16  Q   Were you able to determine independently looking
17  at the photographs, not particularly where the accident
18  occurred, but who owned the property where the accident
19  occurred?
20  A   No.
21  Q   So, the photographs didn't help you either way?
22  A   Not in those two respects.
23  Q   How do they help you?
24  A   It was the attorney's intent to question --
25      MR. BILLERA:   That's up to you.

47

1      MR. CORBETT:   Just I would err on the side of
2   caution.
3   BY MR. BILLERA:
4   Q   I don't want you to tell me what your attorney
5   intended?
6   A   It was a different attorney, but at the time
7   representing the city.
8      MR. CORBETT:   It's the same.
9      MR. BILLERA:   Yeah, you still get the
10  privilege.
11  BY MR. BILLERA:
12  Q   They were helpful in your discussions with your
13  attorney?
14  A   Yes.
15  Q   I don't want to go any further into that.
16      But, normally, if you're trying to figure out
17  who is responsible for fixing a pothole, the edge of
18  the pavement is a good indicator, correct?
19  A   Yes.
20  Q   Because, normally, on private property it's not
21  going to be particularly paved, it might be grass --
22  A   Correct.
23  Q   -- or dirt or concrete?
24  A   Uh-huh.
25  Q   So, is one of your duties to fix potholes for

48

1   the city?
2   A   Yes.
3   Q   And are you familiar with how long it takes
4   potholes to develop or what causes them to develop?
5   A   It depends on the situation, I guess, on the
6   specific area.
7   Q   Well, if you were to assume that the pothole
8   that my client fell in was four and a half inches deep,
9   24 inches wide, and approximately 38 inches long, do
10  you have an opinion as to how long it would have taken
11  a pothole that size to occur?
12  A   No.
13  Q   Is that something that happens sometimes
14  overnight and sometimes over a year or --
15  A   Both.
16  Q   So, it could have just sunk immediately?
17  A   It could have, yes.
18  Q   And it could have been there for a year?
19  A   Yes.
20  Q   You just have no idea?
21  A   No.
22  Q   And what normally causes a pothole to occur?
23  A   It varies depending on the situation.  In this
24  case, it looks like standing water and traffic probably
25  created this problem.

49

1   Q   How would standing water and traffic create a
2   pothole, what happens?
3   A   Water softens the base of the -- underneath the
4   asphalt.  And loosens that and creates an unstable
5   condition.  And the traffic actually creates a live
6   load and forces the asphalt out of the hole.
7   Q   That -- but that doesn't happen overnight, the
8   water has to stand for a while to loosen up the
9   asphalt, correct?
10  A   It could.  It could happen overnight depending
11  where the water came from.
12  Q   And it also could happen over time --
13  A   That's correct.
14  Q   -- standing water for a long time?
15  A   (Nods head.)
16  Q   And, in fact, if it's standing water, it
17  normally takes a long time for it to wear away the
18  asphalt, correct?
19  A   Yes.
20  Q   Do you -- do you have a cost center that charges
21  the city for fixing potholes?
22  A   No.
23  Q   Does the city contract with outside contractors
24  sometimes to fix potholes?
25  A   No.

13 (Pages 46 to 49)

50

1  Q  Do you know what the cost of fixing a pothole
2  is?
3  A  No.  Depending on the size of the pothole.
4  Q  Assuming it's the pothole in question which we
5  believe to be about four and a half inches deep,
6  24 inches wide, and approximately 38 inches long?
7  A  You're asking me what the cost to fix that
8  pothole is.
9  Q  Yeah, what would it cost?
10  A  Estimated value, probably $200.
11  Q  And that would be hiring an outside contractor?
12  A  No, that was doing it with my staff.
13  Q  That would be your in-house cost?
14  A  Yes.
15  Q  Is that 200 for the material?
16  A  No.  That's 200 for everything, materials and
17  labor.
18  Q  Okay.  And how long does it take to fix a
19  pothole like that?
20  A  It varies depending on what's needed, but...
21  Q  Assuming it had standing water in it, would you
22  have to --
23  A  Yes --
24  Q  -- suck that out --
25  A  -- we'd have to remove the water.

51

1  Q  -- dry it out?
2  A  Sweep it or dry it.
3  Q  And then fill it?
4  A  Yes, and then fill it.  And then it would be
5  time going back and forth to the asphalt plant and
6  things like that.
7  Q  So, how many hours or days do you think it would
8  take to fix that?
9  A  Just to do that one pothole, it would probably
10  take two hours.
11  Q  Do you know how many potholes a week your
12  department fixes?
13  A  No.
14  Q  Or a month?
15  A  No.
16  Q  What would be a busy week or month versus a
17  light week or month, like what's the range?  I'm sure
18  it's from none probably to how many --
19  A  I really don't track potholes, repairs
20  personally, so I don't know.
21  Q  Who would know that, just as a range?
22  A  Our asphalt crew.
23  Q  Does your asphalt crew do anything other than
24  fix potholes?
25  A  Yes.

52

1  Q  What else do they do?
2  A  They do utility cut repairs and also concrete
3  work.
4  Q  I kind of started off a little backwards.  Have
5  you given a deposition before?
6  A  Yes, I have.
7  Q  So, you understand the rules that you're under
8  oath, just like you're in a court of law?
9  A  Uh-huh.
10  Q  And that, you know, anything you say at this
11  deposition we'll hold you to later, you understand
12  that?
13  A  Yes.
14  Q  Okay.  And, of course, if I ask you anything you
15  don't understand I'll be happy to repeat for you,
16  right?
17  A  Okay.
18  Q  When is the last time you gave your deposition?
19  A  I don't remember, probably close to a couple
20  years ago.
21  Q  And what kind of case was it?
22  A  Trip and fall.
23  Q  In a pothole?
24  A  No.
25  Q  What kind of --

53

1  A  On a sidewalk.
2  Q  Is that something your department also
3  maintains, the sidewalks?
4  A  Yes.
5  Q  Other than streets, sidewalks, do you have any
6  other areas that are in your control?
7  A  Yes.  Storm drains and canals and waterways,
8  lakes.
9  Q  Who is your direct supervisor?
10  A  Maurice Morrell.
11  Q  What's Maurice's position?
12  A  City civil engineer.
13  Q  Are any of your employees -- are there any of
14  your employees that would have been involved in any way
15  in this incident?  And I know we didn't identify any
16  directly involved, but just in general terms of their
17  job titles that we haven't talked about yet, someone
18  that might have paved the street 10 years ago that we
19  haven't talked about yet, as far as a job title?
20  A  That might have paved it 10 years ago?
21  Q  Yeah.  In other words, is your paving department
22  different --
23  A  Yes.
24  Q  -- than the people we talked about before?
25  A  Yes.

14 (Pages 50 to 53)

U.S. Legal Support
(561) 835-0220

54

1  Q  Who is that?
2  A  The people that paved it were a private
3  contractor that paved that alleyway, and the people
4  that do the maintenance is my staff.
5  Q  So, that would be that Tony Puerta?
6  A  Tony Puerta is not private.  He's a city
7  employee, but he contracts with private companies to do
8  that type of work -- overlaying work.
9  Q  Okay.  So, Tony Puerta would have been the
10  person to hire the contractor and Mike Wood remembers
11  it or Mike Wood would have been involved in it?
12  A  Yes, Tony would have been the person who hired
13  the contractor and Mike Wood would have been the chief
14  inspector on that particular project.
15  Q  Oh, okay.  What kind of documents are generated
16  when you pave a road?  Do you have to submit like
17  permits like a private person would have to if you're
18  the city?
19  A  You'll have to ask Tony on that, what he
20  requires.
21  Q  Tony would know that.  But sitting here, you
22  don't know?
23  A  No, I don't know; specific ones anyway.
24  Q  How about general ones, is there a plat or --
25  A  Usually there's a map of the area that's

55

1  required and is indicated on the map where they will do
2  the paving.  And there are also documents representing
3  striping and that stuff -- that type of work
4  afterwards, after the pavement's done.
5  Q  Okay.
6  A  Generally.
7  Q  Sitting here today, do you know of any other
8  accidents occurring in this area?
9  A  No.
10  Q  Have you ever had any discussions with the
11  Sedlaks regarding this incident?
12  A  No.
13  Q  Have you had any discussions with the Sedlaks?
14  A  No.
15  Q  Do you know who currently owns the property?
16  A  Boca Raton, LLC, I believe.
17  Q  Do you know who the principals are of Boca
18  Raton, LLC?
19  A  No.
20  Q  Do you know when they became owners of the
21  property?
22  A  Not specifically, no.
23  Q  Do you know if they executed a new lease
24  agreement with the post office?
25  A  No, I don't know that.

56

1  Q  But your understanding was the Sedlaks owned the
2  property at the time of the accident, correct?
3  A  Yes.
4  Q  Do you know if the City of Boca Raton has any
5  codes or regulations for private property owners as to
6  how they have to maintain alleyways on their property?
7  A  No, I'm not aware of any.
8  Q  That would be something -- some question for
9  your code enforcement people?
10  A  Yes.  Mike Bergman might be a good contact for
11  that.
12  Q  And what's his title?
13  A  I think his title is chief code administrator or
14  something like that.
15  Q  So, you've never had occasion when you're, you
16  know, trying to fill in a pothole and there's a big
17  sunken spot on private property owner's property to
18  say, hey, according to this code or that code, you need
19  to fix it?
20  A  Yes, we've had some, not according to the --
21  yes, we have.
22  Q  How does that work?  You call out the code
23  people and say, hey, go get 'em or --
24  A  Sometimes.  Sometimes my staff will initiate a
25  complaint to the property owner.

57

1  Q  Okay.  And how does that happen when your staff
2  initiates a complaint to the property owner?
3  A  Well, they can call them, or they can -- they
4  write up a complaint and send it certified mail through
5  the code enforcement.
6  Q  So, that's something written by your staff --
7  A  Yes.
8  Q  -- sent through code?
9  A  Uh-huh.
10  Q  Did you check to see if there's any certified
11  mail ever sent regarding this alleyway?
12  A  No, I didn't.
13  Q  Do you keep a record of complaints that are sent
14  certified mail to property owners?
15  A  No, I don't.
16  Q  Do you know who does?
17  A  Code enforcement, I believe.
18  Q  So, if your staff writes it up, they wouldn't
19  have a file on that property?
20  A  Yes, they would have a file, if my staff wrote
21  it up.
22  Q  Did you check if your staff had any kind of file
23  on this property?
24  A  I questioned my staff on it, and they didn't
25  provide me with any records.

15  (Pages 54 to 57)

58

```
 1      Q  Is there a place where they keep files on
 2  different properties by plat number or however they
 3  keep them?
 4      A  Yes.
 5      Q  You didn't independently take a look at them?
 6      A  No.
 7      Q  Is there a term for a file kept on property?
 8      A  Notice of violation.
 9      Q  Do you keep any other files on property, like
10  work done on the property, even if it's a public area
11  or whatever?
12      A  We keep complaint reports.  We keep MP2 work
13  request documents.
14      Q  Anything else?
15      A  Not that I can think of.
16      Q  Would -- the complaint written up by your staff,
17  would that be in the notice of violation file --
18      A  Yes.
19      Q  -- or would that be separate?
20      A  In the notice of violation file.
21      Q  How about the complaint reports, would that be
22  in the notice of violation file or something separate?
23      A  Separate.
24      Q  What's that file called, complaint reports?
25      A  Complaint reports.
```

59

```
 1      Q  And how that is that indexed, by property?
 2      A  No.
 3      Q  How?
 4      A  There's no real index.  It was just a complaint
 5  report.  It's just a compilation of complaints.
 6      Q  Is it by the date it comes in or the area or
 7  what?
 8      A  There are dates on the complaints.  It can be
 9  filtered by that.
10      Q  What else can be filtered by it?
11      A  They can be searched by name.
12      Q  Name of the person --
13      A  Common field, they could search it in that.
14      Q  Anything else?
15      A  No, nothing I can think of.
16      Q  Is there a particular name for that like techno
17  or some other database that that's called that these
18  complaint reports are a part of or --
19      A  I believe that's called Access.
20      Q  Access.  And this is -- this is a database by
21  which you can track complaints according to location or
22  type of complaint; is that correct?
23      A  Yes.
24      Q  And you have preset fields that you enter, you
25  know, it says slip and fall or a trip and fall and it's
```

60

```
 1  a --
 2      A  Preset fields.  None of them say trip and fall.
 3      Q  What are on the preset fields?
 4      A  Name, owner name, address, telephone number,
 5  date, nature of complaint.
 6      Q  Why is that database kept?
 7      A  For our records review.
 8      Q  Do you also use that database in order to say to
 9  a property owner, look, we had 10 complaints, you need
10  to get this fixed or something like that, in other
11  words --
12      A  We could.
13      Q  Any other purposes for it?
14      A  To see what our own activities are, track our
15  own activities on that.
16      Q  Is it for lawsuits?
17      A  It could be used for that, yes.
18      Q  But that's not its primary purpose?
19      A  No.
20      Q  And it could be used for a lawsuit if you need
21  to figure out if there's other accidents in that area,
22  correct?
23      A  To document when we received the complaint on it
24  and what exactly they complained about.
25      Q  Does your department do accident reports?
```

61

```
 1      A  Yes.
 2      Q  Is that just if something happens within your
 3  department, or do you do accident reports if a person,
 4  a member of the public is hurt on Boca Raton property?
 5      A  Just internal accident reports.
 6      Q  Who would do an accident report if someone
 7  called and said, I got really hurt on a Boca Raton
 8  property?
 9      A  Risk management department.
10      Q  Do you know who that would be?
11      A  Risk -- chief, I think chief risk manager is Pam
12  Gardner.  Not exactly sure if that's her title, but
13  she's in charge of the risk manager.
14      Q  Do you know if they have -- do they use your
15  Access system as well, risk management?
16      A  They'll -- they request information from me
17  regarding if we had any complaints or any problems or
18  issues, they'll --
19      Q  But they don't directly enter any information
20  into Access?
21      A  No.
22      Q  As far as you know, they don't directly pull any
23  information out either?
24      A  No.
25      Q  Did you ever go on Access and take a look to see
```

16 (Pages 58 to 61)

Page 62

1  if there were other complaints in the area of this
2  accident?
3     A  Yes, I did.
4     Q  Did you find any?
5     A  No.
6     Q  And what did you run as the field, did you run
7  that entire alleyway or just the place near the post
8  office or what?
9     A  I ran various scenarios.  One of them I ran was
10  post office, the name search.  Another one was
11  alleyways, another one was potholes.  And I searched
12  those words to see if something had come up in that
13  area.
14     Q  Did you find any other accidents for the post
15  office?
16     A  No.
17     Q  Did you find any other accidents for any
18  alleyways?
19     A  No.
20     Q  Did you find any other accidents for any
21  potholes?
22     A  No.  Well, yes, I did.
23     Q  For potholes?
24     A  Yes, for potholes, I did.
25     Q  And then what did you look at for potholes?

Page 63

1     A  I looked at the -- where they were specifically
2  and if they were in that area.
3     Q  And what did you include to be in that area, the
4  entire alleyway?
5     A  Yes.
6     Q  Did you find --
7     A  The area between Northeast 1st Avenue and Mizner
8  Boulevard.
9     Q  You didn't find any accidents there?
10     A  No.
11     Q  But is that something you would track if it was
12  private property?
13     A  Probably not.
14     Q  How about if a complaint came in, hey, you know,
15  I fell in a pothole on your street and you look and
16  say, it's not our street, would you keep a record of
17  that?
18     A  Yes.
19     Q  And where would that record be kept?
20     A  Under complaints, in that Access database.
21     Q  So, you wouldn't actively track complaints of
22  private property, but if one happened to come in, you
23  would make a record of it and, say, looked it up, it's
24  not our property?
25     A  Yes.

Page 64

1     Q  Did you get a complaint regarding this accident?
2     A  No.
3     Q  When did you first learn about this accident?
4     A  I believe it was in December of '0 -- no,
5  November of '07, I think it was.
6     Q  How long after you learned of this accident did
7  you go out to the area to take pictures?
8     A  It was the next day, I believe.
9     Q  And how did you learn about this accident?
10     A  From a person called Mr. Badger who described
11  himself as an investigator for the United States Post
12  Office.
13     Q  Had you ever met him before?
14     A  No.
15     Q  And did he call you or he come to see you?
16     A  Yes, he called me.
17     Q  And what conversations did you have, what did he
18  tell you about the accident?
19     A  He told me that there was -- he was
20  investigating an accident --
21     Q  Go ahead.
22     A  -- that happened near the post office.  He
23  described that area on the southwest corner of that as
24  an area where there had been some recent repairs and
25  wanted to know if I had any records in maintenance of

Page 65

1  those repairs.
2     Q  Did he tell you anything else?
3     A  He told me there was a person that fell there
4  and got hurt.  That's about it.
5     Q  Were you able to find any records that you were
6  able to give him?
7     A  Well, I sent him some photographs that I took
8  that following day.  And, no, I couldn't find any
9  records of any maintenance.
10     Q  Did you ever meet with him in person?
11     A  No.
12     Q  How many other conversations did you have with
13  Mr. Badger, other than the first one?
14     A  I believe that's it, just one.
15     Q  You didn't follow-up to say, did he get the
16  photos, is that the right area?
17     A  No.
18     Q  You never heard from him again?
19     A  Not that I recall.
20     Q  Did you ever tell him, from my photographs, this
21  looks like Boca Raton property?
22     A  I mentioned in my fax that it looked like a Boca
23  Raton alleyway to him.
24     Q  And did you ever tell him different or send
25  him --

17 (Pages 62 to 65)

**66**

1    A   No, I didn't.

2    Q   -- anything different?

3        Did you ever discuss with him that some of that

4    could be on property leased by the post office?

5    A   No, I didn't discuss that with him.

6    Q   From looking at the survey, does it appear that

7    the accident occurred on property leased by the post

8    office?

9        MR. MELLINGER:  Objection, calls for

10   speculation.

11   BY MR. BILLERA:

12   Q   You can answer.

13   A   It looks like it, yes.

14   Q   Okay.  But in your research, you cannot find any

15   other owner of the property, other than the person who

16   owned it in 1914, of the alleyway, I'm sorry?

17   A   Nope.

18   Q   Well, do you know of any doctrine or any policy

19   by the city that if private property is paved by the

20   city and used by the city that it becomes, after awhile

21   owned by the city?

22       MR. CORBETT:  Object to the form.

23       THE WITNESS:  Not any doctrine that the city

24   has, no.

25

**67**

1    BY MR. BILLERA:

2    Q   And if anyone from the city had fixed that

3    alleyway right before Mr. Badger called, you would have

4    known about it, correct?

5    A   Not necessarily.

6    Q   Why not?  Who else from the city might have

7    fixed it?

8    A   It could have been any one of my staff that did

9    the repairs and not documented it or...

10   Q   So, they'll do ad hoc potholes if they see it

11   and they happen to have the materials, they'll just do

12   it?

13   A   Yes.

14   Q   Do they have to keep a log or something?

15   A   They do track a log on their MP2 work requests.

16   Q   Did you ever check those logs to see if there

17   were any repairs to that area?

18   A   Yes.

19   Q   And how did you check those logs?

20   A   I searched our electronic database.

21   Q   Is that also Access?

22   A   No, that's MP2.

23   Q   MP2 is the name of the database?

24   A   Yes.

25   Q   And you didn't find any work by your staff on

**68**

1    that area?

2    A   No, no.

3    Q   But it's possible they did it and didn't log it?

4    A   Yes.

5    Q   Did you ever ask any of them if they did any ad

6    hoc work on that?

7    A   I asked my foreman.

8    Q   Who is that?

9    A   Jim Hillsley.

10   Q   And what did he say?

11   A   No, not that he was aware of.

12   Q   Would anyone else from the city have fixed that?

13   A   No.

14   Q   Would anyone outside of your department?

15   A   No, I don't believe so.

16   Q   Sitting here today, we don't know who did recent

17   repairs to the pothole that Mr. Badger called you

18   about, correct?

19   A   That's correct.

20   Q   Sitting here today, you don't know of any

21   witnesses to the accident?

22   A   No.

23   Q   Do you know of any surveillance of the area by

24   the city?

25   A   No.

**69**

1    Q   Now, the date of the accident was December 5,

2    2006, we talked about your staff and you said, well, it

3    depends on when the accident occurred, but the people

4    you identified have been with you three plus years.

5    A   Uh-huh.

6    Q   Would they have been the people on duty that

7    would have been actually repairing potholes,

8    December 5, 2006?

9    A   Which people were that?

10   Q   Sure.  Larry Jackson, Floyd Blutcher, and

11   Willard Jones.

12   A   Yes.

13   Q   So, if any ad hoc work had been done that no one

14   heard about or didn't talk about, these three guys

15   would be the ones that would do it or would know about

16   it, correct?

17   A   Yes.

18   Q   How about if there's a pothole that's on

19   pavement, but part of it is within a foot of a

20   building, is that something that normally the city

21   would just go ahead and pave or would they go to the

22   building owner and say, look, everything protrudes

23   three feet from the building, you need to fix that?

24   A   It's hard to answer that question.  It depends

25   on the situation.

70

1  Q  How big the hole is, if a portion of it is on
2  both the properties?
3  A  Right, that's correct.
4  Q  If there was a pothole that was completely
5  within three feet of the building, would the city fix
6  it?
7  A  If it was on public property, yes.
8  Q  How about if it was on private property?
9  A  It's possible.
10  Q  Did you ever go back to the area where the
11  accident occurred after taking those photographs?
12  A  Yes, I did.
13  Q  When did you go back?
14  A  Just recently within the last couple of weeks.
15  Q  What did you do then?
16  A  I reviewed the area and refreshed my memory.
17  Q  Did it still have standing water it in it?
18  A  No, it didn't.
19  Q  Do you know why it didn't when you went back to
20  look at it?
21  A  No.
22  Q  Had it not rained for a while, do you know?
23  A  It hasn't rained for several weeks, so, yeah,
24  that could be the reason.
25  Q  My question is, did you see anything new

71

1  installed in the area like a drain or something to fix
2  that standing water?
3  A  No.
4  Q  Who went with you when you went back?
5  A  I went by myself.
6  Q  Was anyone with you the first time you went and
7  took the photos?
8  A  Yes.
9  Q  Who was with you then?
10  A  Greg Kuller.
11  Q  Who is Greg Kuller?
12  A  He's a facility maintenance supervisor.
13  Q  Is that C-O-L-O-R?
14  A  K-U-L-L-E-R.
15  Q  And I'm sorry, his title?
16  A  Facility maintenance supervisor.
17  Q  Why did he come with you?
18  A  I borrowed his camera.
19  Q  He didn't have any responsibility for potholes
20  or anything like that --
21  A  No.
22  Q  -- or repairs?
23  A  No.
24  Q  Does he usually go with you on inspections of
25  areas where accidents occur?

72

1  A  No.
2  Q  Have you spoken with anyone else regarding this
3  accident from the post office, other than Mr. Badger?
4  A  No.
5  Q  Have you ever spoken with the plaintiff?
6  A  No.
7  Q  Have you ever spoken with anyone that
8  represented the plaintiff prior to today?
9  A  No.
10  Q  When you went back recently, did you take more
11  photographs?
12  A  No.
13  Q  Do you know of the existence of any other
14  photographs, other than what you produced already in
15  discovery?
16  A  No.
17  Q  Meaning photos that you took or were prepared in
18  relation to this accident?
19  A  No, I don't know of any other photographs, other
20  than the aerial photographs the city keeps on file.
21  Q  Sure.  And you still have those on file?
22  A  Yes.
23  Q  Does the city ever pave unincorporated areas
24  that's not owned by any particular person, that's a
25  county area or anything like that?

73

1  A  I'm not aware of any county areas that the
2  city -- well, let me back up.  Yes, we do pave in areas
3  where the county if our utilities is directly affecting
4  the pavement.
5  Q  Okay.
6  A  So, if we would have a sewer break or a water
7  break or something like that in the unincorporated
8  area, we do those repairs.
9  Q  Why is that?
10  A  Because utilities charges a service fee for
11  those utilities, and they maintain them in those areas.
12  Q  And the utilities would charge you to fix the
13  pavement if you didn't go fix it yourself?
14  A  No.  Utilities requests me to do the paving for
15  them after they do their utility repairs.
16  Q  Oh, okay.  And if that needs to be inspected or
17  redone, you have to be notified by the utility?
18  A  Usually, yes.
19  Q  There's no continuing inspection program for
20  areas that are paved by the city that aren't within the
21  city property?
22  A  No.
23  Q  Is there someone that runs around and looks for
24  potholes to make sure there's not potholes; if there
25  are, they get fixed?

19 (Pages 70 to 73)

74

1   A  Yes.
2   Q  Who is that?
3   A  That would be me, also my supervisor, Jim
4   Hillsley, and other staff members that are out in the
5   area that pothole or the pavement crew, also look for
6   them.
7   Q  Is there -- is that kind of a random thing or is
8   there a, you know, certain segments that are done each
9   month or what?
10   A  It's more random than not, but they're familiar
11   with some of the areas that potholes occur more readily
12   in, so they frequent those areas more often.
13   Q  Because there's unsettled ground underneath or
14   something?
15   A  That could be the reason.
16   Q  Or a lot of water runoff?
17   A  That could be another reason.
18   Q  So, you spot check it plus you respond to
19   complaints of potholes and you go fix those?
20   A  Yes.
21   Q  And what other means are kept to make sure that
22   there aren't potholes, other than complaints and spot
23   checking?
24   A  That's about it.
25   Q  Just check.  Do you personally know the Sedlaks?

75

1   A  No.
2   Q  Do you know if the Sedlaks own other property
3   around Boca, other than this?
4   A  No, I don't know.
5   Q  What is this document that was produced?
6   A  That is my notes on my conversation with
7   Mr. Badger.
8   Q  They're pretty legible, but could you read those
9   in for the record?
10   A  Mr. Badger, investigator, U.S. Post Office,
11   (561) 835-3789, pothole 170 Northeast 2nd Street, trip,
12   slash, injury at southwest corner of property near
13   dumpster.  Note, edge of R, dash, O, dash, W.
14   Q  What's that?
15   A  Right of way, across from bank's stone driveway.
16   Fax number (561) 835-9473.  Accident on December 6th,
17   or December '06.  Note, bank was allegedly notified and
18   someone has since repaired.  Any work -- WO, work
19   order, check MP2, slash, complaint log.  Nina looking
20   into.
21   Q  Who is Nina?
22   A  Nina Seiberg is our property -- one of our
23   property specialists.
24   Q  How would she be involved in this case?  What is
25   she looking into?

76

1   A  She was looking at the alleyway for me.
2   Q  Meaning what, who owned it or --
3   A  To see if it was a Boca Raton alleyway, yes.
4   Q  Okay.  What's number 3370, is that her
5   extension?
6   A  That's her extension number, correct.
7   Q  But did you do an independent search after she
8   looked to see who owned it?
9   A  Yes.  I reread the dedication afterwards before
10   I spoke to her.
11   Q  And the only dedication you could find was the
12   1914 dedication?
13   A  That's correct.  I also talked to Lynn Boder,
14   who is also the City of Boca Raton property specialist.
15   Q  She said that the same property owner would own
16   it now as 1914?
17   A  She said she couldn't find any other
18   documentation.
19   Q  Is Lynn Boder the same as Nina Seibert, meaning
20   property specialist?
21   A  Yes and no.  Nina is a consultant that used to
22   have Lynn Boder's job.  She works part-time to purchase
23   our right of way and do other specific roadway paths.
24   Lynn is on staff with the building department.
25   Q  Do you know if any right of way was ever

77

1   purchased for the alley?
2   A  No, I don't.
3   Q  Who would have a record of that?
4   A  Lynn Boder.
5   Q  What's usually involved in the purchase of a
6   right of way?
7   A  I can't answer that.
8   Q  That would also be Lynn?
9   A  Yes.
10   Q  Do you sometimes have, as part of your duties, a
11   duty to maintain an area where the city doesn't own it,
12   but has purchased the right of way?
13   A  Well, if it's a right of way, it's usually we
14   own it.  Right of ways are owned by the city or other
15   governments.
16   Q  But it's a right to pass on another person's
17   property, or am I thinking of something different?
18   A  My understanding of a right of way is it's owned
19   by the entity that owns the right of way.  You're
20   thinking possibly of an easement maybe, which is
21   different.
22   Q  How is a right of way different than an
23   easement?
24   A  Easement gives the person or the easement the
25   right to utilize that property for that specific

20 (Pages 74 to 77)

### 78

```
 1   purpose, but does not entail ownership of the property.
 2       Q   Do you know if Boca Raton has an easement on
 3   that property?
 4       A   No, I don't.
 5       Q   Is that something Boca sometimes purchases?
 6       A   Yes.
 7       Q   Do you know who would know if Boca purchased an
 8   easement on the alleyway in question?
 9       A   Lynn Boder possibly, or Jim Pierce, the utility
10   services department.
11       Q   And, in fact, there are Boca Raton utilities
12   running underneath that alleyway, correct?
13       A   That's correct.
14       Q   And you couldn't do that without some kind of
15   easement or right of way, correct?
16       A   I can't answer that one.
17       Q   So, how is a right of way different than an
18   easement?
19       A   Well, in my understanding, a right of way is
20   owned, purchased and owned by the entity that buys it.
21   It gives them all rights to that property.
22       Q   Okay.
23       A   Easement is specific rights to utilize it for
24   specific purposes.
25       Q   Have you ever had to prepare an area where the
```

### 79

```
 1   city has an easement, but doesn't own it?
 2       A   Yes.
 3       Q   And who would give you that instruction?
 4       MR. BILLERA:  I'm going to attach the notes
 5   that you read into the file as number 13.
 6       (Whereupon, the document referred to was marked
 7   for identification as Plaintiff's Exhibit No. 13.)
 8   BY MR. BILLERA:
 9       Q   So, how would you get the direction and this is
10   a private property, we got an easement, we need to fix
11   it?
12       A   It depends on the situation.  It could be
13   various reasons.
14       Q   Who might be, for example, a person?
15       A   A person could be a utility services person,
16   perhaps sewer network superintendent.
17       Q   Saying we had to fix the sewer --
18       A   Right.
19       Q   -- it's not our property, but we fixed the sewer
20   and you got to go fix -- you got to patch it?
21       A   Yes.
22       Q   Are you aware if there's any contractual duty on
23   behalf of Boca Raton to perform those repairs if it's a
24   city sewer line or something?
25       A   No, I'm not aware of any contracts.
```

### 80

```
 1       Q   That's not something that would be in your
 2   department?
 3       A   No.
 4       Q   You're just told to go fix it, but you don't
 5   inquire as to the reason?
 6       A   Yes, sometimes I would inquire why we're fixing
 7   it.
 8       Q   And did they ever tell you, well, we got a
 9   contract and we have to fix it?
10       A   No, I've never heard that term used.
11       Q   What do they usually tell why you got to fix it
12   when you inquire?
13       A   They usually say their water main broke or their
14   sewer line broke and created a sinkhole or a cavity or
15   something like that.
16       Q   Well, do you know where the duty arises for Boca
17   Raton to then go out and fix that property?
18       A   I believe it's our obligation to repair the
19   damage we did close by our utilities.
20       Q   So, it's just like a legal duty as far as you
21   know?
22       A   Yes.
23       MR. CORBETT:  Objection to form.
24   BY MR. BILLERA:
25       Q   Do you know if this -- if the pothole in
```

### 81

```
 1   question could have been caused by a leaking water main
 2   underneath the road?
 3       A   No, I don't.
 4       Q   It's possible, but there's no evidence either
 5   way, correct?
 6       A   Correct.
 7       Q   All right.  What did you mean by trip injury at
 8   southwest corner of property near dumpster?  Which
 9   property were you referring to, do you know?
10       A   Property at 170 Northeast 2nd Street.
11       Q   That's leased by the post office and owned by
12   the -- I keep blanking on the names.
13       A   Sedlak.
14       Q   Sedlak.  Thank you.
15       A   Yes.
16       Q   And what is this, note, edge of right of way
17   across from bank's stone driveway?
18       A   That's a note to myself with a comment that
19   Mr. Badger had made regarding where it might be
20   located.
21       Q   Well, what do you mean by right of way?
22       A   Right of way, I mean alleyway behind the area.
23       Q   You said the right of way is owned by the
24   property owner?
25       A   That's correct.
```

21 (Pages 78 to 81)

82

1    Q  So, you're not referring to any certain property
2  owner, you're just talking about alleyway there?
3    A  That's correct.
4    Q  I gotcha.  And according to your note, you think
5  the bank had someone fix it?  It says, I'm sorry, bank
6  was allegedly notified and someone has since repaired?
7    A  That's what Mr. Badger had told me, so it was a
8  note that he had said.
9    Q  Your impression from Mr. Badger was that the
10  bank did something to fix it, or is that just two
11  thoughts in one sentence or do you know?
12    A  It looks like two thoughts in one sentence.
13    Q  Okay.  So, the bank was notified and --
14    A  And someone repaired it.
15    Q  But not necessarily the bank?
16    A  That's correct.
17    Q  And, in fact, that's why they're asking you for,
18  a work order, right?
19    A  Yes.
20    Q  To see if you really want to fix it?
21    A  Uh-huh.
22    MR. BILLERA:  I'm going to mark as number 11 a
23  note.
24    (Whereupon, the document referred to was marked
25  for identification as Plaintiff's Exhibit No. 13.)

83

1  BY MR. BILLERA:
2    Q  Is that from you to Mr. Badger?
3    MR. BILLERA:  Did I show you guys?
4    (Whereupon, the document referred to was marked
5  for identification as Plaintiff's Exhibit No. 11.)
6    THE WITNESS:  Yes, it is.
7  BY MR. CORBETT:
8    Q  What is that about?
9    A  About the same incident.
10    Q  What did you find?
11    A  I didn't find anything.
12    Q  Can you read what you wrote in the note?
13    A  I could not find any work order for the repair
14  to a pothole at southwest corner of the post office
15  parking area near the dumpster location you described
16  adjacent City of Boca Raton alley after December 2006.
17  Included is a copy of the dedicated plat for your
18  records.
19    Q  And which plat is that that you're referring to?
20  That's one of the ones we marked.
21    A  Yes.
22    Q  That was the one from 1914?
23    A  Yes.
24    THE VIDEOGRAPHER:  We're going to standby and
25  switch tape.  Standby to stop.

84

1    (Whereupon, a short recess was taken.)
2    THE VIDEOGRAPHER:  Standby to roll.  Tape's
3  rolling.
4    MR. BILLERA:  For the record, I got a little
5  out of order.  And what I originally noted was
6  Exhibit 13 is actually Exhibit 11, the next one in
7  order which is the handwritten notes that we
8  described with Mr. Roberts.  And Exhibit 12 is now
9  the typewritten notes from Mr. Roberts.
10    (Whereupon, the document referred to was marked
11  for identification as Plaintiff's Exhibit No. 12.)
12  BY MR. BILLERA:
13    Q  And Exhibit 12, which is your typewritten fax
14  over to Mr. Badger from the post office was sent after
15  you went and took the photographs, correct?
16    A  Yes.
17    Q  And after you went and did your own inspection
18  of the area, correct?
19    A  Yes.
20    Q  Do you know of any statements regarding this
21  accident?
22    MR. CORBETT:  Object to form.
23    THE WITNESS:  Statements, I'm not sure.
24  BY MR. BILLERA:
25    Q  Like witness statements or statements by the

85

1  plaintiff or statements by --
2    A  No.
3    Q  -- by the post office, the party to this?
4    A  No.
5    Q  Other than what we talked about, I'm not trying
6  to be tricky.
7    Does the City of Boca Raton have any kind of
8  internal policies or procedure manuals regarding fixing
9  potholes?
10    A  No, not that I'm aware of.
11    Q  Are there any memoranda, e-mails, or other items
12  that set forth policies and procedures for fixing
13  potholes that you know of in general?
14    A  No, not that I'm aware of.
15    Q  Do you know of the existence of e-mails, and
16  this is a fax, e-mails back and forth between yourself
17  and Mr. Badger regarding this incident?
18    A  No, there's no e-mails.
19    Q  Do you know of the existence of any e-mails
20  relating in any way to the pothole that we're here
21  about?
22    A  Yes, there's --
23    Q  Not including what you might communicate with
24  your counsel.
25    A  Yes.  I had several e-mails back and forth with

22  (Pages 82 to 85)

86

1   various people.
2       Q   In your department?
3       A   Yes, and in other departments also.
4       Q   And how can you search for those e-mails?  Is
5   there a certain reference line that you use?  It could
6   be the pothole at 170 Northeast 2nd Street --
7       A   That could be it, yeah, a pothole or post office
8   would be another good word to use for a reference or --
9   I brought some of them with me.
10      Q   And did you take a look at them before the depo?
11      A   Yes, I did.
12      Q   Can we see them then?
13          MR. CORBETT:  I don't know what they are, I'm
14   sorry, I haven't looked at them.
15          MR. BILLERA:  You want to take a look at them?
16          MR. CORBETT:  Sure.
17          MR. BILLERA:  I think anything reviewed in
18   preparation for or anticipation of a deposition in
19   federal rules you get to see them, even accident
20   reports.
21   BY MR. BILLERA:
22      Q   What else, while he's reviewing that, did you
23   bring in your file with you today?
24      A   I'm sorry, I didn't hear the question.
25      Q   While he's reviewing that, what else did you

87

1   bring with you in your file today?
2       A   I brought my response to the interrogatory.
3       Q   What else?
4       A   A copy of it.  I brought a work order showing,
5   you know, the work we had done around the storm drain
6   inlet at the parking lot on the east side of that
7   postal building.
8          MR. BILLERA:  Can we take a look at that as
9   well?
10         MR. CORBETT:  I was reading, I'm sorry.  I
11   heard the end of it, that was at the end of the
12   postal building.
13         MR. BILLERA:  He brought a copy of the work
14   order of the work they did on the storm drains.
15         MR. CORBETT:  Is that the same document, Mike,
16   that we've --
17         THE WITNESS:  Yes.
18         MR. CORBETT:  That's fine.
19         MR. BILLERA:  Okay.  Can I take a look at that
20   one, please?
21         Is this your original, or is this a copy that
22   we can attach?
23         THE WITNESS:  That's a paper copy.  We have
24   that on electronic file.
25         MR. BILLERA:  Okay.  So, we can attach this and

88

1   it's not going to be a hardship to you?
2          THE WITNESS:  Yes.
3          MR. BILLERA:  We can ask the reporter to make a
4   copy if you want it back for your file.
5          THE WITNESS:  Yeah, I don't need a hard copy.
6   BY MR. BILLERA:
7       Q   That's fine.  Do you know how long these work
8   orders are kept on file by your department?
9       A   I believe that database goes back to 2002.
10      Q   So, if there were any -- if there was any work
11   done on storm drains anywhere in that alleyway, you
12   should be able to search that back to 2002, correct?
13      A   Yes.
14      Q   And you looked and you didn't see anything?
15      A   That's correct.
16      Q   Actually, I'm not sure I need to attach this
17   because the date of this is -- well, what was the date
18   that the work was performed?  Can you tell from that?
19      A   Well, the date that the record was entered into
20   our system was 12/4/2008.
21      Q   So, when was the work performed?
22      A   I can't be specific.  Some time near that date.
23      Q   I mean, I see some other references here.
24      A   Uh-huh.
25      Q   Would that be the date that the work was done?

89

1       A   It's possible.  Probable.
2       Q   11/21/08, running sidewalk; 12/3/08, asphalt
3   around storm drain in the parking lot; probably the
4   work was done or completed?
5       A   Probably correct.
6       Q   So, this is from 2008?
7       A   Yes, very recent.
8       Q   Isn't back at the time of the accident, so I'm
9   not going to attach it.  I don't know if it's relative
10   to the deposition.  And the e-mail?
11         MR. CORBETT:  I would object to them being
12   added.  They are what I would call attorney-client
13   privilege in that it was during the initiation of a
14   lawsuit regarding our strategy and preparation in
15   responding to discovery.
16         MR. BILLERA:  Okay.  Then you'll privilege log
17   it?
18         MR. CORBETT:  Sure.  And just for the record,
19   they, as presented, are undated, but I would imagine
20   we can document the dates through electronic means.
21         MR. BILLERA:  And the privilege log, normally
22   you identify who it's from, who it's to.  Do you
23   want to tell us that?
24         MR. CORBETT:  Okay.  I thought you meant in the
25   log that we'll produce.

23 (Pages 86 to 89)

90

1    MR. BILLERA: Just for the record.
2    MR. CORBETT: Sure. It is an e-mail from
3  Sharma Haggerty to Mike Roberts, and there are
4  carbon copies to Maurice Morrell, Bob DeChristopher
5  and Pam Gardner.
6    There is a second e-mail also undated, or at
7  least the portion -- the top portion is undated.
8  There is an original e-mail that was created from
9  Pam Gardner on December 29th of last year, 2008 to
10  Mr. Roberts. And then Mr. Roberts' response to
11  Ms. Gardner, which is undated.
12  BY MR. BILLERA:
13    Q  Okay. Who is Sharma Haggerty?
14    A  Sharma Haggerty was or might still be the city
15  clerk.
16    Q  Would she have any involvement in this incident,
17  or is that just somebody you normally copy?
18    A  That's somebody who I requested if she had any
19  additional information that she could provide us.
20    Q  And Bob DeChristopher?
21    A  Bob DeChristopher is the director of municipal
22  services.
23    Q  Pam Gardner is in risk?
24    A  Pam Gardner is a risk manager.
25    Q  Okay. And you looked at those e-mails before

91

1  this deposition, correct?
2    A  Yes.
3    Q  Was there any information factually contained in
4  those e-mails, just factually, that reflected on how
5  the accident happened or any witnesses that we haven't
6  talked about yet?
7    A  No.
8    Q  Or anything different in those e-mails as to
9  where the accident happened?
10    A  No.
11    Q  What other items do you have with you? You said
12  we have the work order, the e-mails, your answers to
13  interrogatories --
14    A  And then the papers that were sent to me by
15  the -- and some e-mails from --
16    Q  Counsel?
17    A  Counsel. That's it.
18    Q  Okay. Terrific.
19    MR. CORBETT: Mike, you just want to put --
20  BY MR. BILLERA:
21    Q  The photographs that we attached that were
22  produced to us, were those photographs taken originally
23  in color?
24    A  Yes.
25    Q  And were they taken on a digital camera?

92

1    A  Yes.
2    Q  Do you still have the digital format, whether it
3  was a chip or however it was stored?
4    A  Yes.
5    Q  So, you still have the originals in color?
6    A  That's correct.
7    Q  And do you know how many photographs you took?
8    A  Four, I believe.
9    Q  I want to give you that back.
10    It seems like there was a second page where it
11  says, note, I spoke to Nina regarding this plat. Is
12  that your handwriting?
13    A  Yes, it is.
14    Q  What's that about?
15    A  That's a Post-It sticky I had on that particular
16  document.
17    Q  And what was the contents of that conversation
18  with Nina or we already discussed that?
19    A  I think we already discussed most of it.
20    Q  That she looked and told you it's
21  privately-owned and you went and confirmed it --
22    A  No. She looked up the plat for me, but it
23  identified it as an alleyway.
24    Q  Okay.
25    A  But not whether it was privately- or

93

1  publicly-owned.
2    Q  And what is this document?
3    A  That is an aerial photograph from the Palm Beach
4  County Property Appraiser.
5    Q  Is that something that you pulled up and
6  printed?
7    A  Yes.
8    Q  And that indicates that John Sedlak owns the
9  property, correct?
10    A  Yes.
11    Q  When property is leased to another party, is
12  that -- is there a record of that kept with the city?
13  Do they have to file that lease with the city?
14    A  I can't answer that, I don't know.
15    Q  That's not something you would normally access,
16  who's operating that property at the moment?
17    A  No. I wouldn't -- I would not normally access
18  that.
19    MR. BILLERA: We'll attach this as our next
20  exhibit. It should be 13. I think that's all I
21  have, sir. Thank you very much.
22    THE WITNESS: Okay. Thank you.
23    MR. BILLERA: Unless there's some follow-up
24  with these guys.
25    MR. MELLINGER: Do you have any follow-up?

24 (Pages 90 to 93)

94

1     MR. CORBETT:  Probably not.

2

3          CROSS-EXAMINATION

4     BY MR. MELLINGER:

5     Q   I just have a few follow-up questions,

6     Mr. Roberts.

7          You indicated that you first became aware of an

8     allegation that an accident happened in November 2007;

9     is that correct?

10    A   That's correct.

11    Q   And that was when Mr. Badger gave you a call; is

12    that right?

13    A   Yes.

14    Q   You never met with Mr. Badger; is that --

15    A   No.

16    Q   Did Mr. Badger ever show you any photographs?

17    A   No.

18    Q   Did Mr. Badger ever tell you that he had any

19    direct knowledge about how the accident occurred or

20    where the accident occurred?

21    A   No.

22    Q   And, as we sit here this day, do you know the

23    exact spot at which the alleged accident occurred?

24    A   No.

25    Q   Now, you testified today in regard to some

95

1     questions that Mr. Billera asked concerning where on

2     the survey and where on the photographs the accident

3     occurred, did you not?

4     A   I might have, yes.

5     Q   And what was the basis of your testimony in that

6     regard?

7     A   The basis of my testimony was a conversation

8     with Mr. Badger regarding a recent repair that had been

9     done and an accident that happened in or around the

10    postal parking lot.

11    Q   And Mr. Badger had asked you about an area at

12    the edge of a right of way; is that correct?

13    A   No.  He had asked me about a recent repair that

14    had been done and what he described near the dumpster

15    location behind the building there on the southwest

16    corner.

17    Q   But, again, you can't tell us, as you sit here

18    today, where the accident happened in relation to that

19    repaired area, can you?

20    A   No.  He didn't say that was the area the

21    accident occurred.

22    Q   You testified that you had taken some

23    photographs of the area; is that correct?

24    A   Yes.

25    Q   And when were those photographs taken?

96

1     A   Shortly after my conversation with Mr. Badger.

2     I believe it was in November of 2007.

3     Q   And why did you take the particular photographs

4     that you took and if you could point out by exhibit

5     those photographs that you took?

6     A   Well, I took those because that was the area he

7     described as had been recently repaired.  And when I

8     inspected the area, it looked like there had been some

9     repairs done.

10    Q   And the four photographs that you have marked as

11    being photographs that you took, they're exhibits 2, 3,

12    5, and 7; is that correct?

13    A   Yes.

14    Q   You took those photographs purely because they

15    showed an area of recent repair?

16    A   Yes.

17    Q   Mr. Billera asked you if you knew whether the

18    accident occurred in the alleyway or the parking lot;

19    is that correct?

20        MR. BILLERA:  Form.

21        THE WITNESS:  I don't remember.

22    BY MR. MELLINGER:

23    Q   Do you know whether the accident occurred in the

24    alleyway or the parking lot?

25    A   No.

97

1     Q   And you stated, during the course of your

2     testimony, that you can't say whether your department

3     made the repairs that are depicted in those photographs

4     that you took; is that correct?

5     A   That's correct.

6     Q   And is it your testimony that you can't tell

7     whether any part of the pothole at issue is on property

8     that is leased by the post office?

9         MR. BILLERA:  Form.

10        THE WITNESS:  I haven't specifically measured

11    it to determine what property it's on.

12    BY MR. MELLINGER:

13    Q   Mr. Roberts, to the best of your knowledge, did

14    any city employee ever meet with Mr. Badger to discuss

15    anything about the accident that we're talking about

16    here today?

17    A   No.

18        MR. MELLINGER:  No further questions at this

19    time.

20        MR. BILLERA:  I have a couple more, just a

21    little follow-up.

22          REDIRECT EXAMINATION

23    BY MR. BILLERA:

24    Q   After you took these photos, you sent them to

25    Mr. Badger, correct?

25 (Pages 94 to 97)

U.S. Legal Support
(561) 835-0220

98

1    A Yes.
2    Q Did he ever call and say, hey, you took a
3 picture of the wrong area?
4    A No.
5    Q And what was the purpose of you going out there?
6 Was there a different accident in this area, or was
7 there only, as far as you know, one accident in this
8 area?
9    A The purpose of me going out there was to
10 determine whether my staff did any repairs to that
11 particular area he described.
12    Q Which is related to the accident we're here
13 about, correct?
14    A Yes.
15    Q No other accident?
16    A No.
17    Q Okay. And, as far as you know, was there only
18 one pothole, or was this repaired to a new and
19 different pothole?
20    A It looks like, to me, the pothole was repaired
21 several times.
22    Q The very same pothole --
23    A Yes.
24    Q -- that was involved in the accident?
25       And you're also relying on the photographs that

99

1 we provided as Exhibit 8, 1 and 9 because I put it on
2 the back and then -- so, Exhibit 8, 1 and 9, and 10
3 looks like the same pothole, correct?
4       MR. MELLINGER: Objection as to form and calls
5    for speculation.
6 BY MR. BILLERA:
7    Q But you were there and you're familiar with the
8 area?
9    A It appears to be the area, yes.
10    Q And, in fact, the pothole you measured or not
11 measured, but photographed I should say, we don't
12 know if that's the area of the accident or not, but the
13 one that you did, in fact, photograph is accurately
14 reflected on this survey, correct?
15    A Yes.
16    Q As being north of the property line, which is
17 the property that is leased by the post office,
18 correct?
19    A Yes.
20    Q Okay. It's on property leased by the post
21 office, according to your mark, correct?
22    A Yes, according to my mark. I didn't measure
23 that though to see if it's specifically -- it's
24 generalized in an area.
25    Q Generalized in the area, it's north of the

100

1 property line, correct?
2       MR. MELLINGER: Objection, calls for
3    speculation.
4       THE WITNESS: It's north of the property line,
5    yes.
6 BY MR. BILLERA:
7    Q And when you looked at the area that was
8 repaired and took photographs of it, did you see any
9 repairs whatsoever that were south of the property
10 line?
11    A I didn't measure the property line, so I don't
12 know. I can't answer your question.
13    Q Did you see any repairs -- other than what you
14 photographed, did you see any other repairs south of
15 those repairs?
16    A No.
17    Q In fact, there was no repairs on the alleyway
18 street itself, correct?
19    A Yes, there's some repairs further down, further
20 west in the alleyway.
21    Q But that's not the area that you understood
22 where the accident occurred, right?
23    A Correct.
24    Q The area where you understood the accident
25 occurred, there were no repairs in that part of the

101

1 alleyway, correct?
2    A Mr. Badger never told me the accident was in
3 this location. He just told me there was some recent
4 repairs done in that area, and he asked me for some
5 work orders.
6    Q Mr. Badger never told you there was a trip,
7 slash, injury at the southwest corner of the property
8 near the dumpster, note, edge of right of way across
9 from the bank stone driveway?
10    A No. He said there was a trip on the -- or he
11 was involved in a trip and fall accident, and it was on
12 the post office's property.
13    Q He said that?
14    A Yes.
15    Q Okay.
16    A And he said there had been some recent repairs
17 around this area on the southwest corner of the
18 building and wanted to know if I had any work orders in
19 relation to that.
20    Q Is your note regarding trip injury at southwest
21 corner of property, is that writing down what he was
22 telling you at the time?
23    A No. That's my shorthand for jogging my own
24 memory.
25    Q But he told you at that time that it was on post

26 (Pages 98 to 101)

U.S. Legal Support
(561) 835-0220

102

```
 1   office property?
 2       MR. MELLINGER:  Objection calls for
 3   speculation.
 4   BY MR. BILLERA:
 5       Q  You can answer.
 6       A  Yes, I believe so.
 7       Q  And, in fact, your answer to interrogatories --
 8   these are your answers to interrogatories, correct,
 9   dated December 5, 2008?
10       A  Yes.
11       Q  And that's your signature at the back?
12       A  Uh-huh.
13       MR. BILLERA:  We'll attach this as 14.
14       (Whereupon, the document referred to was marked
15   for identification as Plaintiff's Exhibit No. 14.)
16   BY MR. BILLERA:
17       Q  Your answer to interrogatory number 3 says,
18   based on review of the documents disclosed by the US of
19   A, it appears that the property where the alleged fall
20   took place was owned by John P. Sedlak and Dorothy
21   Sedlak and leased by the U.S. Postal Service, correct?
22       A  Yes.
23       Q  In fact, that alleyway's not owned by the
24   Sedlak, the alleyway's owned by, as of 1914, JR
25   Campbell, correct?
```

104

```
 1                  CERTIFICATE
 2   THE STATE OF FLORIDA )
 3   COUNTY OF PALM BEACH )
 4       I, Lee M. Walker, a Court Reporter and Notary Public
 5   in and for the State of Florida at Large, do hereby
 6   certify that I reported the deposition of MICHAEL
 7   ROBERTS, a witness called by the Plaintiff in the
 8   above-styled cause; that said witness was duly sworn by
 9   me; that the foregoing pages, 1 through 104, inclusive,
10   constitute a true and correct record of the transcript
11   of the deposition by said witness.
12       I further certify that I am not an attorney or
13   counsel of any of the parties, nor a relative or
14   employee of any attorney or counsel connected with the
15   action, not financially interested in the action.
16       The foregoing certification of this transcript does
17   not apply to any reproduction of the same by any means
18   unless under the direct control and/or direction of the
19   certifying reporter.
20       WITNESS my hand and official seal in the City of
21   Boca Raton, County of Palm Beach, State of Florida,
22   this 12th day of February, 2009.
23               Lee M. Walker, Court Reporter
                 My Commission Expires 11/30/11
24               Commission #DD728386
25
```

103

```
 1       A  Yes.
 2       MR. BILLERA:  That's all I have.
 3       MR. CORBETT:  I do not have any questions, and
 4   we will read.
 5       THE VIDEOGRAPHER:  Standby to stop.
 6       Witness excused.
 7   (Thereupon, the deposition was concluded at
 8   1:40 p.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

105

```
 1              ERRATA SHEET
 2   MARIA TERESA OSORIO vs.
     UNITED STATES OF AMERICA
 3   CASE NO.:  08-80459-CIV-MARRA/JOHNSON
     DEPOSITION OF:  MICHAEL ROBERTS
 4   DATE TAKEN:  January 26, 2009
 5          DO NOT WRITE ON TRANSCRIPT
                ENTER CHANGES HERE
 6
 7   PAGE NO.     LINE NO.     CORRECTION OR CHANGE
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21              WITNESS SIGNATURE

         Sworn to and subscribed before me this        day
22   of              , 2009.
23
24              Notary Public in and for the
                State of Florida at Large
25              My commission expires:
```

27 (Pages 102 to 105)

106



```
 1              U.S. LEGAL SUPPORT, INC.
              515 NORTH FLAGLER DRIVE, SUITE 200
 2            WEST PALM BEACH, FLORIDA 33401
                    (561) 835-0220
 3
               February 12, 2009
 4
 5    Mr. Michael Roberts
      c/o Arye P. Corbett, Esquire
 6    WEISS, SEROTA, HELFMAN, PASTORIZA, COLE & BONISKE, P.L.
      200 East Broward Boulevard, Suite 1900
 7    Fort Lauderdale, Florida 33301
 8    RE: Maria Teresa Osorio v. City of Boca Raton
 9    Dear Mr. Roberts:
10        At the conclusion of your deposition given in the
      above-styled cause on January 26, 2009, you indicated
11    you wished to read and sign the transcript.
12        This letter is to advise you that your deposition is
      ready, and we ask that you call our office at the
13    number listed above to schedule an appointment to come
      in.
14
          If you are a party in this action or an expert
15    witness, and your attorney has ordered a copy of this
      transcript, you may wish to read their copy and forward
16    to us a photostatic copy of your signed correction
      sheet.  Under no circumstances can a copy be released
17    to a witness.
18        If this has not been taken care of within the next
      30 days, or by the time of trial, whichever comes
19    first, we shall conclude that the reading, signing, and
      notice of filing of the above deposition has been
20    waived.
21    Thank you for your prompt attention.
22            Sincerely,
              U.S. LEGAL SUPPORT, INC.
23
24            Lee M. Walker, Court Reporter
25    cc:  All counsel of record
```

1

**A**

able 14:7 19:12
  29:21 40:4
  46:12,16 65:5
  65:6 88:12
about 5:19 6:2
  7:12,13,16,17
  7:20,21 18:6
  18:24 23:18
  27:17 28:19
  34:10 36:4
  37:9 38:2
  41:20 43:13
  43:23 45:25
  50:5 53:17,19
  53:24 54:24
  58:21 60:24
  63:14 64:3,9
  64:18 65:4
  67:4 68:18
  69:2,14,14,15
  69:18 70:8
  74:24 82:2
  83:8,9 85:5
  85:21 91:6
  92:14 94:19
  95:11,13
  97:15,15
  98:13
above 1:25
  106:13,19
above-styled 3:3
  104:8 106:10
access 9:1 36:4
  38:11 59:19
  59:20 61:15
  61:20,25
  63:20 67:21
  93:15,17
accident 6:24,25
  9:25 11:11,13
  12:2,8,17
  15:21,23
  16:17 20:25
  21:3,6,14
  22:8 28:18
  29:22 30:4,18
  30:18 34:13
  46:1,2,14,17
  46:18 56:2
  60:25 61:3,5
  61:6 62:23
  64:1,3,6,9,18
  64:20 66:7
  68:21 69:1,3
  70:11 72:3,18
  75:16 84:21
  86:19 89:8
  91:5,9 94:8
  94:19,20,23
  95:2,9,18,21
  96:18,23
  97:15 98:6,7
  98:12,15,24
  99:12 100:22

100:24 101:2
  101:11
accidentally
  46:6
accidents 55:8
  60:21 62:14
  62:17,20 63:9
  71:25
according 33:11
  41:16 42:20
  56:18,20
  59:21 82:4
  99:21,22
accurately 99:13
across 8:7 42:8
  75:15 81:17
  101:8
action 104:15,15
  106:14
actively 63:21
activities 60:14
  60:15
actually 21:3
  32:15 44:14
  49:5 69:7
  84:6 88:16
ad 67:10 68:5
  69:13
added 89:12
addition 33:10
additional 90:19
address 5:12
  60:4
adjacent 6:3 8:6
  11:20 17:12
  31:22 37:7,8
  83:16
administer 5:25
administrator
  56:13
advise 106:12
aerial 45:15,17
  45:23 72:20
  93:3
affecting 73:3
aforesaid 3:7
after 4:24 11:10
  55:4 64:6
  66:20 70:11
  73:15 76:7
  83:16 84:14
  84:17 96:1
  97:24
afterwards 55:4
  76:9
again 65:18
  95:17
against 11:13
age 3:2
ago 25:12,17,22
  35:12,13
  45:25 52:20
  53:18,20
agree 40:1
agreement 55:24

ahead 64:21
  69:21
Alan 5:11
allegation 6:9
  94:8
alleged 11:18
  94:23 102:19
allegedly 29:22
  75:17 82:6
alley 11:20 17:7
  17:12,23 18:16
  30:25 41:16
  77:1 83:16
alleyway 9:4
  10:5,9,12,13
  10:20 11:7
  12:19,22
  13:20 16:18
  16:19 18:17
  20:4 21:14
  25:19 27:7,16
  31:12,22
  34:16,19
  35:17,20 36:3
  36:9,15 39:4
  39:8 40:11
  42:4,24 54:3
  57:11 62:7
  63:4 65:23
  66:16 67:3
  76:1,3 78:8
  78:12 81:22
  82:2 88:11
  92:23 96:18
  96:24 100:17
  100:20 101:1
alleyways 13:5
  18:19 56:6
  62:11,18
alleyway's
  102:3,24
alongside 9:2
already 43:18
  72:14 92:18
area 7:24 8:1,3
  92:19
America 1:8 4:18
  105:2
amount 42:23
and/or 104:18
announce 4:12
another 10:1
  13:6 21:24
  62:10,11
  74:17 77:16
  86:8 93:11
answer 10:15,22
  12:24 13:18
  14:6,7 17:14
  19:11,12 23:1
  24:6 31:6
  33:17 34:1
  66:12 69:24
  77:7 78:16
  93:14 100:12
  102:5,7,17

answers 11:16
  91:12 102:8
anticipation
  14:19 20:12
  34:11 86:18
anybody 10:16
anyone 12:11
  24:24 67:2
  68:12,14 71:6
  72:2,7
anything 30:23
  31:4 43:16
  51:23 52:10
  52:14 58:14
  59:14 65:2
  66:2 70:25
  71:20 72:25
  83:11 86:17
  88:14 91:8
  97:15
anyway 37:17
  54:23
anywhere 31:15
  88:11
apparently 6:3
appear 29:5 66:6
appearances 2:1
appeared 6:5
Appearing 2:5,8
  2:12
appears 10:4
  11:17 42:13
  99:9 102:19
apply 104:17
appointment
  106:13
Appraiser 93:4
approach 33:12
  33:13,15
approve 19:10
approximately
  15:23 16:3
  32:11 35:12
  48:9 50:6
area 7:24 8:1,3
  8:4,9,10,21
  8:22,24 9:23
  10:2 15:15
  16:2,3 18:1,3
  18:7,8,12
  20:2,25 21:16
  21:17 22:6,7
  22:14,19
  29:21,24,25
  30:4 31:8,23
  32:10,12,17
  32:22,23,24
  37:6,15 39:1
  39:10,11,25
  40:4 41:14
  43:12 44:7
  45:14,18 48:6
  54:25 55:8
  58:10 59:6
  60:21 62:1,13

63:2,3,7 64:7
  64:23,24
  65:16 67:17
  68:1,23 70:10
  70:16 71:1
  72:25 73:8
  74:5 77:11
  78:25 81:22
  83:15 84:18
  95:11,19,20
  95:23 96:6,8
  96:15 98:3,6
  98:8,11 99:8
  99:9,12,24,25
  100:7,21,24
  101:4,17
areas 13:19 22:5
  26:24 53:6
  71:25 72:23
  73:1,2,11,20
  74:11,12
arises 80:16
around 6:20
  13:19 20:9
  32:14 35:18
  38:16,24
  73:23 75:3
  87:5 89:3
  95:9 101:17
Arya 2:6 106:5
asked 27:4 68:7
  95:1,11,13
  96:17 101:4
asking 50:7
  82:17
asphalt 6:17
  28:11 29:25
  32:19 35:6
  37:3,16 49:4
  49:6,9,18
  51:5,22,23
  89:2
Assistant 4:16
assume 39:19
  40:3 48:7
Assuming 50:4,21
attach 28:25
  30:8 79:4
  87:22,25
  88:16 89:9
  93:19 102:13
attached 10:14
  91:21
attempt 44:6
attention 23:19
  106:21
attorney 4:14,17
  46:3,4,7,9
  47:4,6,13
  104:12,14
  106:15
attorney's 46:24
attorney-client
  46:12 89:12
Avenue 63:7

aware 7:25 8:25
  10:18 12:21
  18:13,18,23
  19:4,18,19
  27:23 29:20
  31:19 36:16
  56:7 68:11
  73:1 79:22,25
  85:10,14 94:7
away 29:19 42:18
  49:17
awhile 66:20
Ayre 4:19
a.m 1:20 4:3

**B**
back 8:20 11:11
  26:8 34:20
  51:5 70:10,13
  70:19 71:4
  72:10 73:2
  85:16,25 88:4
  88:9,12 89:8
  92:9 99:2
  102:11
backwards 52:4
bad 33:22
Badger 9:24
  11:10 43:8,17
  64:10 65:13
  67:3 68:17
  72:3 75:7,10
  81:19 82:7,9
  83:2 84:14
  85:17 94:11
  94:14,16,18
  95:8,11 96:1
  97:14,25
  101:2,6
bank 75:17 82:5
  82:5,10,13,15
  101:9
bank's 75:15
  81:17
base 49:3
based 102:18
basis 31:3 95:5
  95:7
Beach 93:3 104:3
  104:21 106:2
became 55:20
  94:7
becomas 66:20
bedrock 39:3
before 1:23 3:5
  8:13 15:1
  17:2 38:19
  52:5 53:24
  64:13 67:3
  76:9 86:10
  90:25 105:21
begins 40:10
  41:16
behalf 2:5,8,12
  26:1,9,21

27:18 79:23
behind 8:4 10:20
  17:12 30:25
  81:22 95:15
being 4:25 11:25
  25:3 89:11
  96:11 99:16
belief 23:16
believe 7:9 9:8
  10:25 16:8
  23:3,8 24:12
  28:16,17,17
  29:22 33:9
  34:12 36:24
  43:1 50:5
  55:16 57:17
  59:19 64:4,8
  65:14 68:15
  80:18 88:9
  92:8 96:2
  102:6
believed 32:10
belong 16:8
belongs 9:5
beneath 16:20
Bergman 56:10
best 97:13
better 39:13,19
  40:6
between 12:25
  13:1 15:24
  16:5 19:6
  63:7 85:16
big 43:21 44:8
  56:16 70:1
bill 44:15
Billera 2:3 3:13
  3:15,25 4:14
  4:14 5:3,6
  8:19 9:19
  12:6,12,15,18
  13:17 15:20
  28:7 29:4
  30:8,11 32:1
  32:5 39:15,24
  41:13 46:25
  47:3,9,11
  66:11 67:1
  79:4,8 80:24
  82:22 83:1,3
  84:4,12,24
  86:15,17,21
  87:8,13,19,25
  88:3,6 89:16
  89:21 90:1,12
  91:20 93:19
  93:23 95:1
  96:17,20 97:9
  97:20,23 99:6
  100:6 102:4
  102:13,16
  103:2
blanking 81:12
block 10:8 29:23
blocks 10:7,7

blown 8:13
blue 16:22 42:12
Blutcher 7:4,6
  7:13 69:10
Bob 90:4,20,21
Boca 1:8,19 2:4
  2:8 4:2,5,7
  4:21 5:13,20
  6:4,5,7 7:23
  8:7,24 10:20
  11:14 12:8,20
  13:4,13 14:3
  14:4 17:22
  19:9,21 20:2
  20:4 23:3,16
  25:10 27:21
  27:25 29:16
  31:11 34:5,19
  35:8,14 36:2
  44:21 55:16
  55:17 56:4
  61:4,7 65:21
  65:22 75:3
  76:3,14 78:2
  78:5,7,11
  79:23 80:16
  83:16 85:7
  104:21 106:8
Boca's 23:12
BODDEN 2:2
Boder 76:13,19
  77:4 78:9
Boder's 76:22
BONISKE 2:6
  106:6
borrowed 71:18
both 38:1 48:15
  70:2
bottom 17:4
  28:11
Boulevard 1:18
  2:7,10 63:8
  106:6
box 20:8,17,19
  34:18
break 73:6,7
bring 14:16
  86:23 87:1
broke 80:13,14
brought 14:15
  23:19 86:9
  87:2,4,13
Broward 2:7,10
  106:6
building 13:11
  13:12 29:6
  35:21 40:23
  41:25 42:16
  42:19 69:20
  69:22,23 70:5
  76:24 87:7,12
  95:15 101:18
built 34:23 35:8
  35:10
business 5:12

38:16,17
busy 51:16
buys 78:20
B-L-U-T-C-H-E-R
  7:7

**C**
call 27:8 56:22
  57:3 64:15
  89:12 94:11
  98:2 106:12
called 4:24
  12:10 45:22
  58:24 59:17
  59:19 61:7
  64:10,16 67:3
  68:17 104:7
calls 66:9 99:4
  100:2 102:2
came 49:11 63:14
camera 71:18
  91:25
Campbell 9:8,10
  10:9,11,17
  11:6,12 12:23
  15:12,15 17:7
  17:9 23:6
  102:25
canals 53:7
carbon 90:4
care 106:18
case 1:2 4:6,7
  48:24 52:21
  75:24 105:3
cause 1:25 3:3
  21:23 104:8
  106:10
caused 37:23
  81:1
causes 48:4,22
caution 47:2
cavity 80:14
cc 106:25
center 49:20
certain 74:8
  82:1 86:5
CERTIFICATE
  104:1
certification
  104:16
certified 57:4
  57:10,14
certify 104:6,12
certifying
  104:19
change 19:16
  20:18 41:8
  105:6
changes 20:3,6
  20:24 105:5
charge 61:13
  73:12
charges 49:20
  73:10
check 22:13

57:10,22
  67:16,19
  74:18,25
  75:19
checking 74:23
chief 17:21 24:2
  24:17 54:13
  56:13 61:11
  61:11
chip 92:3
circle 16:1,20
  16:22 30:3
  32:9,13,22
  42:14
circumstances
  24:23 106:16
citations 33:19
  34:4
cite 33:22,25
city 1:8 2:8 4:5
  4:6,20 5:20
  6:5,7 7:23
  8:7 10:24
  11:2,13 12:20
  13:1,4,13
  14:4 17:11
  18:14,25 19:9
  19:21 20:2,3
  23:3,16,21
  24:12,23,25
  25:2,2,18
  26:1,12,15,21
  27:4,9,15,18
  27:21,24
  29:16 31:11
  33:12,13 34:5
  34:19 35:7,14
  35:24 36:1,2
  43:20,22,24
  44:5,22 45:8
  45:22 47:7
  48:1 49:21,23
  53:12 54:6,18
  56:4 66:19,20
  66:20,21,23
  67:2,6 68:12
  68:24 69:20
  70:5 72:20,23
  73:2,20,21
  76:14 77:11
  77:14 79:1,24
  83:16 85:7
  90:14 93:12
  93:13 97:14
  104:20 106:8
city's 26:9 45:4
civil 53:12
claim 11:13
clear 42:9
clerk 90:15
client 48:8
close 12:22
  52:19 80:19
code 11:5 13:7
  13:10 17:16

17:17,21
33:11,17 34:9
56:9,13,18,18
56:22 57:5,8
57:17
codes 56:5
COLE 2:6 106:6
color 91:23 92:5
colored 28:10
come 7:21 11:6
24:22 62:12
63:22 64:15
71:17 106:13
comes 59:6
106:18
comment 81:18
commission
104:23,24
105:25
Common 59:13
communicate
85:23
companies 6:1
54:7
company 14:2
compilation 59:5
complained 60:24
complaint 56:25
57:2,4 58:12
58:16,21,24
58:25 59:4,18
59:22 60:5,23
63:14 64:1
75:19
complaints 57:13
59:5,8,21
60:9 61:17
62:1 63:20,21
74:19,22
completed 89:4
completely 70:4
complies 42:11
concerned 10:24
concerning 95:1
conclude 106:19
concluded 103:7
conclusion
106:10
concrete 37:22
47:23 52:2
condition 33:14
49:5
conduits 18:10
confirmed 92:21
connected 104:14
constitute
104:10
consultant 76:21
contact 56:10
contained 34:25
91:3
contents 92:17
continuing 26:24
73:19
contract 49:23

80:9
contractor 25:25
26:3,6,10,15
26:17,19 27:6
27:8,17 50:11
54:3,10,13
contractors
26:20,23 27:1
49:23
contracts 6:1
54:7 79:25
contractual
79:22
control 53:6
104:18
conversation
26:16 75:6
92:17 95:7
96:1
conversations
64:17 65:12
copies 90:4
copy 14:12,15
15:8 28:22,24
83:17 87:4,13
87:21,23 88:4
88:5 90:17
106:15,15,16
106:16
Corbett 2:6 4:19
4:19 12:4,12
13:15 29:2
47:1,8 66:22
80:23 83:7
84:22 86:13
86:16 87:10
87:15,18
89:11,18,24
90:2 91:19
94:1 103:3
106:5
corner 64:23
75:12 81:8
83:14 95:16
101:7,17,21
Corporate 1:18
corporation 1:9
correct 5:21
10:5,6 11:22
12:2 15:16
16:12,15,20
16:21 21:15
21:17,18 22:8
27:12,13
30:18 31:13
32:15,20 33:2
33:7,21 36:10
38:18 40:25
42:4,24 44:13
47:18,22 49:9
49:13,18 56:2
59:22 60:22
67:4 68:18,19
69:16 70:3
76:6,13 78:12

78:13,15 81:5
81:6,25 82:3
82:16 84:15
84:18 88:12
88:15 89:5
91:1 92:6
93:9 94:9,10
95:12,23
96:12,19 97:4
97:5,25 98:13
99:3,14,18,21
100:1,18,23
101:1 102:8
102:21,25
103:11
correction 105:6
106:16
cost 44:16 49:20
50:1,7,9,13
counsel 4:12
9:15 85:24
91:16,17
104:13,14
106:25
county 45:16
72:25 73:1,3
93:4 104:3,21
couple 52:19
70:14 97:20
course 52:14
97:1
court 1:1,23 3:4
4:9 52:8
104:4,23
106:24
covered 6:10
46:11
create 49:1
created 48:25
80:14 90:8
creates 49:4,5
crew 51:22,23
74:5
Cross 3:14
CROSS-EXAMIN...
94:3
curb 35:7
current 31:16
currently 10:11
10:16 55:15
cut 52:2
cuts 45:4
C-O-L-O-R 71:13
c/o 106:5

---

D

D 3:9
damage 80:19
darker 28:12
dash 75:13,13
database 59:17
59:20 60:6,8
63:20 67:20
67:23 88:9
date 16:23 28:14

28:18 30:13
35:11 59:6
60:5 69:1
88:17,17,19
88:22,25
105:4
dated 102:9
dates 59:8 89:20
Dave 39:16
David 2:10 4:10
4:16
David's 15:10
day 7:3 64:8
65:8 94:22
104:22 105:21
days 51:7 106:18
DD728386 104:24
Dear 106:9
December 28:18
64:4 69:1,8
75:16,17
83:16 90:9
102:9
DeChristopher
90:4,20,21
dedicated 9:6
38:17 83:17
dedication 76:9
76:11,12
deep 48:8 50:5
Defendant 2:8,12
4:17
Defendants 1:10
department 2:9
7:11,15 11:5
12:9,16 13:12
13:25 14:1,4
14:9 19:14
22:25 24:18
24:19,20
25:21,24 34:9
51:12 53:2,21
60:25 61:3,9
68:14 76:24
78:10 80:2
86:2 88:8
97:2
departments 86:3
depending 7:3
48:23 49:10
50:3,20
depends 27:10
48:5 69:3,24
79:12
depict 45:15
depicted 30:5
39:10,11
42:16 43:2
97:3
depicts 31:21
depo 86:10
deposition 1:13
1:24 3:1 4:4
8:14 14:20
20:12,13

28:25 34:11
52:5,11,18
86:18 89:10
91:1 103:7
104:6,11
105:3 106:10
106:12,19
depression 37:21
37:23
describe 21:17
described 9:4,24
21:16 29:24
40:1 64:10,23
83:15 84:8
95:14 96:7
98:11
describing 8:3,9
40:13
determine 45:7
46:13,16
97:11 98:10
develop 48:4,4
difference 38:4
different 14:24
24:18 28:10
39:25 47:6
53:22 58:2
65:24 66:2
77:17,21,22
78:17 91:8
98:6,19
digital 91:25
92:2
direct 3:13 5:2
53:9 94:19
104:18
direction 79:9
104:18
directly 16:20
53:16 61:19
61:22 73:3
director 90:21
dirt 47:23
disagree 40:18
disagreement
43:3
disclosed 102:18
discovery 3:2
72:15 89:15
discuss 66:3,5
97:14
discussed 32:2
43:18 45:9
92:18,19
discussion 23:18
43:8 46:3,7
discussions 43:5
43:16 47:12
55:10,13
disrepair 13:5
distance 10:5
District 1:1,1
3:4,4
division 24:21
DMP 4:11

dock 31:21 32:24
doctrine 66:18
  66:23
document 8:17
  9:16 12:12
  15:18 28:5
  30:9 32:3
  60:23 75:5
  79:6 82:24
  83:4 84:10
  87:15 89:20
  92:16 93:2
  102:14
documentation
  76:18
documented 67:9
documents 14:18
  15:2 21:1,4
  34:10 39:21
  54:15 55:2
  58:13 102:18
doing 20:23
  50:12
domain 6:6
done 14:5,10
  20:1 22:23
  25:6,18,25
  26:14 30:13
  30:18 37:1,15
  55:4 58:10
  69:13 74:8
  87:5 88:11,25
  89:4 95:9,14
  96:9 101:4
Dorothy 11:19
  33:5 102:20
down 29:14 38:7
  42:4 100:19
  101:21
downspouts 29:14
downtown 31:1
drain 18:7 29:9
  29:11,18 37:4
  37:17,21,22
  71:1 87:5
  89:3
drainage 18:5,7
drains 18:12,14
  18:16,19,24
  19:2 29:6,12
  29:18 53:7
  87:14 88:11
draw 16:1 30:3
  32:9 42:7,7
drawing 30:13
drew 16:20 32:13
  32:23 42:3,14
  42:22
DRIVE 106:1
driveway 75:15
  81:17 101:9
dropped 41:6
dry 51:1,2
duly 4:25 104:8
dumpster 75:13

81:8 83:15
95:14 101:8
during 89:13
97:1
duties 5:23
  47:25 77:10
duty 10:23 11:1
  17:11 26:24
  69:6 77:11
  79:22 80:16
  80:20
--------------------
                E
--------------------
E 3:9
each 74:8
easement 12:19
  77:20,23,24
  77:24 78:2,8
  78:15,18,23
  78:1,10
east 2:7,10 21:2
  34:23 42:13
  87:6 106:6
edge 30:1 40:23
  45:12 47:17
  75:13 81:16
  95:12 101:8
eight 7:12
either 45:16
  46:21 61:23
  81:4
electronic 67:20
  87:24 89:20
ELLIS 2:2
em 56:23
employee 54:7
  97:14 104:14
employees 6:17
  53:13,14
end 34:23 42:22
  87:11,11
ends 40:11 41:16
enforcement 11:5
  13:7,10 17:16
  17:17,21
  33:17 34:9
  56:9 57:5,17
engineer 24:12
  53:12
engineering
  24:21
entail 78:1
enter 59:24
  61:19 105:5
entered 88:19
entire 10:9
  31:12 62:7
  63:4
entity 77:19
  78:20
equipment 6:22
  7:18
erosion 37:24
err 45:2 47:1
ERRATA 105:1

Esquire 2:3,6,10
  106:5
Estimated 50:10
estimation 15:24
even 22:2 58:10
  86:19
ever 11:12 13:13
  27:1 34:4
  43:5 55:10
  57:11 61:25
  64:13 65:10
  65:20,24 66:3
  67:16 68:5
  70:10 72:5,7
  72:23 76:25
  78:25 80:8
  94:16,18
  97:14 98:2
every 51:3,4
  37:13
everything 20:10
  29:23 50:16
  69:22
evidence 3:3
  28:2,8 81:4
exact 16:2 35:11
  94:23
exactly 60:24
  61:12
EXAMINATION 3:12
  5:2 97:22
examined 4:25
example 79:14
Excuse 41:4
excused 103:6
executed 55:23
exhibit 8:18
  9:17 15:19
  28:4,6,15
  30:5,10 31:23
  32:2,4,9
  39:11,17,22
  40:1 43:2
  79:7 82:25
  83:5 84:6,6,8
  84:11,13
  93:20 96:4
  99:1,2 102:15
exhibits 3:16
  96:11
existence 72:13
  85:15,19
existing 38:6
  exit 36:6,7,9,12
expert 106:14
expires 104:23
  105:25
extend 42:4
extends 42:18
extension 76:5,6
extra 28:22
extruded 35:7
e-mail 89:10
  90:2,6,8
e-mails 85:11,15

85:16,18,19
85:25 86:4
90:25 91:4,8
91:12,15
--------------------
                F
--------------------
F 2:3
facility 71:12
  71:16
fact 22:2 35:17
  36:3 49:16
  78:11 82:17
  99:10,13
  100:17 102:7
  102:23
facts 46:8
factually 91:3,4
fall 6:2 11:18
  32:10 52:22
  59:25,25 60:2
  101:11 102:19
familiar 8:10
  26:19 29:7
  48:3 74:10
  99:7
far 9:4,10 10:17
  10:23 16:13
  17:6 31:11
  33:19 39:10
  40:12 41:1
  42:2 43:12
  53:19 61:22
  80:20 98:7,17
fast 45:1
favor 25:6
fax 65:22 75:16
  84:13 85:16
February 104:22
  106:3
federal 2:3
  86:19
fee 73:10
feet 36:11,13
  40:22 42:18
  69:23 70:5
fell 48:8 63:15
  65:3
fence 32:14,17
few 94:5
field 59:13 62:6
fields 59:24
  60:2,3
figure 5:8 47:16
  60:21
file 57:19,20,22
  58:7,17,20,22
  58:24 72:20
  72:21 79:5
  86:23 87:1,24
  88:4,8 93:13
filed 1:24
files 58:1,9
filing 106:19
fill 51:3,4
  56:16

filtered 59:9,10
financially
  104:15
find 20:19,22,24
  28:2,8 62:4
  62:14,17,20
  63:6,9 65:5,8
  66:14 67:25
  76:11,17
  83:10,11,13
fine 29:3 87:18
  88:7
fire 12:9
firm 4:19
first 4:25 27:11
  32:14 64:3
  65:13 71:6
  94:7 106:19
five 7:16,16,20
  15:25 16:5
  25:16 35:12
  36:11,13
  37:12 45:25
fix 6:12,14,15
  7:21 27:8,9
  27:12,15 44:2
  44:12,23,24
  47:25 49:24
  50:7,18 51:8
  51:24 56:19
  69:23 70:5
  71:1 73:12,13
  74:19 79:10
  79:17,20 80:4
  80:9,11,17
  82:5,10,20
fixed 60:10 67:2
  67:7 68:12
  73:25 79:19
fixes 51:12
fixing 34:17
  47:17 49:21
  50:1 80:6
  85:8,12
FLAGLER 106:1
Florida 1:1,8,19
  1:24 2:4,7,11
  3:5,6 4:3
  5:13 104:2,5
  104:21 105:24
  106:2,7
Floyd 7:4,13
  69:10
flush 37:8
follow 42:10
followed 21:23
following 65:8
follows 2:1 5:1
follow-up 65:15
  93:23,25 94:5
  97:21
foot 69:19
forces 49:6
foregoing 104:9
  104:16

foreman 68:7
form 13:15  66:22
  80:23  84:22
  96:20  97:9
  99:4
format 92:2
Fort 2:7,11
  106:7
forth 51:5  85:12
  85:16,25
forward 106:15
found 13:22
  20:17
foundation 39:4
four 15:25  16:5
  45:25  48:8
  50:5  92:8
  96:10
Fourteen 17:1
frequent 74:12
from 4:9,19
  16:14  17:4
  20:19  21:9
  29:12,14
  31:12  33:3
  37:24,24,24
  38:2,4,23
  39:7  40:8,22
  42:19  45:9,15
  45:23  46:8
  49:11  51:18
  61:16  64:10
  65:18,20  66:5
  67:2,6  68:12
  69:23  72:3
  75:15  81:17
  82:9  83:2,22
  84:9,14  88:18
  89:6,22  90:2
  90:8  91:15
  93:3  101:9
front 9:1
full 5:9
fully 42:4
further 47:15
  97:18  100:19
  100:19  104:12

— G —
Gardner 61:12
  90:5,9,11,23
  90:24
gave 28:21  52:18
  94:11
GED 2:2
general 24:5
  25:14,15
  53:16  54:24
  85:13
generalized
  99:24,25
Generally 55:6
generated 54:15
George 14:8
give 65:6  79:3

92:9
given 37:3  52:5
  106:10
gives 77:24
  78:21
go 27:9  38:16
  42:10  47:15
  56:23  61:25
  64:7,21  69:21
  69:21  70:10
  70:13  71:24
  73:13  74:19
  79:20  80:4,17
goes 36:13  88:9
going 8:12,20
  15:11  21:19
  30:2  39:15,17
  41:6,7,7,11
  42:9  44:23,24
  45:5  47:21
  51:5  79:4
  82:22  83:24
  88:1  89:9
  98:5,9
good 5:4,5  45:13
  47:18  56:10
  86:8
gotcha 82:4
gotta 44:2
governments
  77:15
grass 47:21
great 42:12
greater 45:2
Greg 71:10,11
grinding 38:21
ground 29:12
  37:7  38:5,7
  41:6  74:13
guess 48:5
gutter 29:13,14
guys 29:1  69:14
  83:3  93:24

— H —
Haggerty 90:3,13
  90:14
half 44:8  48:8
  50:5
hand 104:20
handle 13:8
handwriting
  92:12
handwritten 84:7
happen 6:15  49:7
  49:10,12  57:1
  67:11
happened 37:17
  63:22  64:22
  91:5,9  94:8
  95:9,18
happens 48:13
  49:2  61:2
happy 52:15
hard 42:10  45:1

69:24  88:5
hardship 89:1
hate 29:23
head 8:2  17:17
  29:2  49:15
hear 86:24
heard 65:18
  69:14  80:10
  87:11
held 3:25
Helfman 2:6  4:20
  106:6
help 46:21,23
helpful 47:12
her 30:3  61:12
  76:4,6,10
hey 43:6  44:1
  56:18,23
  63:14  98:2
higher 38:8
Highway 2:3
Hillsley 68:9
  74:4
him 12:25  13:1
  64:13  65:6,7
  65:10,18,20
  65:23,24,25
  66:3,5
himself 64:11
hire 26:10  54:10
hired 54:12
hiring 50:11
hoc 67:10  68:6
  69:13
hold 52:11
hole 22:13,16
  27:14  40:6
  44:8  45:3
  49:6  70:1
hours 51:7,10
human 18:11
hurt 61:4,7  65:4
hypothetically
  43:23

— I —
idea 48:20
identification
  8:18  9:17
  15:19  28:6
  30:10  32:4
  39:22  79:7
  82:25  83:5
  84:11  102:15
identified 3:17
  69:4  92:23
identify 15:12
  29:21  40:9
  53:15  89:22
imagine 27:11
  89:19
immediately
  48:16
imposed 11:2
imposes 17:11

impression 82:9
Inc 4:11  106:1
  106:22
inches 48:8,9,9
  50:5,6,6
incident 12:10
  34:14  53:15
  55:11  83:9
  85:17  90:16
include 63:3
included 14:22
  15:1,3  31:18
  33:17
including 85:23
inclusive 104:9
independent 76:7
independently
  12:5  46:8,13
  46:16  58:5
index 59:4
indexed 59:1
indicated 21:13
  42:12  55:1
  94:7  106:10
indicates 93:8
indicating 32:7
  32:8  35:4
  41:18
indication 39:3
  42:21,22
indicator 45:13
  47:18
information
  43:17  61:16
  61:19,23
  90:19  91:3
informed 25:1
initiate 56:24
initiates 57:2
initiation 89:13
injured 5:7,8
  9:22  18:1
  36:4
injury 6:11
  75:12  81:7
  101:7,20
inlet 37:4,22
  87:6
inquire 80:5,6
  80:12
inspect 27:25
inspected 73:16
  96:8
inspection 7:22
  8:1  73:19
  84:17
inspections
  71:24
inspector 24:2
  24:17  54:14
installed 71:1
instruction 79:3
intended 47:5
intent 46:24
interested

104:15
internal 61:5
  85:8
interrogatories
  91:13  102:7,8
interrogatory
  11:16  87:2
  102:17
interrupt 30:16
  38:19
intersection
  38:22
investigating
  64:20
investigator
  9:23  21:10,13
  43:9  64:11
  75:10
involved 13:8
  53:14,16
  54:11  75:24
  77:5  98:24
  101:11
involvement
  34:18  90:16
in-house 50:13
issue 33:19  97:7
issued 19:20,24
  34:4
issues 61:18
items 85:11
  91:11

— J —
Jackson 7:4,9
  69:10
Jackson's 7:8
January 1:20  4:1
  105:4  106:10
Jim 68:9  74:3
  78:9
job 5:15,23
  53:17,19
  76:22
jobs 24:4
jogging 101:23
John 2:3  4:14
  5:6  11:18
  16:9  33:5
  93:8  102:20
Jones 7:5,17,18
  69:11
JR 9:8,10  10:9
  10:11,17  11:6
  11:12  15:12
  15:15  17:6,9
  23:6  102:24
July 16:24
just 8:13  10:1
  10:12,12  12:4
  12:13  13:15
  14:12  16:22
  30:3  32:2,22
  35:6  38:17
  40:3  42:8

6

43:1,22 44:8
44:11,21 47:1
48:16,20 51:9
51:21 52:8
53:16 59:4,5
61:2,5 62:7
65:14 67:11
69:21 70:14
74:25 80:4,20
82:2,10 89:18
90:1,17 91:4
91:19 94:5
97:20 101:3
JUSTICE 2:9

**K**

keep 40:13 57:13
58:1,3,9,12
58:12 63:16
67:14 81:12
keeps 72:20
kept 24:4 58:7
60:6 63:19
74:21 88:8
93:12
kind 13:14 25:6
34:13 43:20
45:12 52:4,21
52:25 54:15
57:22 74:7
78:14 85:7
knew 96:17
know 6:23 7:2
9:5,7,10
10:11,17 11:1
11:4,4 12:7
12:13 13:2,3
13:13 15:1,3
16:7,13 17:6
17:9,11,15,17
17:22,25
18:20 19:5,13
19:20 20:2
21:19,21 22:5
22:21,23 23:2
23:11,14,25
24:1,2,6,7
25:7,8,11,12
25:18 26:4
28:14 29:9,17
30:12,20 31:4
31:11 33:8,12
33:18,18,19
34:2,4,8,16
34:18 35:11
35:22,23
36:17 37:23
38:25 39:10
40:12 41:1,20
42:2,9 43:6
50:1 51:11,20
51:21 52:10
53:15 54:21
54:22,23 55:7
55:15,17,20

55:23,25 56:4
56:16 57:16
59:25 61:10
61:14,22
63:14 64:25
66:18 68:16
68:20,23
69:15 70:19
70:22 72:13
72:19 74:8,25
75:2,4 76:25
78:2,7,7
80:16,21,25
81:9 82:11
84:20 85:13
85:15,19
86:13 87:5
88:7 89:9
92:7 93:14
94:22 96:23
98:7,17 99:12
100:12 101:18
knowledge 12:2,8
26:14 37:14
94:19 97:13
known 67:4
Kuller 71:10,11
K-U-L-L-E-R
71:14

**L**

labor 50:17
lakes 53:8
large 1:24 3:6
6:9 104:5
105:24
Larry 7:4,8,9
69:10
last 24:9 36:18
36:21,23
37:10 52:18
70:14 90:9
later 27:14
28:19 52:11
Lauderdale 2:7
2:11 106:7
law 4:19 52:8
lawful 3:2
lawsuit 60:20
89:14
lawsuits 60:16
leaking 81:1
learn 43:16 64:3
64:9
learned 46:8
64:6
lease 19:5,8
55:23 93:13
leased 10:16
11:19,23,23
16:10,14 19:3
33:1,11 36:1
40:7,15,17,24
41:25 66:4,7
81:11 93:11

97:8 99:17,20
102:21
leases 33:3
least 90:7
Lee 1:23 3:5 4:9
104:4,23
106:24
left 32:22
legal 4:2,10
80:20 106:1
106:22
legible 75:8
lessor 33:16
let 39:18 73:2
letter 106:12
Let's 45:25
level 38:10
lid 20:8
light 51:17
like 15:7 17:1
18:6 21:22
22:3 25:5
28:10 29:13
40:2,19,22
41:19 44:24
44:24 50:19
51:6,17 52:8
54:16,17
56:14 58:9
59:16 60:10
65:21,22
66:13 71:1,20
72:25 73:7
80:15,20
82:12 84:25
92:10 96:8
98:20 99:3
line 20:1 31:9
40:20 42:3,3
42:7,12,22
79:24 80:14
86:5 99:16
100:1,4,10,11
105:6
lines 46:15
lip 44:22
listed 106:13
little 8:13
13:16 52:4
84:4 97:21
live 49:5
lived 23:5
LLC 55:16,18
load 49:6
loading 31:21
32:24
located 23:25
81:20
location 18:1
59:21 83:15
95:15 101:3
log 67:14,15
68:3 75:19
89:16,21,25
logs 67:16,19

long 5:17 7:10
7:15,19 23:5
25:12 39:7
48:3,9,10
49:14,17 50:6
50:18 64:6
88:7
look 15:7 19:23
45:20 58:5
60:9 61:25
62:25 63:15
69:22 70:20
74:5 86:10,15
87:8,19
looked 11:8
14:21,23 63:1
63:23 65:22
76:8 86:14
88:14 90:25
92:20,22 96:8
100:7
looking 12:14
15:10,11
39:18 40:5
46:13,16 66:6
75:19,25 76:1
looks 17:1 21:22
22:3 28:10
40:2,19,22
41:18 48:24
65:21 66:13
73:23 82:12
98:20 99:3
loosen 49:8
loosens 49:4
lose 8:21
lot 6:3 16:19
21:2,10 34:23
35:8,15,21,23
36:5,10,17
37:1 38:11,14
39:5 41:21
42:8 74:16
87:6 89:3
95:10 96:18
96:24
lots 15:25 16:5
16:6,8,10,13
Lynn 76:13,19,22
76:24 77:4,8
78:9

**M**

M 1:23 3:5 4:9
4:10 104:4,23
106:24
made 13:14,19,25
81:19 97:3
mail 57:4,11,14
main 80:13 81:1
maintain 10:23
11:1 17:12
26:24 27:22
35:14 56:6
73:11 77:11

maintained 18:25
36:18,23,24
maintaining
34:17
maintains 18:14
53:3
maintenance 6:22
7:9,14 20:16
20:22 37:1
43:12,18 54:4
64:25 65:9
71:12,16
majority 45:3
make 27:12 37:7
41:8 63:23
73:24 74:21
88:3
manage 5:25
management 61:9
61:15
manager 61:11,13
90:24
manhole 31:8
manuals 85:8
many 6:19 51:7
51:11,18
65:12 92:7
map 54:25 55:1
March 30:15
Maria 1:5 4:6,15
5:6 105:2
106:8
mark 8:15,20
9:15 28:3,3
30:2 39:17,20
41:14 82:22
99:21,22
marked 8:17 9:16
15:12,18 28:5
29:25 30:5,9
31:8 32:1,3
39:22 79:6
82:24 83:4,20
84:10 96:10
102:14
match 38:6
material 50:15
materials 50:16
67:11
Maurice 53:10
90:4
Maurice's 53:11
may 9:25 12:9
24:3 36:25
46:8 106:15
maybe 39:13
45:25 77:20
mean 7:22 18:5
25:5 33:13
38:19 81:7,21
81:22 88:23
meaning 72:17
76:2,19
means 45:11
74:21 89:20

104:17
meant 89:24
measure 99:22
  100:11
measured 97:10
  99:10,11
mechanism 27:20
  27:24
meet 65:10 97:14
Mellinger 2:10
  3:14 4:16,16
  15:10 29:3
  66:9 93:25
  94:4 96:22
  97:12,18 99:4
  100:2 102:2
member 25:1,6
  61:4
members 5:25
  6:19 23:19
  74:4
memoranda 85:11
memory 20:20
  70:16 101:24
mentioned 24:14
  65:22
met 64:13 94:14
meter 20:8,17,19
  34:18
Michael 1:14 3:1
  3:10 4:23
  5:11 104:6
  105:3 106:5
microphone 41:5
might 8:21 23:25
  24:1 26:7
  34:1 43:11
  44:17 47:21
  53:18,20
  56:10 67:6
  79:14 81:19
  85:23 90:14
  95:4
Mike 4:4 5:11
  24:2,14,15
  25:4 54:10,11
  54:13 56:10
  87:15 90:3
  91:19
minor 37:3
Mizner 63:7
modifications
  20:3,6,24
moment 93:16
Monday 1:20 4:1
month 51:14,16
  51:17 74:9
months 45:25
more 13:16 25:16
  72:10 74:10
  74:11,12
  97:20
morning 5:4,5
Morrell 53:10
  90:4

most 12:1,8
  92:19
mostly 44:21
MP2 58:12 67:15
  67:22,23
  75:19
much 38:25 93:21
municipal 1:9
  24:20 38:14
  90:21
myself 71:5
  81:18

__N__

N 3:9
name 5:9 9:8
  17:19 24:9
  26:3 59:11,12
  59:16 60:4,4
  62:10 67:23
names 4:12 81:12
nature 60:5
near 31:21 62:7
  64:22 75:12
  81:8 83:15
  88:22 95:14
  101:8
necessarily 67:5
  82:15
need 44:12 56:18
  60:9,20 69:23
  79:10 88:5,16
needed 26:9
  50:20
needs 73:16
network 79:16
never 9:6 36:22
  56:15 65:18
  80:10 94:14
  101:2,6
new 55:23 70:25
  98:18
Nawor 28:12
next 27:8 37:3
  37:16,21
  39:17 64:8
  84:6 93:19
  106:18
Nina 75:19,21,22
  76:19,21
  92:11,18
Nina 39:25
Nods 49:15
none 51:18 60:2
Nope 66:17
normally 31:18
  45:4 47:16,20
  48:22 49:17
  69:20 89:21
  90:17 93:15
  93:17
north 2:3 99:16
  99:25 100:4
  106:1
Northeast 8:5

63:7 75:11
  81:10 86:6
Northwest 1:18
Norton 14:8
Nos 9:17 39:23
Notary 1:24 3:6
  104:4 105:24
note 11:17 75:13
  75:17 81:16
  81:18 82:4,8
  82:23 83:12
  92:11 101:8
  101:20
noted 84:5
notes 75:6 79:4
  84:7,9
nothing 59:15
notice 1:24 3:5
  11:12 58:8,17
  58:20,22
  106:19
noticed 28:21
notified 11:10
  12:17 73:17
  75:17 82:6,13
notify 44:6
November 28:16
  36:24 64:5
  94:8 96:2
number 4:7 11:16
  58:2 60:4
  75:16 76:4,6
  79:5 82:22
  102:17 106:13

__O__

O 75:13
oath 5:1 52:8
object 13:15
  66:22 84:22
  89:11
objection 29:1
  66:9 80:23
  99:4 100:2
  102:2
obligation 80:18
occasion 56:15
occur 48:11,22
  71:25 74:11
occurred 6:3
  9:25 15:22,23
  16:17 21:3,7
  21:14 22:8
  29:23 30:4
  46:2,14,18,19
  66:7 69:3
  70:11 94:19
  94:20,23 95:3
  95:21 96:18
  96:23 100:22
  100:25
occurring 55:8
off 11:23 12:22
  42:10
  45:5 52:4

office 6:4 8:4,7
  9:2,14,24
  11:19,21,23
  16:6,11,14
  19:3,6,21
  21:10,13,20
  29:6 31:1,22
  32:25 33:2,3
  33:10,13 34:5
  38:5,12 39:12
  40:7,10,12,14
  40:15,17,24
  41:25 42:16
  43:6,9 55:24
  62:8,10,15
  64:12,22 66:4
  66:8 72:3
  75:10 81:11
  83:14 84:14
  85:3 86:7
  97:8 99:17,21
  102:1 106:12
officer 17:21
office's 101:12
official 25:7
  104:20
often 74:12
Oh 17:5 30:13
  34:20 54:15
  73:16
okay 8:1,14 10:1
  14:5,14,24
  20:21 21:23
  22:4 30:2
  32:12 33:16
  40:16,16 42:6
  42:12,16
  43:13 45:7
  46:9 50:18
  52:14,17 54:9
  54:15 55:5
  57:1 66:14
  73:5,16 76:4
  78:22 82:13
  87:19,25
  89:16,24
  90:13,25
  91:18 92:24
  93:22 98:17
  99:20 101:15
once 27:20,24
one 7:1,18 8:16
  9:15 10:8
  13:22 16:19
  17:6 21:23
  23:3 34:17
  36:15 38:17
  44:11,23
  47:25 51:9
  62:9,10,11
  63:22 65:13
  65:14 67:8
  69:13 75:22
  78:16 82:11
  82:12 83:20

83:22 84:6
  87:20 98:7,18
  99:13
ones 44:20 54:23
  54:24 69:15
  83:20
online 45:20
only 22:6 37:14
  44:24 76:11
  98:7,17
operating 93:16
operator 6:22
  7:18
opinion 48:10
opposed 26:15
  42:24
order 60:8 75:19
  82:18 83:13
  84:5,7 87:4
  87:14 91:12
ordered 24:24
  106:15
orders 88:8
  101:5,18
original 3:25
  28:23 87:21
  90:8
originally 84:5
  91:22
originals 92:5
Osorio 1:5 4:6
  4:15 5:6 9:21
  18:1 105:2
  106:8
Osorio's 11:13
  29:22
other 6:18 14:18
  20:1,3,6,24
  21:10,17 22:4
  23:18 26:20
  34:16,18
  44:11 45:11
  46:7 51:23
  53:5,6,21
  55:7 58:9
  59:17 60:10
  60:13,21 62:1
  62:14,17,20
  65:12,13
  66:15,15 72:3
  72:13,14,19
  72:19 74:4,21
  74:22 75:2,3
  76:17,23
  77:14 85:5,11
  86:3 88:23
  91:11 98:15
  100:13,14
out 5:8 18:7
  29:23 36:13
  40:20 47:16
  49:6 50:24
  51:1 56:22
  60:21 61:23
  64:7 74:4

80:17 84:5
96:4 98:5,9
outside 49:23
50:11 68:14
over 48:14 49:12
84:14
overhead 40:4
overlaying 54:8
overnight 48:14
49:7,10
own 9:10 10:9,12
10:12 20:20
45:16 60:14
60:15 75:2
76:15 77:11
77:14 79:1
84:17 101:23
owned 6:4 11:18
13:5 15:15
18:20,21
27:18 35:24
36:2 41:1,22
42:23 46:18
56:1 66:16,21
72:24 76:2,8
77:14,18
78:20,20
81:11,23
102:20,23,24
owner 25:7,10
31:16 33:4,8
33:15,20,23
41:15 42:24
44:6,22 56:25
57:2 60:4,9
66:15 69:22
76:15 81:24
82:2
owners 13:1
17:12 19:6
55:20 56:5
57:14
ownership 78:1
owner's 44:1
45:8 56:17
owns 10:12,19
11:7 35:23
41:20 43:6
55:15 77:19
93:8

P
P 2:6 33:5
102:20 106:5
page 3:12,17
92:10 105:6
pages 104:9
paid 23:5,10
Palm 93:3 104:3
104:21 106:2
Palmetto 5:13
Pam 61:11 90:5,9
90:23,24
paper 87:23
papers 91:14

Park 5:13
parking 6:3
16:19 21:1,10
30:1 34:23
35:7,8,15,21
35:23 36:5,10
36:17 37:1
38:11,14 39:5
41:21 42:8
83:15 87:6
89:3 95:10
96:18,24
part 8:24 13:10
14:3 43:21,22
43:24,25
59:18 69:19
77:10 97:7
100:25
partially 16:18
16:18
particular 13:10
43:23 54:14
59:16 72:24
92:15 96:3
98:11
particularly
46:17 47:21
parties 104:13
party 85:3 93:11
106:14
part-time 76:22
pass 77:16
passed 12:13
PASTORIZA 2:6
106:6
patch 27:1 79:20
patching 25:18
paths 76:23
pave 23:7,9,12
26:24 45:14
54:16 69:21
72:23 73:2
paved 23:2,3,14
23:17,20
25:21,24 26:9
27:2,6,11,17
27:21,25
31:12 35:17
35:20 47:21
53:18,20 54:2
54:3 66:19
73:20
pavement 20:9
45:12 47:18
69:19 73:4,13
74:5
pavement's 55:4
paving 24:4,23
25:12 26:20
34:16 53:21
55:2 73:14
pay 10:20
payment 25:10
Pedersen 4:11
pending 3:3

people 7:2 53:24
54:2,3 56:9
56:23 69:3,6
69:9 86:1
percent 44:25
perfectly 16:2
perform 79:23
performed 30:12
31:3 88:18,21
perhaps 12:9,16
24:1 79:16
permit 19:15
permits 19:20,23
54:17
person 6:23 9:5
9:7 11:25
12:1,7 13:6
25:2 54:10,12
54:17 59:12
61:3 64:10
65:3,10 66:15
72:24 77:24
79:14,15,15
personally 51:20
74:25
person's 77:16
photograph 8:22
21:20 22:10
30:5 31:20,21
32:1 39:11
93:3 99:13
photographed
99:11 100:14
photographs 8:12
8:14 9:14
21:5,9 22:4,5
22:6 40:8
45:15,17,23
46:13,17,21
65:7,20 70:11
72:11,14,19
72:20 84:15
91:21,22 92:7
94:16 95:2,23
95:25 96:3,5
96:10,11,14
97:3 98:25
100:8
photos 65:16
71:7 72:17
97:24
photostatic
106:16
Pictometry 45:22
98:3
picture 21:24
pictures 64:7
Pierce 78:9
pipe 18:10
pipes 29:14
place 2:1 3:7
6:25 9:21,24
11:18 27:20
27:24 58:1
62:7 102:20

places 26:20
plaintiff 1:6
2:5 4:24 21:6
21:21 36:4
72:5,8 85:1
104:7
plaintiff's 3:17
3:18,18,19,19
3:20,20,21,21
3:22,22,23,23
3:24 8:16,16
8:18 9:15,17
9:20 10:1,4
15:19 28:6
30:10 32:4,10
39:22 79:7
82:25 83:5
84:11 102:15
plant 51:5
plat 9:9 11:8
12:13 14:23
16:23 20:11
34:25 54:24
58:2 83:17,19
92:11,22
platted 9:5
15:14
please 5:9 41:14
87:20
plus 20:18 41:5
69:4 74:18
point 36:5,6,7
38:11 40:19
41:18 96:4
points 40:20
police 12:16
policies 85:8,12
policy 66:18
portion 35:5
37:7 40:5
70:1 90:7,7
position 53:11
possible 11:10
13:12 68:3
70:9 81:4
89:1
possibly 14:8
19:17 24:8
33:18 77:20
78:9
post 6:4 8:4,6
9:2,24 11:19
11:21,23 16:6
16:10,14 19:3
19:6,21 21:9
21:13,20 29:6
31:1,22 32:24
33:2,3,10,13
34:5 38:5,11
39:12 40:7,10
40:12,13,15
40:17,24
41:25 42:16
43:5,9 55:24
62:7,10,14

64:11,22 66:4
66:7 72:3
75:10 81:11
83:14 84:14
85:3 86:7
97:8 99:17,20
101:12,25
postal 8:15 87:7
87:12 95:10
102:21
Post-It 92:15
pothole 6:10
7:22 37:19
40:6 43:2,7
43:14,21,24
44:2 47:17
48:7,11,22
49:2 50:1,3,4
50:8,19 51:9
52:23 56:16
63:15 68:17
69:18 70:14
74:5 75:11
80:25 83:14
85:20 86:6,7
97:7 98:18,19
98:20,22 99:3
99:10
potholes 6:13,14
6:16 47:25
48:4 49:21,24
51:11,19,24
62:11,21,23
62:24,25
67:10 69:7
71:19 73:24
73:24 74:11
74:19,22 85:9
85:13
practice 23:12
26:8
preparation
14:19 20:12
86:18 89:14
prepare 78:25
prepared 72:17
presented 89:19
preset 59:24
60:2,3
pretty 75:8
primary 60:18
principals 55:17
printed 93:6
prior 30:18 37:9
37:10 72:8
private 14:2
18:24 23:9,12
25:25 26:3,5
26:10,15,17
26:20 27:6,16
27:17,21,25
40:10,13
41:16 43:25
44:22 45:8
47:20 54:2,6

54:7,17 56:5
56:17 63:12
63:22 66:19
70:8 79:10
privately 18:20
18:21 27:18
41:22 92:25
privately-ma...
13:9
privately-owned
92:21
privilege 46:12
47:10 89:13
89:16,21
Probable 89:1
probably 11:5
48:24 50:10
51:9,18 52:19
63:13 89:3,5
94:1
problem 27:7
48:25
problems 61:17
procedure 85:8
procedures 85:12
produce 22:4
43:17 89:25
produced 8:13
9:14 12:1
21:6,20 28:21
72:14 75:5
91:22
Productions 4:11
program 45:21
73:19
project 54:14
prompt 106:21
properties 58:2
70:2
property 5:7,8
8:24 9:3,6,11
10:11,13,16
10:20 11:17
11:20,21,22
12:25 13:9,14
13:16 16:6
17:12,13
18:25 19:2,6
19:9,15,21
25:6,10 33:1
33:3,4,8,11
33:15,16,20
33:23 40:7,10
40:12,13,14
40:15,17,24
41:15,15
42:18,23,23
43:6,14,22
44:1,1,6,21
44:22 45:4,8
45:8,9,15
46:18 47:20
55:15,21 56:2
56:5,6,17,17
56:25 57:2,14

57:19,23 58:7
58:9,10 59:1
60:9 61:4,8
63:12,22,24
65:21 66:4,7
66:15,19 70:7
70:8 73:21
75:2,12,22,23
76:14,15,20
77:17,25 78:1
78:3,21 79:10
79:19 80:17
81:8,9,10,24
82:1 93:4,9
93:11,16 97:7
97:11 99:16
99:17,20
100:1,4,9,11
101:7,12,21
102:1,19
property's 43:25
protocol 43:20
44:2
protrudes 69:22
provide 57:25
90:19
provided 14:11
21:9 99:1
public 1:24 3:6
12:19 58:10
61:4 70:7
104:14 105:24
publicly-owned
93:1
puddle 28:11
Puerta 24:8 26:7
54:5,6,9
pull 61:22
pulled 93:5
purchase 76:22
77:5
purchased 77:1
77:12 78:7,20
purchases 78:5
purely 96:14
purpose 3:2
30:20,24,25
31:7 60:18
78:1 98:5,9
purposes 60:13
78:24
pursuant 1:24
3:5
purview 6:12
put 11:12 91:19
99:1
P-U-E-R-T-A
24:10
P.A 2:2
P.L 2:6 106:6
p.m 1:20 103:8

Q
question 16:19
46:24 50:4

56:8 69:24
70:25 78:8
81:1 86:24
100:12
questioned 57:24
questions 94:5
95:1 97:18
103:3

R
R 75:13
rained 70:22,23
ran 17:22 62:9,9
random 74:7,10
range 51:17,21
rather 35:1
42:13
Raton 1:8,19 2:4
4:3,5,7,21
5:13,20 6:4,5
6:7 7:23 8:24
10:20 11:14
12:8,20 13:4
13:13 14:3,4
17:22 19:9,21
20:2,4 23:3
23:17 27:21
27:25 29:17
31:11 34:6,19
35:8,14 36:2
55:16,18 56:4
61:4,7 65:21
65:23 76:3,14
78:2,11 79:23
80:17 83:16
85:7 104:21
106:8
RE 106:8
read 22:1 75:8
79:5 83:12
103:4 106:11
106:15
readily 74:11
reading 87:10
106:19
ready 106:12
real 59:4
realize 11:6
really 33:17
51:19 61:7
80:22
reason 31:2,5,6
70:24 74:15
74:17 80:5
reasons 79:13
recall 22:10
37:10,12
44:18 65:19
received 60:23
recent 22:18
28:8 64:24
68:16 89:7
95:8,13 96:15
101:3,16
recently 36:18

70:14 72:10
96:7
recess 41:10
84:1
recognize 8:22
record 4:13 5:10
13:22 14:11
14:12 16:22
20:22 35:6
42:9 43:1
57:13 63:16
63:19,23 75:9
77:3 84:4
88:19 89:18
90:1 93:12
104:10 106:25
records 13:21
14:9 20:16
23:23,25 24:1
24:3,4 26:5
43:11 57:25
60:7 64:25
65:5,9 83:18
Redirect 3:15
97:22
redone 73:17
reference 86:5,8
references 88:23
referred 8:17
9:16 15:18
28:5 30:9
32:3 39:21
79:6 82:24
83:4 84:10
102:14
referring 28:14
81:9 82:1
83:19
reflected 91:4
99:14
reflection 32:15
refreshed 70:16
regard 94:25
95:6
regarding 12:2
13:4 14:10
21:6 33:14
43:18 55:11
57:11 61:17
64:1 72:2
81:19 84:20
85:8,17 89:14
92:11 95:8
101:20
regards 43:11
regular 31:3
regulations 56:5
related 98:12
relating 85:20
relation 35:20
46:1 72:18
95:18 101:19
relative 89:9
104:13
released 106:16

relevant 8:21
relying 98:25
remember 20:23
44:20 52:19
96:21
remembered 26:17
remembers 54:10
remove 50:25
repair 13:25
20:9 28:2,8
37:3,6,10,14
44:5,5 80:18
83:13 95:8,13
96:15
repaired 13:23
37:16 75:18
82:6,14 95:19
96:7 98:18,20
100:8
repairing 45:2
69:7
repairs 6:18
13:14,19 20:3
20:6,25 22:18
22:21,23,25
44:7 51:19
52:2 64:24
65:1 67:9,17
68:17 71:22
73:8,15 79:23
96:9 97:3
98:10 100:9
100:13,14,15
100:17,19,25
101:4,16
repeat 52:15
replaced 20:9
report 59:5 61:6
reported 31:14
104:6
reporter 1:23
4:9 88:3
104:4,19,23
106:24
reports 34:13,14
58:12,21,24
58:25 59:18
60:25 61:3,5
86:20
represent 5:6
represented 72:8
representing
4:17,20 47:7
55:2
reproduction
104:17
request 25:7
58:13 61:16
requested 24:24
25:1 90:18
requests 67:15
73:14
required 55:1
requirement
29:16,20

requires 54:20
reread 76:9
research 33:6
  66:14
respects 46:22
respond 74:18
responding 89:15
response 30:17
  87:2 90:10
responsibili...
  45:14
responsibility
  17:7 42:18
  71:19
responsible
  43:13 47:17
resurfaced 36:19
  36:21,22
reveal 46:6
review 19:10
  20:11 34:13
  60:7 102:18
reviewed 14:19
  20:10,11 21:4
  21:5 34:11
  45:24 70:16
  86:17
reviewing 86:22
  86:25
right 13:11 16:4
  17:19 27:11
  29:25 30:1,6
  32:7,7 35:4
  35:17 40:19
  41:2,18 52:16
  65:16 67:3
  70:3 75:15
  76:23,25 77:6
  77:12,13,14
  77:16,18,19
  77:22,25
  78:15,17,19
  79:18 81:7,16
  81:21,22,23
  82:18 94:12
  95:12 100:22
  101:8
rights 78:21,23
right-hand 35:5
  42:22
risk 61:9,11,11
  61:13,15
  90:23,24
road 5:13 9:1,2
  23:2,9,14,17
  24:23 27:7,17
  27:21,22,25
  54:16 81:2
roads 23:12
roadway 76:23
Roberts 1:14 3:1
  3:10 4:4,23
  5:4,11 84:8,9
  90:3,10,10
  94:6 97:13

104:7 105:3
  106:5,9
roll 41:12 84:2
rolling 41:12
  84:3
roof 29:6,9,11
  29:12,17
routine 7:22 8:1
rule 44:24 45:1
  45:12
rules 52:7 86:19
run 62:6,6
running 78:12
  89:2
runoff 29:6,9,11
  29:18 74:16
runs 8:6,7 9:2
  10:5 73:23

----------------
        S
----------------
same 9:13 10:2
  21:24 35:18
  38:24 39:11
  39:20 40:3,4
  43:2 47:8
  76:15,19 83:9
  87:15 98:22
  99:3 104:17
sanitary 18:8,9
  18:10
sanitation 31:9
saw 15:9
saying 38:20
  44:1 79:17
says 30:25 31:7
  35:6 59:25
  82:5 92:11
  102:17
scale 16:2
scenarios 62:9
schedule 106:13
seal 104:20
search 59:13
  62:10 76:7
  86:4 88:12
searched 59:11
  62:11 67:20
second 7:1 90:6
  92:10
section 44:6
Sedlak 11:18,19
  11:24 16:9
  33:5,5 81:13
  81:14 93:8
  102:20,21,24
Sedlaks 11:22
  16:14 33:12
  41:1,23 55:11
  55:13 56:1
  74:25 75:2
see 6:10 14:18
  15:9 19:23
  39:18 45:25
  46:1 57:10
  60:14 61:25

62:12 64:15
  67:10,16
  70:25 76:3,8
  82:20 86:12
  86:19 88:14
  88:23 99:23
  100:8,13,14
seems 21:24
  92:10
seen 22:18 45:17
segments 74:8
Seiberg 75:22
Seibert 76:19
send 44:15 57:4
  65:24
sent 57:8,11,13
  65:7 84:14
  91:14 97:24
sentence 82:11
  82:12
separate 58:19
  58:22,23
Serota 2:6 4:20
  106:6
served 12:5
service 73:10
  102:21
services 14:1,2
  24:20 78:10
  79:15 90:22
set 85:12
settled 37:18,19
  38:5,7
settling 38:3,23
  38:25
seven 7:12
several 70:23
  85:25 98:21
severe 6:11
sewage 19:14
sewer 13:20 14:5
  18:6,8,9,10
  20:1,18 31:8
  34:17 73:6
  79:16,17,19
  79:24 80:14
sewers 17:22,25
Shakes 8:2 29:2
Sharma 90:3,13
  90:14
sheet 105:1
  106:16
short 41:10 84:1
shorthand 101:23
Shortly 96:1
shot 10:3 39:19
show 8:12 9:20
  15:21 31:15
  83:3 94:16
showed 96:15
showing 9:13
  21:10 22:10
  39:12 87:4
shown 31:13,23
  31:23

shows 15:15
sic 43:25
side 38:5 45:2
  47:1 87:6
sidewalk 37:6,8
  38:2,4,4,6,8
  53:1 89:2
sidewalks 38:21
  53:3,5
sign 33:22
  106:11
signature 102:11
  105:20
signed 106:16
signing 106:19
signs 22:18
since 25:19
  75:18 82:6
Sincerely 106:22
sink 27:14
sinkhole 80:14
six 14:18 15:13
  41:17 93:21
sit 44:18 94:22
  95:17
site 45:16
sitting 43:14
  54:21 55:7
  68:16,20
situation 27:10
  43:24 48:5,23
  69:25 79:12
six 7:16 16:8,10
  16:13 30:8
six-inch 35:7
size 48:11 50:3
slash 75:12,19
  101:7
slightly 37:18
slip 59:25
softens 49:3
some 8:15,21
  9:13 10:15
  20:16 21:1,3
  25:5 28:10
  31:2 38:7,21
  43:20 56:8,20
  59:17 64:24
  65:7 66:3
  74:11 78:14
  86:9 88:22,23
  91:15 93:23
  94:25 95:22
  96:8 100:19
  101:3,4,16
somebody 10:19
  90:17,18
someone 17:16
  53:17 61:6
  73:23 75:18
  82:5,6,14
someone's 5:7
  44:1
something 6:6
  14:24 15:2

19:8,9 21:22
  22:3 26:8
  27:2,15 29:19
  31:18 37:13
  38:20 46:6
  48:13 53:2
  56:8,14 57:6
  58:22 60:10
  61:2 62:12
  63:11 67:14
  69:20 71:1
  73:7 74:14
  77:17 78:5
  79:24 80:1,15
  82:10 93:5,15
sometimes 19:1
  26:11,12,13
  45:10,14
  48:13,14
  49:24 56:24
  56:24 77:10
  78:5 80:6
somewhere 15:24
  29:25 32:12
sorry 8:16 12:12
  24:16 28:3,18
  29:6 30:16
  34:20 66:16
  71:15 82:5
  86:14,24
  87:10
Sort 29:13
south 42:13,15
  100:9,14
Southern 1:1 3:4
southwest 64:23
  75:12 81:8
  83:14 95:15
  101:7,17,20
specialist 24:13
  76:14,20
specialists
  75:23
specific 13:16
  30:25 31:7,19
  44:20 46:7
  48:6 54:23
  76:23 77:25
  78:23,24
  88:22
specifically
  25:13 44:18
  55:22 63:1
  97:10 99:23
speculation
  66:10 99:5
  100:3 102:3
spell 7:6 24:9
spoke 76:10
  92:11
spoken 72:2,5,7
spot 28:9 56:17
  74:18,22
  94:23
staff 5:25 6:14

6:15,17 18:15
23:18 36:25
37:2 50:12
54:4 56:24
57:1,6,18,20
57:22,24
58:16 67:8,25
69:2 74:4
76:24 98:10
stamp 21:24 22:1
22:2
stand 49:8
standby 41:5,6,8
41:11 83:24
83:25 84:2
103:5
standing 32:19
48:24 49:1,14
49:16 50:21
70:17 71:2
started 52:4
state 1:24 3:6
5:9 104:2,5
104:21 105:24
stated 14:11
97:1
statements 84:20
84:23,25,25
85:1
States 1:1,8
2:12 3:4 4:18
34:5 64:11
105:2
stay 44:11
step 27:1,8
stepped 6:11
sticky 92:15
still 9:5,10
33:8 47:9
70:17 72:21
90:14 92:2,5
stone 75:15
81:17 101:9
stop 41:5,7,9
45:5 83:25
103:5
stored 92:3
storm 18:12,14
18:16,19,24
19:2 29:5,18
37:3,17,21,22
53:7 87:5,14
88:11 89:3
stormwater 24:12
straight 42:8
strategy 89:14
street 6:5,7 8:5
8:6,8 16:18
31:4 36:13
43:21,24
53:18 63:15
63:16 75:11
81:10 86:6
100:18
streets 4:5 5:16

5:18,24 13:5
39:4 53:5
striping 55:3
stuff 55:3
subdivision
15:12,14
submit 54:16
subscribed
105:21
suck 50:24
Suite 1:19 2:7
2:10 106:1,6
sunk 48:16
sunken 56:17
superintendent
4:5 5:16,17
5:23 79:16
supervisor 53:9
71:12,16 74:3
Support 4:2,10
106:1,22
sure 6:25 8:9,10
12:15 17:1
21:2 34:22
51:17 61:12
69:10 72:21
73:24 74:21
84:23 86:16
88:16 89:18
90:2
surface 38:10
surveillance
68:23
survey 14:21
15:1,5,7,11
20:14,15
28:21 29:5,21
30:8,12,20,23
30:25 31:2,3
31:6,7,13,15
31:18,19
34:25 35:5
39:7 40:9,20
41:14,17
42:17,20 45:9
66:6 95:2
99:14
survey's 14:24
Sweep 51:2
switch 41:7
83:25
sworn 4:25 104:8
105:21
system 61:15
88:20

T
take 19:23 29:19
50:18 51:8,10
58:5 61:25
64:7 72:10
86:10,15 87:8
87:19 96:3
taken 1:23 3:2
28:14,16

41:10 48:10
84:1 91:22,25
95:22,25
105:4 106:18
takes 48:3 49:17
taking 1:24
22:10 70:11
talk 34:10 69:14
talked 53:17,19
53:24 69:2
76:13 85:5
91:6
talking 18:6
36:3 43:23
82:2 97:15
tape 41:5,12
83:25
tapes 41:7
Tape's 84:2
taxes 10:20
techno 59:16
telephone 60:4
tell 17:4 20:10
30:23 39:7
40:5 47:4
64:18 65:2,20
65:24 80:8,11
88:18 89:23
94:18 95:17
97:6
telling 101:22
Ten 35:13
tenant 33:25
Teresa 1:5 4:6
2:5 106:18
term 40:6 58:7
80:10
terms 12:20 19:5
53:16
Terrific 91:18
testified 4:25
94:25 95:22
testimony 95:5,7
97:2,6
Thank 15:9 41:17
81:14 93:21
93:22 106:21
their 4:12 6:21
11:1 17:13
41:15 44:7
45:13 53:16
56:6 67:15
73:15 80:13
80:13 106:15
themselves 27:9
44:23
thing 44:15 74:7
things 45:12
51:6
think 7:16,20
15:2 17:19
21:25 51:7
56:13 58:15
59:15 61:11
64:5 82:4

86:17 92:19
93:20
thinking 77:17
77:20
though 99:23
thought 32:14
89:24
thoughts 82:11
82:12
three 6:20 11:16
16:8,10,13
69:4,14,23
70:5
through 16:8,10
16:13 57:4,8
89:20 104:9
thumb 45:12
time 2:1 3:7 4:3
6:24 9:13
11:23 16:9
21:24 22:1,2
22:14 23:4
27:11 33:6
34:17 35:18
38:24 41:3,8
41:23 42:1
44:14 47:6
49:12,14,17
51:5 52:18
56:2 71:6
88:22 89:8
97:19 101:22
101:25 106:18
times 98:21
title 5:15 7:8
7:13,17 17:20
24:11,16
53:19 56:12
56:13 61:12
71:15
titles 6:21
53:17
today 4:1 6:2
7:2,3 14:13
14:20 17:9
44:19 55:7
68:16,20 72:8
86:23 87:1
94:25 95:18
97:16
told 64:19 65:3
80:4 82:7
92:20 101:2,3
101:6,25
ton 8:7
Tony 24:8 26:7
54:5,6,9,12
54:19,21
top 90:7
track 51:19
59:21 60:14
63:11,21
67:15
traffic 37:24
48:24 49:1,5

transcript
104:10,16
105:5 106:11
106:15
trial 106:18
tricky 85:6
trip 52:22 59:25
60:2 75:11
81:7 101:6,10
101:11,20
trucks 8:15
39:12
true 104:10
try 42:9 45:6
46:1
trying 5:7 47:16
56:16 85:5
two 8:12 27:14
46:22 51:10
82:10,12
type 54:8 55:3
59:22
types 6:18
typewritten 84:9
84:13
typically 45:2
45:13

U
Uh-huh 36:8
40:21 43:10
46:10 47:24
52:9 57:9
69:5 82:21
88:24 102:12
undated 89:19
90:6,7,11
under 5:1 17:22
39:4 52:7
63:20 104:18
106:16
underneath 39:4
49:3 74:13
78:12 81:2
understand 6:2
9:21 16:1
24:22 25:5,9
30:3 52:7,11
52:15
understanding
12:4 15:22
31:9 42:17
56:1 77:18
78:19
understood 22:7
100:21,24
unincorporated
72:23 73:7
United 1:1,8
2:12 3:4 4:17
34:5 64:11
105:2
unless 93:23
104:18
unsettled 74:13

12

unstable 49:4
use 3:3 19:15,16
   45:11 60:8
   61:14 86:5,8
used 60:17,20
   66:20 76:21
   80:10
usually 6:20 7:4
   27:9 44:23
   54:25 71:24
   73:18 77:5,13
   80:11,13
utilities 13:20
   73:3,10,11,12
   73:14 78:11
   80:19
utility 14:1,2
   52:2 73:15,17
   78:9 79:15
utilize 77:25
   78:23
utilizes 45:22
U.S 2:9 4:2,9,17
   6:4 11:19
   19:20 33:13
   75:10 102:21
   106:1,22

            V
v 106:8
value 50:10
varies 6:20 7:3
   48:23 50:20
various 6:1 62:9
   79:13 86:1
vary 42:6
vehicle 37:24
versus 4:6 45:8
   51:16
very 6:11 34:23
   89:7 93:21
   98:22
Video 4:11
videographer 4:1
   4:10 41:4,11
   83:24 84:2
   103:5
view 39:25 40:4
violation 58:8
   58:17,20,22
virtue 12:20
vs 1:7 105:2

            W
W 75:13
waived 106:20
Walker 1:23 3:5
   4:9 104:4,23
   106:24
want 15:9 40:6
   46:5,5 47:4
   47:15 82:20
   86:15 88:4
   89:23 91:19
   92:9

wanted 12:23
   64:25 101:18
War 17:2
wasn't 7:25
waste 18:11,11
water 6:10 13:20
   18:7 19:14
   20:8,17,19
   22:11 29:19
   32:15,19
   37:25 48:24
   49:1,3,8,11
   49:14,16
   50:21,25
   70:17 71:2
   73:6 74:16
   80:13 81:1
waterways 53:7
way 31:12 36:15
   46:21 53:14
   75:15 76:23
   76:25 77:6,12
   77:13,18,19
   77:22 78:15
   78:17,19 81:5
   81:16,21,22
   81:23 85:20
   95:12 101:8
ways 77:14
wear 49:17
Web 45:16
week 51:11,16,17
weeks 70:14,23
Weiss 2:6 4:20
   106:6
well 14:1 15:8
   21:11 22:2
   29:24 31:12
   36:11 40:9
   41:23 48:7
   57:3 61:15
   62:22 65:7
   66:18 69:2
   73:2 77:13
   78:19 80:8,16
   81:21 87:9
   88:17,19 96:6
went 70:19 71:4
   71:4,5,6
   72:10 84:15
   84:17 92:21
were 2:1 9:14
   19:20,23 20:7
   21:9 23:5
   24:23 34:4
   38:19 39:19
   39:21 46:12
   46:16 47:12
   48:7 54:2
   62:1 63:1,2
   65:5,5 67:17
   69:9 72:17
   81:9 88:10
   91:14,21,22
   91:25 95:25

99:7 100:9,25
weren't 21:2
   23:10
west 1:19 5:13
   100:20 106:2
we'll 28:3 41:8
   45:1 52:11
   89:25 93:19
   102:13
we're 5:7 6:2
   36:3 39:18
   41:6,7,7,11
   44:24 80:6
   83:24 85:20
   97:15 98:12
we've 37:14
   56:20 87:16
whatsoever 100:9
whichever 106:18
while 15:10 49:8
   70:22 86:22
   86:25
whole 44:15
wide 48:9 50:6
Willard 7:4,17
   7:18 69:11
wish 106:15
wished 106:11
witness 3:1 4:24
   12:16 41:5
   42:11 66:23
   83:6 84:23,25
   87:17,23 88:2
   88:5 93:22
   96:21 97:10
   100:4 103:6
   104:7,8,11,20
   105:20 106:15
   106:17
witnesses 68:21
   91:5
WO 75:18
Wood 24:2,15,16
   25:4 26:16
   31:14 54:10
   54:11,13
Woods 24:14
word 86:8
words 53:21
   60:11 62:12
work 5:20 6:18
   10:19 20:1,23
   52:3 54:8,8
   55:3 56:22
   58:10,12
   67:15,25 68:6
   69:13 75:18
   75:18 82:18
   83:13 87:4,5
   87:13,14 88:7
   88:10,18,21
   88:25 89:4
   91:12 101:5
   101:18
worker 6:22 7:9

7:14
working 25:2,2
works 76:22
World 17:2
wouldn't 13:11
   26:7 57:18
   63:21 93:17
write 57:4 105:5
writes 57:18
writing 101:21
written 57:6
   58:16
wrong 27:12 98:3
wrote 57:20
   83:12
----------------
            X
X 3:9
----------------
            Y
yeah 13:12 23:7
   47:9 50:9
   53:21 70:23
   86:7 88:5
year 28:19 36:25
   37:13 48:14
   48:18 90:9
years 5:19 7:12
   7:16,20 25:17
   25:22 27:14
   31:4 35:12,13
   36:18 37:12
   52:20 53:18
   53:20 69:4
----------------
            $
$200 50:10
----------------
            0
0 64:4
06 75:17
07 64:5
08-80459-CIV...
   1:2 4:8 105:3
----------------
            1
1 3:17 8:16,18
   99:1,2 104:9
1st 63:7
1:40 1:20 103:8
10 3:22 25:17,22
   31:4 35:12
   36:18 39:20
   39:23 40:3
   43:2 53:18,20
   60:9 99:2
10:19 1:20 4:3
102 3:24
104 104:9
11 3:22 82:22
   83:5 84:6
11/21/08 89:2
11/30/11 104:23
12 3:23 84:8,11

84:13 106:3
12th 104:22
12/3/08 89:2
12/4/2008 88:20
13 3:23 79:5,7
   82:25 84:6
   93:20
14 3:24,25 16:25
   102:13,15
15 3:19
17 5:25
170 8:4 75:11
   81:10 86:6
18 5:19
19 16:24 17:1
1900 1:18 2:7
   106:6
1914 17:3,5
   66:16 76:12
   76:16 83:22
   102:24
1919 17:3
----------------
            2
2 3:18 9:15,17
   9:20 10:4
   96:11
2nd 8:5 75:11
   81:10 86:6
200 2:7 50:15,16
   106:1,6
2000 28:17 30:13
   30:14,15
2002 88:9,12
2004 13:24 14:5
2005 45:23
2006 28:19 69:2
   69:8 83:16
2007 28:17 45:23
   94:8 96:2
2008 89:6 90:9
   102:9
2009 1:20 4:2
   104:22 105:4
   105:22 106:3
   106:10
201 5:13
215 1:19
24 48:9 50:6
26 1:20 105:4
   106:10
26th 4:2
28 3:19
29th 28:16 90:9
----------------
            3
3 3:18 9:15,18
   10:1,4 96:11
   102:17
3.13 40:22 42:18
   42:21
30 3:20 106:18
32 3:20
33301 2:7 106:7

```
33394 2:11
33401 106:2
33431 5:14
33487 2:4
3370 76:4
356-7355 2:11
38 48:9 50:6
39 3:21,21,22

            4
4 3:19 15:19
  28:4

            5
5 3:13,19 28:4,6
  28:15,18 30:5
  31:23 39:11
  69:1,8 96:12
  102:9
50 44:25
50/50 44:24
500 2:10
515 106:1
561 2:4 75:11,16
  106:2

            6
6 3:20 30:10
6th 75:16
61 15:12

            7
7 3:20 31:24
  32:2,4,9
  96:12
700 2:10
7171 2:3
763-4242 2:8
79 3:23

            8
8 3:17,21 39:17
  39:23 40:1
  99:1,2
82 3:22,23
835-0220 106:2
835-3789 75:11
835-9473 75:16
84 3:23

            9
9 3:17,18,18,21
  39:20,23 43:3
  99:1,2
94 3:14
954 2:8,11
97 3:15
995-1966 2:4
```



J.R. CAMPBELL'S SUBDIVISION
A PORTION OF LOTS 3 THROUGH 6
SPECIAL PURPOSE SURVEY

CAULFIELD & WHEELER, INC.
CIVIL ENGINEERING - LAND SURVEYING
LANDSCAPE ARCHITECTURE
7900A W. PALMETTO PARK ROAD - SUITE 100A
BOCA RATON, FLORIDA 33433
PHONE (561)-392-1991 / FAX (561)-750-1452

EXHIBIT
C

*Thomas M. Black, P.E.*

*Consulting Engineer*

*3016 Seminole Street*
*Miami, Florida 33133*

*Telephone: 305-854-6972*
*Telefax: 305-854-7739*

December 22, 2009

Mr. Paul E. Wilson, Esq.
WICKER, SMITH, O'HARA,
    McCOY & FORD, P.A.
2900 Southwest 28th Terrace, 5th Floor
Miami, Florida  33133

          Re:    <u>Maria Teresa Osorio vs. United States of America,</u>
                  <u>City of Boca Raton and John & Dorothy Sedlak</u>
                  Your File No.:       64459-3

Dear Mr. Wilson:

Please consider this letter your requested report.

On December 3, 2009, I conducted an accident site inspection at the insured's premises located at 170 N.E. 2nd Street, Boca Raton, Florida.  More specifically, I examined the Post Office leased property on the west side of the Boca Raton Downtown Station Post office building which is used for Post Office loading and unloading operations, United States Postal Service (USPS) vehicle traffic, parking and related postal worker functions.

The following are my observations and opinions;

1. The Building was constructed in 1960, including the paved USPS operational and vehicle parking area on the west side of the building.  Public parking and a pedestrian way are provided on the East side of the building.  The north side of the building provides the entrance and exits for the public at large.

2. A. The building and West side paved area are grandfathered in to current Building Code drainage facility requirements.  Inspections were made by the Boca Raton Building and Zoning Department when the facilities were constructed and a Certificate of Occupancy was issued.  In fact the area was repaved in 1994 with permits granted and inspections made, and drainage was not an issue.



B. Article IV of the City of Boca Raton Development Regulations, Division 3, Drainage; Section 23-141, Requirements; Penalty (attached). This section applies (3)(b) when buildings are modified which alter the existing drainage flow. To my knowledge this has not occurred as is evidenced by various inspections made by the City over the years.

C. Article IV of the City of Boca Raton Development Regulations, Division 7. Swale Areas, Section 25-251 (attached). Maintenance of swale area. Swale area is defined under the City of Boca Raton's right-of-way construction and administration and Newsrack Regulations and reads;

In the right-of-way section it defines it as: "Swale area" means the portion of the right-of-way located between a private property line and the street curb or the edge of a paved road, including , but not limited to, sidewalks, bikeways, and driveways.

In the Newsrack Regulations it defines it as: "Swale" shall mean any area within a right-of-way which is not either a bike path, sidewalk, or roadway. The term shall also include any area within a roadway which is not open to vehicular travel.

The Pothole was located primarily on the easement with a small portion on the subject private property, neither of which is considered a swale area by definition, and therefore section 26-251 does not apply.

3. The subject pothole, likely recently formed, at the time of the accident of December 5, 2006, was on the South side of the paved area, approximately 15% on the private paved portion and 85% on the dedicated easement owned by the City of Boca Raton. That crowned paved easement roadway does deposit some rainwater after a heavy rain in the vicinity of the area where the pothole existed.

Engineering logic tells me that the pothole originated in the easement and spread to the subject private property since 85% of it was on the easement. Just as throwing a stone into a pond sends concentive circles that get wider, so could the growth of the pothole have taken place in that manner.

The Florida Building Code which applies to all jurisdictions in the State of Florida states, in part, "3401.6 Maintenance. All buildings, structures, electrical, gas, mechanical and plumbing systems both existing and new, shall be maintained in a safe and sanitary condition." The pothole was not a building or structure, in my opinion, and therefore not subject to the Code's maintenance requirement.

- 2-

4. Again, in my opinion, the private property portion of the area where the accident occurred was not intended to be used by the public at large for parking or pedestrian traversing, but rather was dedicated for the use of USPS vehicles and employees who were working in and on the property of the Post Office Building. A sign was posted on the exterior wall of the Post Office Building in the vicinity of the loading dock area that stated "no trespassing." (See my photo) There is no mandatory code that requires a property owner to identify and segregate portions of their premises that are off limits to the general public.

In addition, this area must be functional in order to accomplish loading and unloading of tractor trailers and trucks. Barriers such as fencing would reduce and at times eliminate that necessary flexible use.

5. Acceptable means of egress for the able bodied and handicapped are provided at the North main entrance to the building. The accident area is not considered part of the required means of egress by applicable Codes and Standards.

Please let me know if you have any questions.

Very sincerely,

THOMAS M. BLACK, P.E.

TMB/rm
Enclosed Photographs (20)